IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>BANK OF AMERICA CORP., et al.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 12-cv-00361-RMC |

UNITED STATES' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO WELLS FARGO BANK, N.A.'S MOTION TO ENFORCE THE CONSENT JUDGMENT

Pursuant to Local Civil Rule 7(b), plaintiff United States of America (the "United States" or "Government") respectfully submits this memorandum of points and authorities in opposition to defendant Wells Fargo Bank, N.A.'s ("Wells Fargo") Motion to Enforce the Consent Judgment (Nov. 1, 2012) (Dkt. No. 41) ("Wells Fargo's Motion" or the "Motion").

PRELIMINARY STATEMENT

Wells Fargo seeks an Order from this Court entering declaratory relief and enjoining the United States from pursuing pending litigation against the bank in the United States District Court for the Southern District of New York ("SDNY"). *See United States v. Wells Fargo Bank, N.A.*, 12 Civ. 7527 (JMF) (the "SDNY Action"). In the SDNY Action, the United States seeks to recover damages and penalties based upon hundreds of millions of dollars of losses suffered in connection with defaulted Federal Housing Administration ("FHA") home mortgage loans originated by Wells Fargo that the bank knew contained material violations of requirements established by the United States Department of Housing and Urban Development ("HUD") and FHA. According to Wells Fargo, it is entitled to the relief sought because the release that was included in the Consent Judgment entered by this Court on April 4, 2012, supposedly "wiped the

slate clean" between the parties, barring the Government from asserting the bank's liability for "a wide range of Wells Fargo conduct relating to its [FHA] mortgage loan portfolio." Wells Fargo's Statement of Points and Authorities in Support of Its Motion to Enforce the Consent Judgment at 1 (Dkt. No. 41-1) ("Wells Fargo D.C. Br."). As shown below, Wells Fargo's Motion seeks equitable relief which the applicable case law overwhelmingly rejects and, further, Wells Fargo's arguments wholly lack merit. Accordingly, Wells Fargo's Motion should be denied.

As a threshold matter, this Court should decline to entertain Wells Fargo's Motion for extraordinary equitable relief. It is well established that federal courts should not exercise equitable remedies where the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief. Here, Wells Fargo cannot genuinely dispute that it has an adequate remedy at law in the SDNY Action; indeed, the bank has moved to dismiss the complaint in that proceeding, asserting among its arguments the exact same grounds asserted here. Accordingly, based upon fundamental principles applicable to the entry of equitable relief, Wells Fargo's effort to have this Court construe the allegations in the SDNY Complaint and enjoin pursuit of the action pending in that court should be rejected.

Wells Fargo's Motion fails on the merits, as well. Wells Fargo's argument that the causes of action asserted by the Government in the SDNY Action are barred by the Consent Judgment release is flatly inconsistent with the plain language of the release. By its express terms, the release only bars the Government from asserting a very specific type of claim, i.e., where its "sole basis" is Wells Fargo's submission of a false annual certification in connection with maintaining its status as an FHA-approved Direct Endorsement Lender. The Government's complaint against Wells Fargo in the SDNY does not allege any such claim. Rather, the SDNY

Complaint is premised on Wells Fargo's knowing origination of loans insured by FHA that did not meet HUD-FHA requirements and which resulted in substantial losses to the FHA insurance fund. As such, the claims in the SDNY Complaint are not barred by the release. In fact, as shown below, these claims were expressly reserved in the release.

## BACKGROUND

### A. The Consent Judgment

On April 4, 2012, this Court entered a Consent Judgment among the United States, forty-nine states, the District of Columbia, and Wells Fargo.[1] Consent Judgment (Apr. 4, 2012) (Dkt. No. 14) ("Consent Judgment"). The Consent Judgment included numerous exhibits setting forth the terms of the parties' settlement. *See id*. (Exhibits A-H). One of the exhibits to the Consent Judgment – Exhibit F – was denominated as the "Federal Release," and included both descriptions of claims released by the United States under the terms of the settlement and express reservations of claims not released by the United States.

Of particular relevance for purposes of the SDNY Complaint and Wells Fargo's Motion is the release provision in paragraph 3(b) of the Federal Release, in which the United States released specific FHA loan origination claims only where liability was not premised on a loan containing a material violation of HUD-FHA requirements.[2] Consent Judgment, Ex. F, ¶ 3(b). Specifically, the United States released Wells Fargo from:

---

[1] This was one of five consent judgments entered by the Court on April 4, 2012, involving the five largest servicers of residential mortgages, one of which was Wells Fargo. *See* Dkt. Nos. 10-14.

[2] Although Wells Fargo apparently recognizes that paragraph 3(b) of the Federal Release is the key provision for purposes of its arguments, *see, e.g.*, Wells Fargo D.C. Br. at 7-8 (quoting paragraph 3(b)), Wells Fargo confusingly begins its discussion with excerpts from the definition of "Covered Origination Conduct," set forth in Section D of the Federal Release, Wells Fargo Br. at 6, even though paragraph 3(b) of the Federal Release makes no reference to "Covered Origination Conduct." *Compare* Federal Release ¶ 3(b) (no reference to "Covered

> [A]ny civil or administrative claims it has or may have and from any civil or administrative remedies or penalties (expressly including punitive or exemplary damages) it may seek or impose under FIRREA, the False Claims Act, and the Program Fraud Civil Remedies Act where the *sole basis for such claim or claims is that [Wells Fargo] submitted to HUD-FHA* prior to 11:59 p.m., Eastern Standard Time, on February 8, 2012 *a false or fraudulent annual certification* that the mortgagee had "conform[ed] to all HUD-FHA regulations necessary to maintain its HUD-FHA approval" (including, but not limited to, the requirement that the mortgagee implement and maintain a quality control program that conforms to HUD-FHA requirements), or "complied with and agree[d] to continue to comply with HUD-FHA regulations, handbooks, Mortgagee Letters, Title I Letters, policies, and terms of any agreements entered into with the Department under HUD's Direct Endorsement Program."

*Id.*, at F-17 (emphasis added). The Federal Release then clarified that the only claims being released were those based solely on the annual certification, i.e., those that did not allege the existence of a material underwriting violation:

> For avoidance of doubt, this Paragraph means that the United States is barred from asserting *that a false annual certification renders [Wells Fargo] liable under the False Claims Act and the other laws cited above for loans endorsed by [Wells Fargo] for FHA insurance* during the period of time applicable to the annual certification *without regard to whether any such loans contain material violations of HUD-FHA requirements*, or *that a false individual loan certification* that "this mortgage is eligible for HUD mortgage insurance under the Direct Endorsement program" *renders [Wells Fargo] liable under the False Claims Act for any individual loan that does not contain a material violation of HUD-FHA requirements*.

*Id.*, at F-17-18 (emphasis added). The Federal Release also confirmed that it did not bar any claims imposing liability based upon Wells Fargo's origination of loans that suffered from material underwriting violations:

> Paragraph [3(b)] does not . . . release, bar or otherwise preclude the right of the United States to pursue any civil or administrative claims or remedies it has or

---

Origination Conduct") *with* Federal Release ¶¶ 2(b) (releasing certain Covered Origination Conduct related to specific statutes), 2(c) (releasing certain Covered Origination Conduct related to FIRREA-based claims), 4 (releasing certain Veterans Affairs-related Covered Origination Conduct claims), 5 (releasing certain Department of Agriculture-related Covered Origination Conduct claims), 7 (releasing certain CFPB-related Covered Origination Conduct claims), 8 (releasing certain FTC-related Covered Origination Conduct claims).

> may have . . . against [Wells Fargo] . . . for conduct with respect to the insurance of residential mortgage loans that violates any laws, regulations, or other HUD-FHA requirements applicable to the insurance of residential mortgage loans by HUD, *including, but not limited to, material violations of any applicable HUD-FHA requirements with respect to an individual loan or loans*, except if and to the extent such claim, remedy or penalty is based solely on such entity's failure to provide HUD with an accurate annual certification as described above.

*Id.*, at F-18. The Federal Release further made clear that it did not bar the United States from introducing evidence of Wells Fargo's failure to comply with HUD requirements to prove the bank's knowledge that it was submitting insurance claims to FHA for loans that contained material underwriting violations:

> [Paragraph 3(b) does not . . . release, or otherwise bar the United States from introducing evidence of any alleged failure to comply with applicable HUD-FHA requirements, including, but not limited to, sufficient quality control, under-writing, or due diligence programs, in any way (including, but not limited to, for the purpose of proving intent) *in connection with any claim that there was a material violation(s) of applicable HUD-FHA requirements with respect to an individual loan or loans* that would subject [Wells Fargo] or an affiliated entity to liability under the False Claims Act or any other federal statutory or common law administrative or judicial claim.

*Id*.

Finally, the Federal Release expressly recognizes that there may be disputes between the parties concerning the use of statistical sampling of individual loans to calculate damages or establish material violations of HUD-FHA underwriting requirements and states:

> The parties agree that the issue of whether and to what extent the United States may use statistical sampling of individual loans or similar techniques for calculating damages or proving material violations of HUD-FHA underwriting requirements with respect to a pool of loans is not addressed by the Consent Judgment and shall be governed by the law of the relevant administrative or judicial forum of any future dispute.

*Id*, at F-18-19.

B. The SDNY Complaint and Wells Fargo's Response

On October 9, 2012, the United States filed a complaint against Wells Fargo in the U.S. District Court for the Southern District of New York. *United States v. Wells Fargo Bank, N.A.*, No. 12-cv-7527 (S.D.N.Y.) (Oct. 9, 2012) (Dkt. No. 1) ("SDNY Complaint"). The SDNY Complaint alleges that Wells Fargo violated the False Claims Act, 31 U.S.C. § 3729 *et seq.*; predicate statutes for purposes of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, 12 U.S.C. § 1833a; and is subject to liability under various common law theories based on its origination of loans that contained material violations of HUD requirements and subsequent submission and causing of the submission of claims for insurance to FHA when the seriously deficient loans defaulted.

For purposes of establishing Wells Fargo's knowledge that it was submitting false claims for FHA insurance, the SDNY Complaint divides the deficient loans into two categories. First, the United States alleges that between January 2002 and December 2010, Wells Fargo identified, through its Quality Assurance process, 6,558 FHA loans that contained material violations of HUD-FHA requirements and therefore were ineligible for FHA insurance. SDNY Complaint ¶¶ 115-131. With respect to these loans, Wells Fargo had already falsely certified to HUD that the loans had been properly originated and underwritten and were eligible for FHA insurance. *Id.* ¶¶ 147, 154. Upon learning that these loans contained significant deviations from the specific loan program parameters and/or misrepresentations or significant risk factors, Wells Fargo nonetheless failed to self-report 6,320 of these deficient loans to HUD as required by HUD regulations. *Id.* ¶ 127. Furthermore, Wells Fargo never corrected its individual loan certifications for these 6,320 deficient loans and, with respect to the loans from this group that the bank sold to third parties, Wells Fargo never informed those third parties that the loans

contained material violations of HUD-FHA program requirements. *Id.* ¶¶ 146-148, 153-154. Instead, when any of these 6,320 deficient loans defaulted, Wells Fargo submitted, or caused the third party that purchased the loan to submit, a false claim to HUD for FHA insurance. *See, e.g.*, SDNY Complaint, ¶¶ 115-131, 144-156 and Ex. A (listing the 6,320 individual loans that Wells Fargo knew contained material violations of HUD-FHA requirements and were the subject of false individual loan certifications).

Second, the United States alleges that from May 2001 through October 2005, Wells Fargo originated thousands of retail FHA mortgage loans that did not meet FHA requirements, knowingly certified falsely to HUD that these individual mortgage loans were eligible for FHA insurance, and knowingly submitted, and caused third parties to submit, false claims for insurance when these seriously deficient individual loans containing material violations of HUD-FHA requirements defaulted. *See* SDNY Complaint, ¶¶ 42-114. The SDNY Complaint highlights a litany of information that Wells Fargo's management learned through internal reviews and other processes about the poor quality of the retail FHA loans that the bank was originating, including the fact that Wells Fargo's own post-closing random sampling of these loans revealed that for certain months nearly one-half of the retail FHA loans that the bank certified as being FHA-compliant had not been properly underwritten, contained unacceptable risk, did not meet the applicable HUD-FHA requirements, and were not eligible for FHA insurance. *See id.* ¶¶ 50, 85. The SDNY Complaint further alleges that Wells Fargo knew that its underwriters routinely failed to perform basic due diligence, failed to verify information in the loan file that bore directly on the borrower's ability to make payments on the mortgage, and repeatedly certified for FHA insurance individual mortgage loans that contained serious defects and departures from HUD's underwriting standards. *See id.* ¶¶ 40-51, 80-85. Nonetheless,

Wells Fargo's management failed to take prompt and effective action. *See id.* ¶¶ 41, 47. Rather, the SDNY Complaint alleges, the extremely poor quality of Wells Fargo's loans was exacerbated by the bank's hiring of temporary underwriters to approve an ever-increasing quantity of FHA loans; failure to provide its inexperienced staff with proper training; payment of improper bonuses to its underwriters to incentivize them to approve as many FHA loans as possible; and pressuring of loan officers and underwriters to originate and approve more and more FHA loans as quickly as possible. *See id.* ¶¶ 42-51. The SDNY Complaint seeks to recover for the tens of thousands of individual retail FHA-insured mortgages containing material violations of HUD-FHA requirements that Wells Fargo falsely certified as being eligible for FHA insurance and for which the bank submitted, or caused the submission of, false claims to the United States for insurance after the loans defaulted. *See id.* ¶¶ 132-143.

Wells Fargo has responded to the filing of the SDNY Complaint by pursuing relief in *two* separate federal district courts. On November 1, 2012, it filed the Motion in this Court, in which it asks this Court to enter declaratory and injunctive relief to bar the United States from pursuing its claims in the SDNY Complaint. *See* Wells Fargo D.C. Motion at 2; Wells Fargo D.C. Br. at 20-22. Four days later, on November 5, 2012, it sought and obtained from the Honorable Jesse M. Furman in the Southern District of New York an unopposed extension of the page limitation for a motion to dismiss to be filed in his court. SDNY Action (Dkt. No. 5) (Order at Conclusion of Endorsed Letter to Judge Furman). In its letter to Judge Furman, Wells Fargo advised the court that it intended to include the very same arguments to that federal district court as are set forth in its Motion before this Court:

> In addition, Wells Fargo's Motion to Dismiss will brief a substantial *res judicata* defense that arises out of Wells Fargo's settlement with the United States approximately seven months ago in a separate action in the United States District

> Court for the District of Columbia. Wells Fargo contends that conduct alleged in the Complaint in this action was released in the prior settlement.

*Id.* at 2 (footnote omitted).[3]

On November 16, 2012, Wells Fargo filed its motion to dismiss in the SDNY Action, *see* Wells Fargo's Notice of Motion to Dismiss (Dkt. No. 14), and its lead argument is that the "U.S. release bars all claims alleged in the complaint," Wells Fargo Bank, N.A.'s Memorandum of Law in Support of Its Motion to Dismiss at 9 (Dkt. No. 15) ("Wells Fargo SDNY Br."). Wells Fargo expressly argues to Judge Furman that "*Res judicata* is an affirmative defense and is properly raised in a motion to dismiss." *Id.* at 12 n. 7. Thus, Wells Fargo has already placed before Judge Furman the issue that it seeks to have addressed in its Motion before this Court. *See id.* at 2 (asserting, as first argument to the SDNY court, "The Complaint as pled should be dismissed on this ground [*i.e.*, the Federal Release] alone.").

## ARGUMENT

### I. The SDNY Court Is the Proper Forum for Determining Whether Claims Asserted in the SDNY Complaint Have Been Released

Wells Fargo's Motion seeks extraordinary relief from this Court. Notwithstanding that Wells Fargo has an adequate remedy at law to address its concern, Wells Fargo asks this Court to enjoin proceedings in another federal district court in which it may obtain such relief. This Court should reject Wells Fargo's request that it exercise its equitable powers to alter the conduct of litigation in the SDNY.

[3] In a footnote to the letter, Wells Fargo advised Judge Furman that it was also pursuing relief through its Motion in this Court.

A. This Court Should Decline to Enter the Equitable Relief Sought by Wells Fargo Because the Bank Has Available an Adequate Remedy at Law, Which It Is Pursuing in the Southern District of New York Litigation

Wells Fargo's Motion expressly seeks only equitable relief from this Court. In its Motion, Wells Fargo advises that it "specifically seeks declaratory relief" and "an order enjoining the United States from pursuing causes of action, such as the ones pled in the [SDNY] complaint, that are based on annual certification conduct released in the Consent Judgment." Wells Fargo D.C. Motion at 2. Wells Fargo further confirms this in its supporting memorandum. Wells Fargo D.C. Br. at 20-21.

There can be no genuine dispute that the requested relief is equitable in nature. Wells Fargo's prayer for declaratory and injunctive relief seeks the Court's exercise of its equitable powers. *See, e.g.*, *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 331 (4th Cir. 2006) ("To be sure, injunctive and declaratory relief are equitable remedies."); *FEC v. Christian Coalition*, 965 F. Supp. 66, 72 (D.D.C. 1997) (distinguishing case cited by defendants and characterizing declaratory and injunctive relief "[a]s an exclusively equitable remedy"). Nor can there be a genuine dispute that Wells Fargo may seek relief from the SDNY Complaint through legal remedies. *E.g.*, Fed. R. Civ. P. 8(c)(1) (in answering complaint, defendant is required to "affirmatively state any . . . affirmative defense, including . . . release . . . ."). In fact, Wells Fargo is relying upon a "substantial *res judicata* defense" in its motion to dismiss in the SDNY, Endorsed Letter to Judge Furman, page 2 (footnote omitted),[4] asserting that the conduct alleged in the SDNY Complaint was released in the Consent Judgment, Wells Fargo SDNY Br. at 9-11.

[4] The United States relies upon Wells Fargo's statements solely to demonstrate that even the bank recognizes that it may seek relief from Judge Furman with respect to the complaint pending in the SDNY.

It is axiomatic that federal courts should exercise equitable remedies only in extraordinary cases and should defer to legal remedies where they are available. *See, e.g.*, *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) ("It is a 'basic doctrine of equity jurisprudence that courts of equity should not act . . . when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief.'" ) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 499 (1974), and *Younger v. Harris*, 401 U.S. 37, 43-44 (1971)) (ellipsis in *Morales* opinion); *JMM Corp. v. District of Columbia*, 378 F.3d 1117, 1121 (D.C. Cir. 2004) (same) (quoting *Younger*, 401 U.S. at 43-44); *American Road & Transportation Builders Ass'n v. EPA*, 865 F. Supp. 2d 72, 84 (D.D.C. 2012) (dismissing complaint seeking declaratory judgment because Clean Air Act provided plaintiff with adequate remedy at law).

Because Wells Fargo has an adequate remedy at law in the SDNY Action – and in fact has moved to dismiss the SDNY Complaint based, among other things, on the bank's contention that the claims at issue were released – this Court should decline to entertain Wells Fargo's Motion.

### B. Wells Fargo's Motion Is Particularly Objectionable Because It Asks This Court to Enter the Equivalent of an Antisuit Injunction Affecting Litigation Already Pending in Another Federal District Court

While well-established law confirms that Wells Fargo's Motion should be denied because it seeks equitable relief notwithstanding the availability of an adequate legal remedy, the Motion is particularly objectionable because it essentially asks this Court to make crucial determinations regarding the viability of a case currently pending in another federal district court. Indeed, by requesting that this Court enjoin the United States from litigating its complaint in the SDNY, Wells Fargo is asking this Court to enter the equivalent of an antisuit injunction; the only substantive difference between Wells Fargo's request and the request in a typical antisuit

injunction case is that Wells Fargo seeks to enjoin the prosecution of an action *in another federal district court*, rather than in a wholly different court system.

In *Laker Airways, Ltd. v. Sabena, Belgian World Airlines,* 731 F.2d 909 (D.C. Cir. 1984), the Court of Appeals instructed:

> There are no precise rules governing the appropriateness of antisuit injunctions. The equitable circumstances surrounding each request for an injunction must be carefully examined to determine whether, in light of the principles outlined above, the injunction is required *to prevent an irreparable miscarriage of justice*. Injunctions are most often necessary *to protect the jurisdiction of the enjoining court*, or to *prevent the litigant's evasion of the important public policies of the forum*.

*Id.* at 927 (emphasis added). *See also Goss International Corp. v. Man Roland Druckmaschinen Aktiengesellschaft*, 491 F.3d 355, 359-60 (8th Cir. 2007) (contrasting "conservative" approach, followed in D.C. Circuit and others, where foreign antisuit injunctions are rarely authorized, with "liberal" approach where such injunctions require a showing of "necess[ity] to prevent duplicative and vexatious foreign litigation and to avoid inconsistent judgments").[5]

Wells Fargo cannot establish the unusual circumstances that must exist before any federal court should consider issuing an antisuit injunction. No "irreparable miscarriage of justice" will result if this Court declines to entertain the arguments in the Motion, particularly given that the same arguments are already before the federal district court in New York. Further, because two federal district courts are involved, Wells Fargo's Motion is not designed to protect the jurisdiction of American federal courts or public policies of the federal judicial system in general, or this Court in particular. To the contrary, Wells Fargo's motion would require this Court to construe the allegations pled in the matter before Judge Furman to determine if they run

[5] Wells Fargo's Motion would not even satisfy what the *Goss Int'l Corp.* court described as the "liberal" approach in considering antisuit injunctions.

afoul of the Federal Release and, if so, to enjoin the conduct of litigation in another federal district court. That request does not remotely satisfy the standards described by *Laker Airways* for issuance of an antisuit injunction.[6]

### C. The United States' Opposition to the Relief Sought by Wells Fargo's Motion Does Not Require This Court to Disregard the Consent Judgment's Jurisdiction and Venue Provisions

In urging the Court to reject Wells Fargo's request for declaratory and injunctive relief, the Government is not asking the Court to disregard the Consent Judgment's provisions regarding jurisdiction and venue. Consent Judgment ¶ 13 ("This Court retains jurisdiction for the duration of this Consent Judgment to enforce its terms."); Federal Release ¶ 20, at F-43 ("The exclusive jurisdiction and venue for any dispute arising out of matters covered by this Release is the United States District Court for the District of Columbia."); *see* Wells Fargo D.C. Br. at 4. The Consent Judgment's statement that this Court retains jurisdiction to enforce its terms for its duration is not remarkable. Such provisions serve a valuable purpose in judgments requiring future performance by a party. *See generally Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 381 (1994) (ancillary jurisdiction exists where "parties' obligation to comply with the terms of the settlement agreement ha[ve] been made part of the order of dismissal-either by

---

6 Wells Fargo's inapposite case citations do not warrant a different conclusion. *See* Wells Fargo D.C. Br. at 21-22; *United States v. International Brotherhood of Teamsters*, 907 F.2d 277, 279 (2d Cir. 1990) (affirming permanent injunction maintaining jurisdiction in SDNY over disputes between union members and the Government related to labor racketeering Consent Decree that, among other things, appointed trustees to conduct union affairs and prevent criminal conduct, where various union members "began litigation in other district courts challenging the actions" of those appointed trustees); *FDIC v. Bank of New York*, 479 F. Supp. 2d 1, 13, 20 (D.D.C.) (enjoining re-litigation, in state court interpleader seeking collection of receivables, of "issue of whether early amortization under the Master Indenture's ipso facto clause is enforceable" because court in prior, settled action became "intimately familiar with the parties, their dispute, and the relevant law" through the course of extensive motion practice, and that issue had been "submitted for judicial determination and actually and necessarily determined[,]" but denying injunction against state court litigation of other issues related to subject) (internal citation and quotation marks omitted), *aff'd*, 508 F.3d 1 (D.C. Cir. 2007).

separate provision (such as a provision 'retaining jurisdiction' over the settlement agreement) or by incorporating the terms of the settlement agreement in the order").

Here, the Consent Judgment entered with respect to each of the five servicers requires future performance by the servicers. For example, the Consent Judgment includes requirements that the settling servicers reform their servicing practices. *E.g.*, Consent Judgment, Exhs. A ("Servicing Standards"), D ("Consumer Relief Requirements") and H (Servicemembers Civil Relief Act provisions). The Consent Judgment preserves the ancillary jurisdiction of this Court to enforce these obligations and makes clear that this Court would be the proper and exclusive forum for doing so.

Although Wells Fargo styles its pleading as a motion to enforce the Consent Judgment, it is not truly seeking to enforce the currently existing judgment, as would be the case where, for example, the United States sought to enforce a servicer's future performance obligations under the Consent Judgment. In substance, Wells Fargo's motion pleads an affirmative defense of release or accord and satisfaction. The bank, however, has an available legal remedy before Judge Furman to obtain such relief and, indeed, is currently pursuing that remedy. Wells Fargo's Notice of Motion to Dismiss (S.D.N.Y.) (Nov. 16, 2012) (Dkt. No. 14). Accordingly, requiring Wells Fargo to pursue its legal remedy would not contradict the Consent Judgment's provisions regarding jurisdiction and venue.[7]

---

[7] Wells Fargo's reliance on paragraph 20 of the Federal Release is also misplaced because paragraph 20 is limited to "disputes arising out of matters covered by th[e] Release," and does not extend to disputes over the scope of the release. Such an overly broad construction would mean that any of the settling servicers *in any action brought in any federal district court* could invoke this Court's jurisdiction simply by asserting that the lawsuit's claims were subject to an affirmative defense, such as release or accord and satisfaction, by virtue of the Consent Judgment.

## II. The Federal Release Does Not Bar Any of the Claims Alleged in the SDNY Action

### A. Rules of Contract Interpretation

As Wells Fargo correctly recognizes, the meaning and import of the Federal Release are to be determined under basic principles of contract interpretation. Wells Fargo D.C. Br. at 4. "Under general contract law, the plain and unambiguous meaning of an instrument is controlling, and the Court determines the intention of the parties from the language used by the parties to express their agreement." *A-J Marine, Inc. v. Corfu Contractors, Inc.*, 810 F. Supp. 2d 168, 185 (D.D.C. 2011) (internal citation omitted); *see also Washington Metropolitan Area Transit Authority v. Mergentime Corp.*, 626 F.2d 959, 961 (D.C. Cir. 1980) (same). "In performing this task, the Court should construe the contract as a whole so as to give meaning to all of the express terms." *A-J Marine,* 810 F. Supp. 2d at 185. "Where the contract is unambiguous, as evidenced by the plain language of the contract, the court's inquiry is at an end, and the plain language of the contract controls." *Red Lake Band of Chippewa Indians v. U.S. Dept. of Interior*, 624 F. Supp. 2d 1, 15 (D.D.C. 2009); *accord Washington Metropolitan Area Transit Authority*, 626 F.2d at 961.

Moreover, a "cardinal principle of contract construction [is] that a document should be read to give effect to all its provisions and to render them consistent with each other." *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 (1995). "In so doing, the Court is mindful that it 'must give reasonable meaning to all parts of the contract and not render portions of the contract meaningless.'" *Pfeiffer v. Duncan*, 659 F. Supp. 2d 160, 166 (D.D.C. 2009) (quoting *YRT Services Corp. v. United States*, 28 Fed. Cl. 366, 389 (1993)).

B. The Claims Asserted in the SDNY Action Are Not Barred by, and in Fact Are Expressly Reserved in, the Federal Release

Wells Fargo's assertion that the claims asserted by the United States in the SDNY Action are barred by the Federal Release is flatly inconsistent with the express terms of the release. A review of the operative language confirms that Wells Fargo was released only from a narrow set of claims, i.e., claims in which the United States seeks to hold Wells Fargo liable for loans that contained no material violation of HUD-FHA requirements based upon the bank's submission of a false *annual* certification to HUD regarding its loan origination and due diligence procedures. Specifically, the Federal Release bars the United States from commencing a civil or administrative action where the "*sole basis*" for such claim or claims is that Wells Fargo submitted a false or fraudulent annual certification to HUD. Federal Release ¶ 3(b), F-16-17. That is the entire extent of the Federal Release in the operative paragraph (¶ 3(b)), and it plainly does not preclude the claims alleged in the SDNY Action, which assert Wells Fargo's liability for individual FHA loans that contain material violations of HUD-FHA requirements. *See* SDNY Complaint ¶¶ 132-195.

"For avoidance of doubt," the Federal Release goes on to expressly spell out the two types of claims that are barred: (a) claims that "a false annual certification renders [Wells Fargo] . . . liable under the False Claims Act and the other laws cited above for loans endorsed by Wells Fargo . . . without regard to whether any such loans contain material violations of HUD-FHA requirements," and (b) claims that Wells Fargo's submission of a "false individual loan certification . . . renders [Wells Fargo] liable under the False Claims Act for any individual loan that does not contain a material violation of the HUD-FHA requirements." Federal Release ¶ 3(b), F-17-18. Under both of these prongs, the claims that are barred are ones in which the United States is asserting blanket liability on Wells Fargo's part for defaulted FHA loans based

on false certifications alone without regard to whether the underlying loans contained material violations of HUD requirements.[8] Stated differently, claims in which the United States is seeking to hold Wells Fargo liable for individual loans that contain material violations of HUD-FHA requirements – like the claims alleged in the SDNY Complaint – are not released.

This is made abundantly clear again in the next sentence of the Federal Release, which describes the claims that are reserved. That provision states that the Federal Release does not "release bar, or otherwise preclude the United States" from asserting Wells Fargo's civil liability for conduct in connection with the FHA program that "violates any laws, regulations or other HUD-FHA requirements applicable to the insurance of residential mortgage loans by HUD, including, but not limited to *material violations of any applicable HUD-FHA requirements with respect to an individual loan or loans*," except to the extent that the claim is based solely on Wells Fargo's failure to provide an accurate annual certification. Federal Release ¶ (3)(b), F-18 (emphasis added). Thus, consistent with the prior two provisions, this reservation of rights plainly permits the United States to sue Wells Fargo for individual FHA loans that contain material violations of HUD-FHA requirements, as was done in the SDNY Action.

---

[8] The release for this blanket theory of liability based on the false annual certification was significant. If the Government successfully asserted a claim that had as its "sole basis" the false annual certifications, it could recover treble damages for *all* FHA claims paid on loans certified by Wells Fargo as FHA-compliant during those years, regardless of whether the individual loans contained material violations of HUD requirements. *See generally* SDNY Complaint ¶ 42 (noting that just between January 1, 2001 and December 31, 2002, Wells Fargo originated or sponsored about 225,000 FHA loans). The Government asserted a False Claims Act claim for recovery relying, in part, on the annual certification theory, in *United States v. Deutsche Bank AG,* 11 Civ. 2976 (LAK) (S.D.N.Y.) (filed May 3, 2011). *See, e.g., id.* Amended Complaint, ¶¶ 154-58 (Aug. 22, 2011) (Dkt. No. 15); *id.* Memo of Law in Opp. to Mot. to Dismiss Am. Cmplt. at 24 (Nov. 1, 2011) (Dkt. No. 29) ("Defendants are liable for all claims paid following the Government's granting of the benefit of DEL status regardless of whether those claims are themselves true or false."). The SDNY Complaint asserts no such claim, however, because that is precisely the claim that Wells Fargo was spared by the Federal Release.

Further, the next reservation of rights provision states that nothing in Paragraph 3(b) shall be construed as barring the United States from "introducing evidence of any failure to comply with applicable HUD-FHA requirements, *including, but not limited to, sufficient quality control, underwriting, or due diligence programs, in any way (including, but not limited to, for the purpose of proving intent) in connection with any claim that there was a material violation(s) of applicable HUD-FHA requirements with respect to an individual loan or loans*." Federal Release ¶ (3)(b), F-18 (emphasis added). This is what the United States pled in the SDNY Action.

In particular, in Counts 1 and 2 of the SDNY Complaint, the Government alleges that between May 2001 and October 2005, Wells Fargo violated HUD's underwriting and due diligence requirements with respect to tens of thousands of retail home mortgage loans that it certified for FHA insurance; that Wells Fargo senior management was aware of the reckless origination and underwriting practices and, instead of taking immediate action to address the problems, allowed them to continue; that Wells Fargo exacerbated the loan quality issues by focusing on quantity of loans originated, instead of quality, in hiring temporary underwriters to churn out more loans, failing to provide its inexperienced staff with proper training, paying improper bonuses to underwriters to incentivize them to approve as many FHA loans as possible, and applying pressure on loan officers and underwriters to originate and approve more and more FHA loans as quickly as possible; that to avoid scrutiny, Wells Fargo failed to notify HUD of the bank's serious loan quality problems; and that Wells Fargo submitted and caused the submission of false claims for FHA insurance with respect to thousands of defaulted FHA loans that the bank knew contained material violations of HUD-FHA requirements. SDNY Complaint ¶¶ 42-114, 132-143.

Likewise, in Counts 3 and 4 of the SDNY Complaint, the Government alleges that Wells Fargo internally identified 6,558 FHA loans that contained material violations of HUD-FHA requirements and therefore were ineligible for FHA insurance; that Wells Fargo had already certified (falsely) to HUD that these loans had been properly originated and underwritten and were eligible for FHA insurance; that upon learning that these loans contained significant deviations from the specific loan program parameters and/or misrepresentations or significant risk factors, Wells Fargo nonetheless failed to self-report 6,320 of these deficient loans to HUD as required by HUD regulations; that Wells Fargo never corrected its individual loan certifications for these 6,320 deficient loans and, with respect to the loans from this group that Wells Fargo sold to third parties, never informed those third parties that the loans contained material violations of HUD-FHA program requirements; and that when any of these 6,320 deficient loans defaulted, Wells Fargo submitted, or caused the third party that purchased the loan to submit, a false claim to HUD for FHA insurance. *See, e.g.*, SDNY Complaint, ¶¶ 115-131, 144-156 and Ex. A.[9]

Because these claims, which assert liability for individual FHA loans which contain material violations of HUD-FHA requirements, are expressly reserved in and not released by the Federal Release, Wells Fargo's Motion should be denied. *See generally Washington Metropolitan Area Transit Authority*, 626 F.2d at 961 (plain and unambiguous meaning of an instrument is controlling); *A-J Marine*, 810 F. Supp. 2d at 185 (court determines the intention of the parties from the language used to express their agreement).

[9] The claims in the remainder of the SDNY Complaint are based on the same facts and similar legal theories. *See* SDNY Complaint ¶¶ 157-195.

C. Wells Fargo's Arguments Contradict the Plain Language of the Federal Release

Wells Fargo's assertions that the Federal Release "wiped the slate clean" in terms of the bank's liability for its misconduct in originating and sponsoring FHA loans "except in carefully crafted narrow circumstances," Wells Fargo D.C. Br. at 1, and "bar[s] the United States from bringing" the claims asserted in the SDNY Action, *id.* at 5, are simply wrong. In multiple places in its brief, Wells Fargo sets out what it claims are the four key tenets of the Federal Release, *see id.* at 1-2, 8; *see also id.* at 5; however, tellingly, Wells Fargo does not quote the release when it sets out these principles. That is because, with one exception, these tenets are not supported by the plain language of the release and do not represent the agreement struck by the parties.

First, Wells Fargo insists that the Federal Release bars the United States from bringing any claim "based on *conduct* covered by Wells Fargo's annual certification to HUD regarding its FHA program participation, such as conduct related to Wells Fargo's quality control (including self-reporting), underwriting, and due diligence programs." *Id.* at 1 (emphasis added). This is simply wishful thinking. The Federal Release released claims, not conduct. *See* Federal Release ¶ 3(b), F-16-17 (releasing Wells Fargo where the "sole basis" of any "claim or claims" is the submission of a false annual certification). In fact, Paragraph 3(b) does not use the word conduct, except with respect to the claims that the United States is reserving against Wells Fargo. *See id.*, F-18 (reserving civil claims against Wells Fargo for "conduct with respect to the insurance of residential mortgage loans that violates any laws, regulations or other HUD-FHA requirements . . .").

Moreover, nothing in the Federal Release remotely suggests that the United States released Wells Fargo for all conduct covered by the annual certification, including misconduct in connection with its underwriting of FHA loans, quality control (including self-reporting), and

due diligence. Rather, what the Federal Release says is that Wells Fargo is released only where the "sole basis" of the claim is the submission of a false annual certification. *Id.*, F-17. This is repeated again in the "For avoidance of doubt" provision, which also makes clear that the only claims that are being released are ones in which the United States seeks to hold Wells Fargo liable for defaulted FHA loans based only on the submission of a false certification without regard to whether the underlying loans contained a material violation of HUD-FHA requirements. *See id.*, F-17-18 (barring claims asserting that false annual certification or false individual loan certification renders bank liable for individual FHA loan that "does not contain a material violation of HUD-FHA requirements"). And, as demonstrated above, the Federal Release expressly reserves the United States' ability to bring claims against Wells Fargo for defaulted FHA loans that contain a material violation of HUD-FHA requirements, s*ee id.*, F-17-18, and expressly permits the United States to introduce evidence of Wells Fargo's inadequate "quality control, underwriting, or due diligence programs" for any purpose, including to prove Wells Fargo's intent, in connection with "any claim that there was a material violation(s) of applicable HUD-FHA requirements with respect to an individual loan or loans that would subject [Wells Fargo] . . . to liability under the False Claims Act," *id.*, F-18. This is even further reinforced by the parties' agreement to disagree with respect to the use of statistical sampling in future cases brought by the United States against Wells Fargo to "prov[e] material violations of HUD-FHA underwriting requirements with respect to a pool of loans." *See id.*, F-18-19. The parties thus plainly understood that the United States could pursue claims against Wells Fargo for individual loans that contain a material violation of HUD-FHA requirements.[10]

[10] Wells Fargo's suggestion that the Federal Release must be broad because of the "unprecedented" amount that Wells Fargo paid as its share of the settlement is mistaken. *See* Wells Fargo D.C. Br. at 8-9; *id*. at 1, 2, 23. The language of the Federal Release, not the amount paid, controls. Moreover, as discussed above, the release of the annual certification claim

Wells Fargo's second tenet is actually correct: "The United States cannot bring a claim against Wells Fargo based on alleged false individual FHA loan-level certifications unless those mortgage loans have a 'material violation[] of applicable HUD-FHA requirements.'" Wells Fargo D.C. Br. at 2; *see id.* at 8 (same). This tracks the language of the Federal Release. *See* Federal Release ¶ 3(b), F-17-18. Consistent with the Federal Release, the United States' claims in the SDNY Complaint are limited to losses that resulted from loans containing material violations of HUD-FHA requirements.

Wells Fargo's remaining tenets, though, are again completely at odds with the language of the Federal Release. As its third and fourth tenets, Wells Fargo admits that the United States may bring a claim against Wells Fargo for individual loans that contain a material violation of applicable HUD-FHA requirements but restricts those claims to only those instances where "the United States can prove that the individual Wells Fargo underwriter who handled the loan certified that 'this mortgage is eligible for HUD mortgage insurance under the Direct Endorsement program' knowing that the certification was false." Wells Fargo D.C. Br. at 2; *see id*. at 8. This assertion is wrong for a host of reasons.

Most fundamentally, it finds no support in the language or terms of the Federal Release. Although Wells Fargo is correct in conceding that the Federal Release permits the United States to bring claims against the bank for individual loans containing material violations, the release in no way restricts the manner in which the Government may prove any such causes of action. Nothing in the Federal Release states that the Government must prove its claims only through the knowledge of the individual underwriters who certified each loan. Indeed, Wells Fargo can point

---

relieved the bank from facing potentially massive liability for all of its defaulted FHA loans that were originated between 2002 and 2010, *see* note 8, *supra*, and the bank received value for the many additional claims that were released in the Consent Judgment, including but not limited to claims for the covered servicing conduct and the covered bankruptcy conduct.

to no language in the Federal Release which supports that position, because the bank's assertion is made out of whole cloth.

In fact, the Federal Release provides otherwise. In the first prong of the reservation of rights provision, the Federal Release expressly permits the United States to bring claims against Wells Fargo for "material violations of any applicable HUD-FHA requirements with respect to an individual loan or loans," Federal Release ¶ 3(b), F-18, and the only limitation placed on those claims is that they cannot be based "solely on [Wells Fargo's] failure to provide HUD with an accurate annual certification," *id.* There is no mention of a requirement that knowledge and intent can only be proven through the individual underwriter.

Likewise, the second prong of the reservation of rights provision states that the Federal Release does not bar the United States from "introducing evidence of any alleged failure to comply with applicable HUD-FHA requirements" for any purpose, including for the purpose of proving intent, "in connection with any claim that there was a material violation(s) of applicable HUD-FHA requirements with respect to an individual loan or loans." *Id.* Accordingly, this provision expressly contemplates that the United States may prove the bank's fraudulent intent with respect to individual loans through evidence of insufficient "quality control, underwriting or due diligence programs," *id.*, and there again is no reference to the knowledge and intent of the individual underwriters as asserted by Wells Fargo.[11] And the parties agreed to disagree with respect to the use of statistical sampling to prove material violations of HUD-FHA underwriting requirements and calculate damages – a provision that would be unnecessary if, as Wells Fargo

[11] Wells Fargo's assertion, as its fourth tenet, that evidence of insufficient "quality control, underwriting or due diligence programs" may only be used to prove the intent of the individual underwriter who certified the loan at issue, Wells Fargo D.C. Br. at 2, 8, thus is completely unsupported by the Federal Release.

contends, the only way to establish a false claim is through the knowledge and intent of the individual underwriter. *See id.*, F-18-19.

At bottom, Wells Fargo is not really arguing that the Government's claims in the SDNY Action are barred by the Federal Release, but rather is seeking to raise a legal issue to this Court with respect to the type of proof necessary to establish those claims. That is patently improper as any such arguments relating to the sufficiency of the SDNY Complaint can and should be made to Judge Furman. Indeed, Wells Fargo has asserted the exact same insufficiency argument in its motion to dismiss the SDNY Complaint under the rubric of failure to plead fraud with particularity. *See* Wells Fargo SDNY Br. at 3, 17-19 (arguing under Fed. R. Civ. P. 9(b) that the Government's complaint is subject to dismissal for failure to allege the identity, knowledge and intent of each individual underwriter).

To be clear, however, Wells Fargo's novel assertion concerning the level of knowledge and intent that the Government must prove to establish its False Claims Act claims in the SDNY is not the law. The scienter of the individual underwriters who signed the individual loan certifications is not a necessary element of the Government's False Claims Act claims. *See United States ex rel. Bledsoe v. Community Health Systems, Inc.*, 501 F.3d 493, 506, 509 (6th Cir. 2007) (to properly allege a claim under the False Claims Act plaintiff need not plead the identity of the specific individual employees within the defendant corporation who submitted false claims to the government); *United States v. Huron Consulting Group*, 2011 WL 253259, at *2-3 & n.3 (S.D.N.Y. Jan. 24, 2011) (unreported) (same); *see also United States ex rel. Folliard v. CDW Technology Services, Inc.*, 722 F. Supp. 20, 32 (D.D.C. 2010) (rejecting argument that

Rule 9(b) requires relator to plead names of "individual participants in the alleged fraud, such as 'who at [defendant] submitted false claims to the government.").[12]

D. Wells Fargo's Alternative Request for Discovery and an Evidentiary Hearing Should Be Denied

Wells Fargo's alternative request for discovery and an evidentiary hearing concerning "the parties' intent with respect to the scope of the U.S. Release," Wells Fargo D.C. Br. at 22, should also be denied. As Wells Fargo recognizes, extrinsic evidence of the parties' intent should only be considered by the Court where the language of the agreement is ambiguous. *Id.* at 4-5; *accord Washington Metropolitan Area Transit Authority*, 626 F.2d at 961. Because, as demonstrated above, the Federal Release is clear and unambiguous with respect to the claims that have been released, there is no basis on which to order discovery or to conduct an evidentiary hearing. *See id.*; *Red Lake Band of Chippewa Indians*, 624 F. Supp. 2d at 15 ("Where the contract is unambiguous, as evidenced by the plain language of the contract, the court's inquiry is at an end, and the plain language of the contract controls.").

[12] Wells Fargo's assertion also makes no sense. For example, in the third and fourth causes of action in the SDNY Complaint, the Government alleges that Wells Fargo learned that 6,358 FHA loans that it had already certified for FHA insurance actually contained material violations and were ineligible for FHA insurance, and that thereafter the bank nonetheless failed to self-report 6,320 of these loans to HUD as required and instead submitted or caused the submission of false claims for payment to HUD when any of those 6,320 deficient loans defaulted. SDNY Complaint ¶¶ 115-131, 144-161. Surely those claims do not fail because the bank learned about the material deficiencies after the individual underwriters certified the underlying loans.

**CONCLUSION**

For the foregoing reasons, Wells Fargo's Motion should be denied in its entirety.

Respectfully submitted,

STUART F. DELERY
Principal Deputy Assistant Attorney General

/s/ John Warshawsky
Michael D. Granston, Acting Director
Renée Brooker, Assistant Director
William C. Edgar, Senior Trial Counsel
John Warshawsky, Trial Attorney (D.C. Bar No. 417170)
U.S. Department of Justice
Commercial Litigation Branch
Civil Division
601 D Street, N.W., Room 9132
Washington, D.C. 20004
Telephone: (202) 305-3829
Facsimile: (202) 305-7797
E-mail: john.warshawsky@usdoj.gov

PREET BHARARA
United States Attorney for the Southern District
of New York

Jeffrey Oestericher
Sarah J. North
Rebecca S. Tinio
Assistant United States Attorneys
86 Chambers Street, Third Floor
New York, New York 10007
Telephone: (212) 637-2698/2639/2774
Facsimile: (212) 637-2730
E-mail: jeffrey.oestericher@usdoj.gov

November 29, 2012

Certificate of Filing

I hereby certify that on November 29, 2012, a copy of the foregoing "UNITED STATES' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO WELLS FARGO BANK, N.A.'S MOTION TO ENFORCE THE CONSENT JUDGMENT" was filed electronically through the Court's Electronic Case Filing (ECF) system. I understand that notice of this filing will be transmitted to all parties by operation of the ECF system and that parties may access this filing through the ECF system and the Public Access to Court Electronic Records (PACER) system.

/s/ John Warshawsky