**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

———————————————————————

| | |
|---|---|
| UNITED STATES, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )     **Civil Action No. 12-361 (RMC)** |
| | ) |
| BANK OF AMERICA, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| ———————————————————— | ) |

**OPINION**

The United States and numerous state attorneys general sued Wells Fargo &
Company and Wells Fargo Bank N.A. (collectively, Wells Fargo), and other major mortgagees,
alleging misconduct in their home mortgage practices. All parties agreed to a settlement,
resulting in multiple consent judgments. In its consent judgment, Wells Fargo agreed to pay
over $5 billion, without admitting fault, in exchange for a release of certain liabilities.
Thereafter, the U.S. Attorney for the Southern District of New York filed a civil complaint
against Wells Fargo alleging, *inter alia*, fraud under the False Claims Act. Wells Fargo contends
that the New York suit is barred by the terms of the release, and seeks an order enforcing the
consent judgment. As explained below, the motion to enforce the consent judgment will be
denied.

**I. FACTS**

On March 12, 2012, the Department of Justice, forty-nine state attorneys general,[1]
and the attorney general for the District of Columbia filed this case alleging that Wells Fargo and

———————————————————

[1] The State of Oklahoma did not participate in this suit.

other banks (the Banks)[2] engaged in misconduct in making Federal Housing Administration (FHA) insured mortgage loans. *See* Compl. [Dkt. 1].

FHA provides mortgage insurance on loans made by approved lenders throughout the United States, including mortgages on single family housing. *Id.* ¶ 15. FHA mortgage insurance provides lenders with protection against losses when mortgagors default. *Id.* ¶ 16. FHA approved lenders, known as Direct Endorsement Lenders, are required to ensure that loans meet strict underwriting criteria in order to be eligible for insurance, including income verification, credit analysis, and property appraisal. *Id.* ¶¶ 17, 69. By reducing risk to lenders, the FHA insurance program stimulates lenders to make home loans. *Id.* ¶ 19.

Direct Endorsement Lenders are required to comply with pertinent FHA Handbooks and Mortgagee Letters, including handbooks issued by the Department of Housing and Urban Development (HUD Handbooks). *Id.* ¶ 72. Further, Direct Endorsement Lenders must maintain a functioning quality control program that complies with FHA standards. *Id.* ¶ 76. Direct Endorsement Lenders and their underwriters are required to certify to FHA that each loan complies with FHA requirements in order to obtain FHA mortgage insurance. *Id.* ¶ 68.

The United States and state attorneys general complained that certain of the Banks' activities that related to loan "servicing conduct," loan "origination conduct," and "certifications" as defined below, violated a host of federal laws. *See id.* ¶¶ 47-64 (alleging servicing misconduct); *id.* ¶¶ 65-89 (alleging origination misconduct). Among these allegations, the plaintiffs alleged that the Banks had submitted false annual certifications that they had

_____

[2] The Banks who are Defendants here are: Bank of America Corporation; Bank of America, N.A.; BAC Home Loans Servicing, LP; Countrywide Home Loans, Inc.; Countrywide Financial Corporation; Countrywide Mortgage Ventures, LLC; Countrywide Bank, FSB; Citigroup, Inc.; Citibank, N.A.; Citimortgage, Inc.; J.P. Morgan Chase & Company; JPMorgan Chase Bank, N.A.; Residential Capital, LLC; Ally Financial, Inc.; GMAC Mortgage, LLC; GMAC Residential Funding Co., LLC; Wells Fargo & Company; Wells Fargo Bank N.A.

complied with all applicable FHA and HUD regulations and policies and that they had the

required quality control programs in place.  *Id*. ¶¶ 68-89.  FHA paid enormous amounts for

insurance claims on FHA-insured mortgages in default, insurance that was based on the Banks'

allegedly false certifications.  *Id*.  The Complaint set forth the following eight counts:

> Count I – unfair and deceptive consumer practices with respect to loan servicing;
>
> Count II – unfair and deceptive consumer practices with respect to foreclosure processing;
>
> Count III – unfair and deceptive consumer practices with respect to origination;
>
> Count IV – violation of the False Claims Act (or FCA), 31 U.S.C. §§ 3729(a)(1)(A)-(C) & (G) and 31 U.S.C. §§ 3729(a)(1)-(3) & (7);
>
> Count V – violation of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA), 12 U.S.C. § 1833a;
>
> Count VI – violation of the Servicemembers Civil Relief Act, 50 U.S.C. § App. 501, *et seq*.;
>
> Count VII – declaratory judgment under 28 U.S.C. §§ 2201, 2202; and
>
> Count VIII – abuse of the bankruptcy process under common law.

Compl. ¶¶ 102–137.  The Complaint sought injunctive relief, disgorgement of unlawful gains,

restitution, civil penalties, damages, attorney fees and costs.  Compl., Prayer for Relief at 47-48.

On April 4, 2012, all parties agreed to a settlement and entered into five separate

consent judgments, together valued at $25 billion.  One of these consent judgments relates to

Wells Fargo.  *See* Consent J. [Dkt. 14].  By the terms of its Consent Judgment, Wells Fargo

agreed to pay $5 billion and to take various actions beneficial to homeowners, including setting

up programs to assist mortgagors at risk of foreclosure. *Id*. In exchange, the United States released Wells Fargo from certain types of liability. *See id*., Ex. F (Release).[3]

Just a few months later, the United States sued Wells Fargo in federal district court in the Southern District of New York, in a case styled *United States v. Wells Fargo Bank, N.A*., Civ. No. 12-7527 (S.D.N.Y.) (New York Suit). *See* Reply [Dkt. 47], Ex. A (SDNY Am. Compl., filed Dec. 14, 2012) (SDNY Amended Complaint). In the New York Suit, the United States alleges violations of the False Claims Act and FIRREA.[4] Wells Fargo has moved to dismiss the suit in New York. In this Court, Wells Fargo moves for enforcement of the Consent Judgment and an order (1) declaring that the United States has violated the Consent Judgment by filing the New York Suit and (2) enjoining the United States from pursuing any of the released claims against Wells Fargo. The critical issue presented here is whether the New York Suit is precluded by the terms of the Release. This Opinion interprets the plain meaning of the Release.

## II. JURISDICTION

The United States avers that this Court lacks jurisdiction and that the interpretation of the Release should be presented to the SDNY court. This argument is based on a strained and disingenuous reading of the Release—that the express language reserving jurisdiction in this Court over disputes *arising out of matters covered by* the Release does not

---

[3] The States also released their claims against Wells Fargo. *See* Consent J., Ex. G (State Release).

[4] The SDNY Amended Complaint includes 11 claims: Claim 1–violation of the False Claims Act, causing false claims to be presented (reckless underwriting); Claim 2–violation of the False Claims Act, use of false statements in support of false claims (reckless underwriting); Claim 3–violation of the False Claims Act, causing false claims to be presented (self-reporting); Claim 4–violation of the False Claims Act, use of false statements in support of false claims (self-reporting); Claim 5–violation of the False Claims Act, reverse false claims (self-reporting); Claim 6–violations of FIRREA, 12 U.S.C. § 1833a, false certifications to HUD; Claim 7–breach of fiduciary duty; Claim 8–gross negligence; Claim 9–negligence; Claim 10–unjust enrichment; Claim 11–payment under mistake of fact.

include jurisdiction over disputes *regarding the scope* of the Release.  *See* Opp. [Dkt. 45] at 14 n.7.

This Court is best suited to interpret the terms of the Consent Judgment and accompanying Release because it presided over the settlement of this case.  Further, the Consent Judgment and Release expressly provide that this Court retains jurisdiction.  Consent J. ¶ 13 ("This Court retains jurisdiction for the duration of this Consent Judgment to enforce its terms."); Release F-43 ("The exclusive jurisdiction and venue *for any dispute arising out of matters covered by this Release* is the United States District Court for the District of Columbia.") (emphasis added).  Also, it makes logical sense for this Court to address the scope of the Release, as future disputes might arise with regard to the Consent Judgment and Release concerning other parties to this case who are not part of the New York Suit.

The United States also argues that the Court should not enjoin the New York Suit, citing *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) and *JMM Corp. v. District of Columbia*, 378 F.3d 1117, 1121 (D.C. Cir. 2004).  These cases are based on the *Younger* abstention doctrine.  *See Younger v. Harris*, 401 U.S. 37 (1971).  In *Younger*, the Supreme Court ruled that, due to interests of comity and federalism, a federal court should not enjoin a pending state proceeding that is judicial in nature and involves important state interests. 401 U.S. at 41.

*Younger* abstention does not apply in this case.  Wells Fargo seeks enforcement of the Consent Judgment, together with an order (1) declaring that the United States has violated the Consent Judgment by filing the New York Suit and (2) enjoining the United States from pursuing the released claims against Wells Fargo.  The motion does not raise concerns of comity and federalism, as Wells Fargo does not seek to enjoin the process or decision of a state court.

Under the All Writs Act, the Court has authority to "issue all writs necessary or appropriate in aid of [its] jurisdiction[]."  28 U.S.C. § 1651; *see United States v. New York Tel.*, 434 U.S. 159, 172 (1977) (the All Writs Act empowers courts to issue extraordinary writs as necessary to effectuate and prevent the frustration of orders the court has issued).  A court has power under the All Writs Act to enjoin a party to a consent judgment from bringing suit in violation of the consent judgment. *See United States v. Int'l Bhd. of Teamsters*, 907 F.2d 277, 279 (2d Cir. 1990) (a district court has authority under the All Writs Act to enjoin parties to consent decree from litigating issues related to consent decree in other districts).[5]

### III.  ANALYSIS

#### A.  Standard for Reviewing a Consent Decree

A consent decree must be construed according to principles of contract interpretation.  *United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 236-37 (1975); *United States v. W. Elec. Co.*, 894 F.2d 1387, 1390 (D.C. Cir. 1990).  The meaning of a consent decree, like a contract, should be determined within its "four corners."  *W. Elec. Co.*, 894 F.2d at 1390.  When a contract is clear and unambiguous, courts presume that the words in the contract have their ordinary meaning.  *Mesa Air Grp., Inc. v. Dep't of Transp.*, 87 F.3d 498, 503 (D.C. Cir. 1996).  "Under general contract law, the plain and unambiguous meaning of an instrument is controlling."  *WMATA v. Mergentime Corp.*, 626 F.2d 959, 960-61 (D.C. Cir. 1980).  "Where the contract is unambiguous, as evidenced by the plain language of the contract, the court's inquiry is at an end, and the plain language of the contract controls."  *Red Lake Band of Chippewa*

---

[5] The United States also contends that Wells Fargo is barred from obtaining relief here under concepts applicable to foreign antisuit injunctions.  Opp. at 11-13 (relying on *Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 927 (D.C. Cir. 1984)).  Cases such as *Laker Airways* are based on special concerns raised when a U.S. court is asked to enjoin a *foreign* proceeding.  International comity concerns are not at issue here.

*Indians v. Dep't of Interior*, 624 F. Supp. 2d 1, 15 (D.D.C. 2009).  A contract is unambiguous

when there is only one reasonable interpretation.  *Id*.  The question of whether an agreement is

clear or ambiguous is one of law for the court.  *NRM Corp. v. Hercules, Inc.*, 758 F.2d 676, 682

(D.C. Cir. 1985).

   A contract is not rendered ambiguous merely because the parties disagree over its

proper interpretation.  Instead, a contract is deemed ambiguous when it can be reasonably

construed to have two or more different meanings.  *Tillery v. Dist. of Columbia Contract Appeals

Bd.*, 912 A.2d 1169, 1176 (D.C. 2006).  If a contract is ambiguous, then the court should be

guided by extrinsic evidence such as "the circumstances surrounding the formation of the

consent order, any technical meaning words used may have had to the parties, and any other

documents expressly incorporated in the decree."  *W. Elec. Co.*, 894 F.2d at 1390; *see also

Tillery*, 912 A.2d at 1177 (extrinsic evidence may include the circumstances of contract

formation, custom, and course of conduct).

   In the case of ambiguity of an ordinary contract, courts look to extrinsic evidence

in order to determine what a reasonable person in the position of the parties would have thought

the disputed language meant.  *Tillery*, 912 A.2d at 1176; *see WMATA v. Georgetown Univ.*, 347

F.3d 941, 945-46 (D.C. Cir. 2003) (under District of Columbia law, contracts are construed in

accord with the intention of  the parties insofar as it can be discerned from the text of the

instrument).  In the case of a consent decree, a court must be careful not to interpret the decree

by reference to the purpose of one of its parties because:

> [T]he decree itself cannot be said to have a purpose; rather the
> parties have purposes generally opposed to each other, and the
> resultant decree embodies as much of those opposing purposes as
> the respective parties have the bargaining power and skill to
> achieve. . . .  [T]he instrument must be construed as it is written,

and not as it might have been written had the plaintiff established
his factual claims and legal theories in litigation.

*ITT Cont'l Baking Co.*, 420 U.S. at 236-37 (citing *United States v. Armour & Co.*, 402 U.S. 673,

681-82 (1971)).

In short, the Court must construe the Release that is part of the Consent Judgment,

by referring to the document's text and purpose.  As described below, the Court finds that the

Release is clear and unambiguous.

### B.  Release of Claims and Reservation of Rights

The parties agree that Paragraph 3(b) of the Release covers claims based on false

certifications and governs the issue raised by Wells Fargo's motion.  Wells Fargo construes the

SDNY Amended Complaint as alleging claims arising from conduct covered by annual

certifications,[6] and argues that liability for such conduct is covered by Paragraph 3(b).

Paragraph 3(b) governs the release of claims based on fraudulent annual

certifications as follows:

> (3)(b) [T]he United States fully and finally releases [Wells Fargo]
> from any civil or administrative claims it has or may have and
> from any civil or administrative remedies or penalties (expressly
> including punitive or exemplary damages) it may seek to impose
> under FIRREA, the False Claims Act, and the Program Fraud Civil
> Remedies Act *where the sole basis for such claim or claims is that
> [Wells Fargo] submitted to HUD-FHA . . . a false or fraudulent
> annual certification that the mortgagee had "conform[ed] to all
> HUD-FHA regulations necessary to maintain its HUD-FHA
> approval"* (including, but not limited to, the requirement that the
> mortgagee implement and maintain a quality control program that
> conforms to HUD-FHA requirements), or "complied with and
> agree[d] to continue to comply with HUD-FHA regulations,
> handbooks, Mortgagee letters, Title I Letters, policies, and terms of
> any agreements entered into with the Department under HUD's
> Direct Endorsement Program."

---

[6] The interpretation of the SDNY Amended Complaint is a matter properly addressed by the
New York district court.

*Id.* at F-16–F-17 (emphasis added).  To clarify this language further, the next sentence of the same paragraph states:

> For avoidance of doubt, this Paragraph means that the United States is *barred from asserting*
>
> [1] that a *false annual certification* renders [Wells Fargo] liable under the False Claims Act and other laws cited above for loans endorsed by [Wells Fargo] for FHA insurance during the period of time applicable to the annual certification without regard to whether any such loans contain material violations of HUD-FHA requirements, or
>
> [2] that a *false individual loan certification* that "this mortgage is eligible for HUD mortgage insurance under the Direct Endorsement program" renders [Wells Fargo] liable under the False Claims Act *for any individual loan that does not contain a material violation* of HUD-FHA requirements.

*Id.* at F-17–F-18 (emphasis added).  In addition, however, the United States and Wells Fargo agreed that certain claims were not released:

> However, *this Paragraph does not*
>
> (i) *release*, bar or otherwise preclude the right of the United States to pursue any civil or administrative *claims* or remedies it has or may have . . . against [Wells Fargo] *for conduct with respect to the insurance of residential mortgage loans that violates any laws* . . . including, but not limited to, material violations of any applicable HUD-FHA requirements with respect to an individual loan or loans, *except* if and *to the extent such claim*, remedy or penalty *is based solely on [Wells Fargo's] failure to provide HUD with an accurate annual certification* as described above . . . .

*Id.* at F-18 (emphasis added).[7]

---

[7] In furtherance of the reservation clause, the Release also reserves the Government's right to introduce evidence of failure to comply with HUD-FHA requirements in connection with a claim that a loan or loans materially violated such requirements:

> This Paragraph [3b] does not . . . (ii) release or otherwise bar the United States from introducing evidence of any alleged failure to comply with applicable HUD-FHA requirements, including, but

The Release expressly addresses both false "annual certifications" and false "individual loan certifications." Annual certifications deal with company-wide compliance with HUD-FHA requirements. *See* Mot. to Enforce Consent J. [Dkt. 41], Ex. 3 (Sample Annual Certification) [Dkt. 41-5] at 4; *see also id.*, Ex. 5 (HUD Handbook 4060.1, Rev. 2) (establishing compliance standards). An individual loan certification contains the underwriter's pledge that a particular loan qualifies for FHA insurance in light of the appraisal and the borrower's assets and credit rating. *See id.*, Ex. 5 (HUD Form 92900-A) [Dkt. 41-7] at 3.

Notably, Paragraph 3(b) releases liability to the federal government on all claims where the sole basis for the claim is a false *annual* certification. Release ¶ 3(b) at F-16–F-18. Paragraph 3(b) releases claims based on a false *individual* loan certification only if the individual loan did not contain a material violation of HUD-FHA requirements:

> For avoidance of doubt, this Paragraph means that the United States is barred from asserting . . . [2] that a false individual loan certification . . . renders [Wells Fargo] liable under the False Claims Act for any individual loan that does not contain a material violation of HUD-FHA requirements.

Release 3(b) at F-17–F-18. The reservation of rights language is a mirror image of the release language.

> [The United States reserves the right to pursue any claims against Wells Fargo] for conduct with respect to the insurance of residential mortgage loans that violates any laws . . . including, but not limited to, material violations of any applicable HUD-FHA

---

> not limited to, sufficient quality control, underwriting or due diligence programs, in any way (including for the purpose of proving intent) in connection with any claim that there was a material violation(s) of applicable HUD-FHA requirements with respect to an individual loan or loans that would subject [Wells Fargo] to liability under the False Claims Act or any other federal statutory or common law administrative or judicial claim.

Release at F-18 (Evidence Clause).

> requirements with respect to an individual loan or loans, *except if and to the extent such claim . . . is based solely on [Wells Fargo's] failure to provide HUD with an accurate annual certification as described above*.

Release 3(b) at F-18.  That is, the Government reserved the right to bring claims against Wells

Fargo based on illegal conduct including material violations of HUD-FHA requirements, but did

not reserve the right to bring claims based only on false annual certifications.

In sum, with regard to liability based on false certifications, the United States

released:

> (1) Claims under FIRREA, FCA, and the Program Fraud Civil Remedies Act where the "sole basis" for such claims is that Wells Fargo submitted a false or fraudulent annual certification—without regard to whether any such loan contains a material violation of HUD-FHA requirements; and
>
> (2) Claims under FCA based on a false individual loan certification where the individual loan did not contain a material violation of HUD-FHA requirements.[8]

Wells Fargo argues that the allegations set forth in the New York Suit are not

based on false individual loan certifications, but instead relate to company-wide conduct covered

by annual certifications,[9] *conduct* that is covered by Paragraph 3(b) of the Release.  Wells

Fargo's reasoning proceeds as follows:  Paragraph 3(b) releases Wells Fargo from claims based

on annual certifications; therefore, Paragraph 3(b) releases Wells Fargo from liability for

---

[8] The parties agree on this second point.  *See* Mot. to Enforce Consent J. at 2, 8; Opp. at 22; Reply at 17.

[9] Wells Fargo contends that certain allegations in the SDNY Amended Complaint arise from conduct covered by annual certifications.  *See, e.g.*, SDNY Am. Compl. ¶ 134 ("Wells Fargo failed to review all early payment defaults . . . ."); ¶ 51 ("No written action plans were prepared for loans with material violations.  Corrective action for such loans was not formally tracked."); ¶ 152 ("Wells Fargo intentionally failed to self-report to HUD, as required, at least 6,320 FHA loans that it knew failed to meet the FHA loan program parameters . . . ."); ¶ 46 ("[E]mployees were not adequately trained . . . ."); ¶ 47 (accusing Wells Fargo of paying its underwriters a bonus, which was really a *de facto* commission).

company-wide conduct that was the subject of such annual certifications. This leap of logic is not consistent with the Consent Judgment signed by Wells Fargo.

Paragraph 3(b) specifically covers claims based on false annual certifications, not claims based on Covered Origination Conduct, which are expressly addressed in other paragraphs. *See* Release ¶ 2(b) at F-13 (release of claims based on Covered Origination Conduct only under the Real Estate Settlement Procedures Act, the Fair Credit Reporting Act, and the Truth in Lending Act); Release ¶ 2(c) at F-14–F-15 (release of FIRREA claims based on Covered Origination Conduct only to the extent that the claim is based on a false statement and it did not harm another financial institution or governmental entity).[10] In Paragraph 3(b), the United States releases Wells Fargo from *claims* based on the annual certification. *See* Release ¶ 3(b) at F-16–F-17 ("[T]he United States fully and finally releases [Wells Fargo] from any civil or administrative *claims* it has or may have . . . . under FIRREA [and] the False Claims Act *where the sole basis for such claim or claims is that [Wells Fargo] submitted to HUD-FHA . . . a false or fraudulent annual certification that the mortgagee had "conform[ed] to all HUD-FHA regulations necessary to maintain its HUD-FHA approval . . .").* Paragraph 3(b) specifically states that *claims* based on fraudulent annual certifications are released; it does not state that claims based on "Covered Origination Conduct" or any other underlying conduct are released. Paragraph 3(b) does not mention the conduct underlying annual certifications. Presumably, a

---

[10] In Release Paragraphs 2(a) and 3(a), the United States released claims based on Covered Servicing Conduct more broadly than claims based on Covered Origination Conduct. *See* Release ¶ 3(a) at F-15–F-16 (HUD releases Wells Fargo from any claims based on Covered Servicing Conduct); Release ¶ 2(a) at F-12–F-13 (the United States releases Wells Fargo from claims based on Covered Servicing Conduct under FIRREA, FCA, the Racketeer Influenced and Corrupt Organizations Act, the Real Estate Settlement Procedures Act, the Fair Credit Reporting Act, the Fair Debt Collection Practices Act, the Truth in Lending Act, and other statutes); *see also* Release ¶ 9 at F-25–F-29 (release of claims based on Covered Bankruptcy Conduct. The part of the Release at issue here, Paragraph 3(b), deals with claims based on false certifications.

false annual certification could jeopardize each application for FHA insurance during that year and potentially expose Wells Fargo to hundreds, if not thousands of claims under the FCA and other statutes.

In arguing that the Release covers "underlying conduct," Wells Fargo notes the definition of "Covered Origination Conduct":

> D. The United States further contends that it has certain civil claims based on the conduct of [Wells Fargo] in originating mortgage loans (the "Covered Origination Conduct"). Such Covered Origination Conduct consists of all activities of [Wells Fargo] directed toward directly or indirectly originating, assisting in the origination of, or purchasing single-family residential mortgage loans and excludes conduct occurring following the closing of the borrower's mortgage loan that is otherwise covered as the Covered Servicing Conduct. Such Covered Origination Conduct includes, but is not limited to, the following conduct:

> (1) Submitting loans for insurance endorsement and claims for insurance benefits for FHA loans that [Wells Fargo] endorsed or underwrote as a participant in the Direct Endorsement Program that failed to meet any applicable underwriting requirements, including those set forth in the applicable version of the HUD Handbook 4155.1, as supplemented by relevant mortgagee letters, all as of the time of origination;

> (2) Submitting loans for insurance endorsement or claims for insurance benefits for FHA loans that [Wells Fargo] endorsed or underwrote as a participant in the FHA's Direct Endorsement Program while failing to implement applicable quality control measures; and

> (3) Other deficiencies in originating single-family residential mortgage loans relating to:

> . . .

> (l) Licensing, registration, qualifications or approvals of employees in connection with the Covered Origination Conduct;

> (m) Quality control, quality assurance or compliance or audit testing or oversight related to the Covered Origination Conduct.

Release, Recital D, at F–6–F–9 (emphasis added).[11]  The definition of Covered Origination Conduct, however, is not relevant to the interpretation of Paragraph 3(b), which governs the release of claims based on certifications.  As noted above, a more limited release of claims based on Covered Origination Conduct is addressed in other portions of the Release.

The Court finds that the Release is clear and unambiguous, as evidenced by its plain language.  *See Red Lake Band of Chippewa Indians*, 624 F. Supp. 2d at 15.  The plain language of the Release governs, and it does not have the meaning ascribed to it by Wells Fargo. Having construed the Release as described in this Opinion, the Court leaves the interpretation of the SDNY Amended Complaint to the court that has jurisdiction over it, the United States District Court for the Southern District of New York.  Wells Fargo's motion to enforce the Consent Judgment will be denied.

## IV.  CONCLUSION

For the foregoing reasons, Wells Fargo's motion to enforce consent judgment [Dkt. 41] will be denied.  A memorializing Order accompanies this Opinion.


Date:  February 12, 2013

_____/s/_____
ROSEMARY M. COLLYER
United States District Judge

---

[11] Separate recitals define the Government's claims based on "Covered Servicing Conduct."  *See* Release Recital C, at F–2–F–6; *see also id.*, Recital E, at F–9–F–11 (describing Government's claims based on "Covered Bankruptcy Conduct").