IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

-----------------------------------------------------------------X
UNITED STATES OF AMERICA, et al.,

                              Plaintiffs,          Case No. 1:12-cv-00361-RMC

v.                                                 ORAL HEARING REQUESTED

BANK OF AMERICA CORP., et al.,

                              Defendants.
-----------------------------------------------------------------X

**PLAINTIFF NEW YORK ATTORNEY GENERAL'S MEMORANDUM OF LAW IN
SUPPORT OF MOTION TO ENFORCE THE CONSENT JUDGMENT AGAINST
WELLS FARGO DEFENDANTS**


                    ERIC T. SCHNEIDERMAN
                    Attorney General of the State of New York
                    Attorney for Plaintiff
                    120 Broadway
                    New York, NY 10271


Of Counsel:

JANE M. AZIA
Bureau Chief
Consumer Frauds and Protection Bureau

LAURA J. LEVINE
Deputy Bureau Chief

ADAM H. COHEN
BRIAN N. LASKY
MELISSA J. O'NEILL
Assistant Attorneys General

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................................1

STATEMENT OF FACTS .........................................................................................................3

    Background on the National Mortgage Settlement...............................................3

    The NMS's Enforcement Provisions ...................................................................6

        1.  Enforcement by the NMS Plaintiffs........................................................6

        2.  Enforcement by the Monitoring Committee ...........................................7

        3.  Oversight by the Monitor........................................................................8

    The NMS's Loan Modification Timeline Requirements ......................................9

    Wells Fargo's Repeated Violations of the NMS.................................................10

        1.  Wells Fargo Has Failed to Acknowledge Receipt ...............................11

        2.  Wells Fargo Has Failed to Notify Borrowers of Missing Documents....................13

        3.  Wells Fargo Has Failed to Allow Adequate Time to Supplement Submissions ...14

        4.  Wells Fargo Has Failed to Make Timely Determinations on Complete Loan Modification Applications ...................................................15

        5.  Wells Fargo Has Failed to Promptly Convert from Trial Modifications to Permanent Modifications ...................................................15

    Wells Fargo's Conduct Substantially Harms New York Borrowers .................16

ARGUMENT .........................................................................................................................18

I.    The Court Has Jurisdiction to Enforce the Consent Judgment Against Wells Fargo........18

II.    Wells Fargo Has Repeatedly Violated the Consent Judgment  ........................22

        1.  The Bank Has Failed to Acknowledge Receipt of Application Documents..........22

        2.  The Bank Has Failed to Notify Borrowers of Document Deficiencies ................23

        3.  The Bank Has Failed to Allow Thirty Days to Supplement .................24

        4.  The Bank Has Failed to Make Timely Decisions .................................24

        5.  The Bank Has Failed to Promptly Convert to Permanent Modifications .............25

        6.  The Experiences of Borrowers in Other States Confirm Wells Fargo's Numerous Violations of the Agreement ...................................................26

III.    The Court Should Exercise Its Authority to Grant Equitable Relief Sufficient to Protect New York Homeowners ...................................................28

CONCLUSION......................................................................…………………….32

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Berger v. Heckler*, 771 F.2d 1556 (2d Cir. 1985) ......................................................18, 19, 29, 30

*Cook v. City of Chicago*, 192 F.3d 693 (7th Cir. 1999).................................................................28

*Corvello v. Wells Fargo Bank, NA*, No. 11-16234, 2013 U.S. App. LEXIS 16415
   (9th Cir. Aug. 8, 2013).................................................................................................................26

*Frew v. Hawkins*, 540 U.S. 431 (2004).........................................................................................18

*Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd.*, 885 F.2d 1 (2d Cir. 1989).........................18

*McComb v. Jacksonville Paper Co.,* 336 U.S. 187 (1949) ......................................................18, 29

*Palmer v. Shultz*, Civ. No. 76-1439, 1988 U.S. Dist. LEXIS 16522
   (D.D.C. Dec 28, 1988)................................................................................................................19

*Segar v. Mukasey,* 508 F.3d 16 (D.C. Cir. 2007).........................................................................19

*Shy v. Navistar Int'l Corp.*, 701 F.3d 523 (6th Cir. 2012)..........................................18, 28, 29, 31

*United States v. Alcoa, Inc.*, 533 F.3d 278 (5th Cir. 2008).....................................................18, 29

*United States v. Bank of Am.*, Civ. No. 12-361 (RMC),
   2013 U.S. Dist. LEXIS 18527 (D.D.C. Feb. 12, 2013) ....................................................19, 21

*Washington Metro. Area Transit Auth. v. Mergentine Corp.*,
   636 F.2d 959 (D.C. Cir. 1980)..................................................................................................21

*Wigod v. Wells Fargo Bank, N.A.,* 673 F.3d 547 (7th Cir. 2012).................................................26

**STATUTES**

24 C.F.R. § 203.500 *et seq.*..........................................................................................................3

Plaintiff Eric T. Schneiderman, Attorney General of the State of New York ("NYAG"), respectfully submits this Memorandum of Law in support of the Motion to Enforce the Consent Judgment against defendants Wells Fargo & Company and Wells Fargo Bank, N.A. (collectively, "Wells Fargo" or the "Bank").

## PRELIMINARY STATEMENT

NYAG asks this Court to compel Wells Fargo to honor the terms of the bargain it struck just over a year ago, when it entered into the consent judgment commonly known as the "National Mortgage Settlement" ("NMS").  The National Mortgage Settlement was meant to put an end to a broad pattern of residential mortgage servicing abuses engaged in by Wells Fargo and other major mortgage servicing banks.  These abuses included the rote and automatic signing of legal documents in hundreds of thousands of foreclosure proceedings across the country, known as "robo-signing," and a pattern of obstructive practices designed to avoid reasonable modifications to loan terms by burying homeowners in paperwork and besieging them with bureaucratic delays and dead ends.  Under the NMS, state and federal regulators released claims against the banks for their broad and extensive abuses in exchange for, among other things, the banks' agreement to comply with highly specific servicing standards designed to make loan modifications available to distressed homeowners through a swift and streamlined process.

The declarations submitted with this application, describing the experiences of 97 New York homeowners, show that Wells Fargo has not abided by its agreement.  The Bank has engaged in widespread breaches of its most basic obligations under the consent judgment that have harmed and continue to harm thousands of New York families.  Indeed, within the last few months, the Monitor of the consent judgment announced that Wells Fargo had repeatedly failed to comply with a key timing provision of the 2012 settlement.

The Bank has continued to subject homeowners to Kafkaesque delays and obstructions in the loan modification process.  The documents submitted herein show that the Bank made repeated demands that one homeowner provide additional information in support of his application for a loan modification over the course of a seven-month period.  Most of the information required from the homeowner by the Bank had either been provided with the initial submission (such as the homeowner's tax return for 2011) or related to trivial matters that could have no impact on the decision whether or not to grant a loan modification (such as the demand for a "letter of explanation" concerning a $2 amount listed on one paystub).  Many New York homeowners were similarly required by the Bank to retrieve and resubmit documents that they had already provided with their original applications months earlier.  Often, the Bank's demands for documents were cryptic and confusing, if not entirely unintelligible to the average homeowner.

The Bank has also subjected homeowners to repetitive and wasteful court appearances and provided them contradictory and inaccurate information.  These abuses and delays have led to more than frustration for homeowners; they have caused the fees and interest owed by homeowners to grow, making it harder by the day for the homeowners to obtain modifications that would allow them to become current on their loans and avoid foreclosures.

In order to put an end to the Bank's continued defiance of the consent judgment, NYAG respectfully requests that the Court order that:  (1) the Bank comply with the NMS requirements; (2) the Bank take such additional steps as are necessary to ensure compliance with the loan modification timelines; (3) the Bank provide relief from foreclosure for New York borrowers harmed by the Bank's breaches of the NMS; (4) the Bank provide relief from assessments due to the Bank's violations of the rights of New York borrowers; and (5) the Bank provide such other equitable relief as the Court may deem just and proper.

## STATEMENT OF FACTS

**Background on the National Mortgage Settlement**

In October 2010, state and federal regulators (collectively, the "NMS Plaintiffs") initiated an investigation of five major mortgage servicing banks and their affiliates:  defendant Wells Fargo, Bank of America Corporation, Citigroup Inc., J.P. Morgan Chase & Company, and Ally Financial, Inc. (collectively, "Defendants").  The NMS Plaintiffs launched the investigation after it was revealed that employees of the mortgage servicers had engaged in the widespread, fraudulent, and systematic "robo-signing" of affidavits in mortgage foreclosure proceedings. *See, e.g.,* Philip A. Lehman, Assistant Attorney General, North Carolina Dep't of Justice, *Executive Summary of Multistate/Federal Settlement of Foreclosure Misconduct Claims*, at 1 (Lasky Ex. 4); Office of the New York Attorney General, *A.G. Schneiderman Secures $136 Million for Struggling New York Homeowners in Mortgage Servicing Agreement*, Press Release (Feb. 9, 2012) (Lasky Ex. 5).[1]  The investigation revealed that in hundreds of thousands of proceedings nationwide, the servicers falsely attested to having personal knowledge about mortgages and properties when they had none.  *See, e.g.,* Congressional Oversight Panel, *Examining the Consequences of Mortgage Irregularities for Financial Stability and Loss Mitigation* (Nov. 16, 2010), at 10-14 (Lasky Ex. 6).

The state and federal regulators uncovered a wide range of additional misconduct by the Defendants, including their systematic failure to engage in proper loss mitigation efforts and loan modifications in violation of federal law and state consumer protection statutes.  *See, e.g.,* 24 C.F.R. § 203.500 *et seq.*; March 14, 2012 Complaint of NMS Plaintiffs ("Compl.") ¶¶ 52-58 (Lasky Ex. 2).

---

[1] All references to "Lasky Ex. __" are to exhibits attached to the Declaration of Brian N. Lasky submitted in support of this motion.  All references to "Cohen Ex. __" are to exhibits attached to the Declaration of Adam H. Cohen submitted in support of this motion.

A loan modification is a permanent change in the terms of a homeowner's mortgage loan in order to lower the homeowner's monthly mortgage payment to an affordable amount and to bring the loan current, so that the homeowner can avoid foreclosure.[2]  The NMS Plaintiffs found that the Defendants' loan modification process was plagued by endless cycles of paperwork and document submission.  Homeowners routinely submitted modification applications that they understood to be complete, did not hear back from the Defendants for prolonged periods of time, and were then frequently delayed by requests for materials or information that were included with prior submissions.  Defendants often misplaced or lost submitted materials, starting additional rounds of document requests to beleaguered homeowners.  Throughout this process, interest on borrowers' loans continued to accrue and the Defendants assessed fees on delinquent loans.  On many occasions, after engaging in this process, the Defendants deemed homeowners' documents to be "stale" due to the sheer passage of time and demanded submission of entirely new packages.  The end result of this pattern of misconduct was the unlawful delay, or denial, of homeowners' requests to modify their mortgage loans – and potentially save their homes.  *See* Elizabeth Lynch Decl. ("Lynch Decl.") ¶¶ 14-15 (Lasky Ex. 3).[3]

On April 4, 2012, following months of negotiations between the parties, the Court entered consent judgments between the NMS Plaintiffs and each of the Defendants, including Wells Fargo.  The judgments, among other things, required the Defendants to make monetary payments to the participating states and provide significant mortgage loan relief to distressed

---

[2] *See, e.g., Loan Modification Frequently Asked Questions* (accessed June 13, 2013), *available at* http://portal.hud.gov/hudportal/HUD?src=/program_offices/housing/sfh/nsc/faqlm (Lasky Ex. 7).

[3] For an overview of the problems plaguing the loan modification application process, *see generally* Congressional Oversight Panel, *April Oversight Report: Evaluating Progress on TARP Foreclosure Mitigation Programs* (Apr. 14, 2010), at 82 (Lasky Ex. 8) (noting that housing counselors report "continued frustration" with HAMP loan modification process, including that "communication is difficult, servicers continue to lose information, [and] transitions from trial periods to permanent modifications have been slow"); Written Testimony of Diane E. Thompson (National Consumer Law Center) Before the United States Senate Committee on Banking, Housing & Urban Affairs, *Problems in Mortgage Servicing from Modification to Foreclosure* (Nov. 16, 2010), at 9-13 (Lasky Ex. 9) (testifying as to "delay and deny" approach of servicers to loan modification requests).

borrowers (including principal forgiveness and refinancing).  *See, e.g.,* Philip A. Lehman,

Assistant Attorney General, North Carolina Dep't of Justice, *Executive Summary of*

*Multistate/Federal Settlement of Foreclosure Misconduct Claims*, at 2-4 (Lasky Ex. 4).

NYAG received $136 million as its share of the payments made to states to use to address

housing and lending issues in New York.  *See* NMS Ex. B at B2-14.[4]  To date, New York has

allocated $60 million to launch the Homeowner Protection Program ("HOPP"), an initiative to

fund housing counseling and legal services for struggling homeowners throughout New York

State to ensure that New York homeowners receive tangible benefits from the settlement.  *See*

Office of the New York Attorney General, *A.G. Schneiderman Secures $136 Million for*

*Struggling New York Homeowners in Mortgage Servicing Agreement*, Press Release (Feb. 9,

2012) (Lasky Ex. 5); Office of the New York Attorney General, *Homeowner Protection*

*Program*, available at  http://www.nysmortgagesettlement.com/hopp.html (Lasky Ex. 10).

NYAG has funded 76 agencies ("HOPP Members") to provide free foreclosure prevention

services to homeowners in financial distress throughout New York State.  *See* Cohen Decl. ¶ 6.

Between October 1, 2012 and August 31, 2013, these agencies provided foreclosure prevention

services to more than 18,000 New York families and they regularly reported to NYAG on the

Defendants' compliance with the NMS.  *See id.* ¶ 9.  HOPP Members have assisted homeowners

in assessing appropriate loan modification programs, helped in the preparation and submission of

loan modification applications, and reviewed loan modification approvals and denials for

compliance with relevant program guidelines.  *See id.* ¶ 7.  HOPP legal services agencies also

have provided legal representation to homeowners in connection with foreclosure-related

proceedings, including the mandatory foreclosure settlement conferences required by New York

State law.  *See id.* ¶ 8.

---

[4] The consent judgment with exhibits is attached as Exhibit 1 to the Lasky Declaration.

In addition to requiring monetary payments to the states and relief for consumers, the NMS also provides that the Defendants "shall comply" with 304 enumerated "servicing standards," which are set forth in Exhibit A to the consent judgment.  Consent Judgment ¶ 2. The servicing standards agreed to by the Defendants are designed to correct the rampant abuses identified by the NMS Plaintiffs through their investigation and through complaints received from homeowners, housing counselors, and legal services attorneys representing borrowers.  In exchange for this relief, the NMS Plaintiffs released the Defendants from claims covering a wide range of unlawful activity and misconduct.  *See* NMS Ex. F (federal release); NMS Ex. G (state release).

**The NMS's Enforcement Provisions**

Exhibit E to the NMS provides for the enforcement of the servicing standards and the Defendants' consumer relief obligations.  *See* Consent Judgment ¶ 6.  For those provisions, the NMS establishes a multi-faceted enforcement regime, with roles played by each of three groups: (1) the individual NMS Plaintiffs, including NYAG, (2) the "Monitoring Committee," a body created by the NMS that is composed of representatives of the state and federal regulators, and (3) the "Monitor," who is charged under the consent judgment with conducting a statistical nationwide review of the Defendants' compliance with some aspects of the consent judgment. The NMS Plaintiffs and the Monitoring Committee both have the right to enforce the consent judgment, while the Monitor's role is confined to analyzing the Defendants' compliance to facilitate enforcement by the NMS Plaintiffs or the Monitoring Committee.

    1.   <u>Enforcement by the NMS Plaintiffs</u>

The NMS was filed as a consent judgment with this Court and is "enforceable therein" by the parties to the agreement.  NMS Ex. E, § J(1), (2).  Paragraph 6 of the consent judgment provides that the "Servicing Standards and Consumer Relief Requirements" of the NMS "shall

be enforced" in accordance with the enforcement procedures set forth in Exhibit E to the

agreement.  Consent Judgment ¶ 6.  Exhibit E to the consent judgment, in turn, authorizes "any

Party to this Consent Judgment," as well as the Monitoring Committee, to bring an action in this

Court to enforce the consent judgment.  NMS Ex. E, § J(2).

The NMS requires a party to provide notice to the Monitoring Committee of its intent to

bring an enforcement action prior to commencing suit, unless immediate action is necessary to

prevent irreparable harm.  *See id.*  The members of the Monitoring Committee then have twenty-

one days to determine whether to bring an enforcement action.  *See id.*

By letter of May 23, 2013, NYAG provided the required notice to the Monitoring

Committee.  *See* Letter from NYAG to NMS Monitoring Committee (May 23, 2013) (Lasky Ex.

11).  On June 27, 2013, the Monitoring Committee declined to commence an enforcement action

of its own, but recognized that "the particular circumstances of each state may dictate different

courses of action."  Letter from NMS Monitoring Committee to NYAG, at 3 (Jun. 27, 2013)

(Lasky Ex. 12).  As required by Section J(2) of the NMS, NYAG filed the present motion to

enforce after waiting more than twenty-one days after the Monitoring Committee's notification.

*See* NMS Ex. E, § J(2).

This Court retained "jurisdiction for the duration of the Consent Judgment to enforce its

terms" and the NMS requires that any enforcement action by a party to the agreement be brought

before this Court.  Consent Judgment ¶ 13; NMS Ex. E, § J(2).

2.     Enforcement by the Monitoring Committee

The Monitoring Committee is comprised of representatives of the state Attorneys General

and financial regulators, the U.S. Department of Justice, and the U.S. Department of Housing

and Urban Development.  *See* NMS Ex. E, § B.  The Monitoring Committee seeks to ensure that

the banks are complying with their settlement obligations on a national level and one of its

principal roles is to interface directly with the Monitor on behalf of the NMS Plaintiffs.  The

Monitoring Committee may also bring an enforcement action in the event a Defendant violates

its obligations under the consent judgment.  *See* NMS Ex. E, § J(2).

      3.   <u>Oversight by the Monitor</u>

The NMS designates Joseph A. Smith, Jr. to serve as the "Monitor."  *See* NMS Ex. E,

§ C(1).  The Monitor is responsible for assessing whether the Defendants have complied with the

servicing standards and relief requirements of the NMS through a review of nationwide

aggregate data over time.  *See* NMS Ex. E, § C(5).  The Monitor, however, has no authority to

bring an enforcement action if he finds a violation of the agreement; that right is reserved for the

parties to the consent judgment and the Monitoring Committee.  *See* NMS Ex. E, § J(2).

To assess compliance, the Monitor reviews internal national data and testwork with

respect to twenty-nine "metrics" reported to him every quarter by each Defendant.  *See* NMS Ex.

E, §§ C(11), (15), D(1).  The Monitor uses sampling methods to determine for each metric

whether the Defendant's performance exceeds the relevant "threshold error rate."  *See* NMS Ex.

E, § C(11); Office of Mortgage Settlement Oversight, *Summary of Compliance: A Report from*

*the Monitor of the National Mortgage Settlement*, at 4 (Jun. 19, 2013) (Lasky Ex. 13).  If it does,

the Monitor identifies a  "Potential Violation" which, if it remains uncorrected, he may then

declare to be an "uncured Potential Violation."  *See* NMS Ex. E, §§ E(1), (2).  The Monitor

reports the results of his review in periodic "Monitor Reports," which among other things,

identify any Potential Violations of the consent judgment.  *See* NMS Ex. E, § D(5).

To cure a Potential Violation, the Defendant Servicer must develop and complete an

approved "Corrective Action Plan" to the satisfaction of the Monitor.  *See* NMS Ex. E, § E(3).

Then, the Monitor must confirm that the threshold error rate for the relevant metric was not

exceeded during the "Cure Period," generally the first full quarter after the completion of the Corrective Action Plan. *See id.*

The Monitor has already determined that Wells Fargo committed a Potential Violation of one of the NMS's loan modification timing standards. In his June 18, 2013 Monitor Report, covering the third and fourth quarters of 2012, the Monitor reported that Wells Fargo exceeded the threshold error for "metric 19" for that period. *See* June 18, 2013 Monitor Report for Wells Fargo at 31 (Lasky Ex. 14). In particular, the Monitor found that Wells Fargo repeatedly failed to provide a timely notification of the documents missing from borrowers' loan modification applications, as required by Section IV(F)(2) of the servicing standards. *See id.* at 32.

**The NMS's Loan Modification Timeline Requirements**

The NMS servicing standards cover a range of mortgage servicing practices, including conduct during foreclosure and bankruptcy proceedings, restrictions on servicing fees, and loss mitigation procedures. *See* NMS Ex. A. At issue here are five servicing standards that impose firm timelines and requirements upon the Defendants in the application and approval process for first-lien loan modifications. These "Loan Modification Timeline Requirements" require that:

- "Servicer shall provide written acknowledgment of the receipt of documentation submitted by the borrower in connection with a first lien loan modification application within 3 business days. In its initial acknowledgment, Servicer shall briefly describe the loan modification process and identify deadlines and expiration dates for submitted documents." (NMS Ex. A, § IV(F)(1));

- "Servicer shall notify borrower of any known deficiency in borrower's initial submission of information no later than 5 business days after receipt, including any missing information or documentation required for the loan modification to be considered complete." (NMS Ex. A, § IV(F)(2));

- "Servicer shall afford borrower 30 days from the date of Servicer's notification of any missing information or documentation to supplement borrower's submission of information prior to making a determination on whether or not to grant an initial loan modification." (NMS Ex. A, § IV(F)(3));

- "Servicer shall review the complete first lien loan modification application submitted by borrower and shall determine the disposition of borrower's trial or preliminary

request no later than 30 days after receipt of the complete modification application, absent compelling circumstances beyond Servicer's control."  (NMS Ex. A, § IV(F)(4)); and

- "Servicer shall promptly send a final modification agreement to borrowers who have enrolled in a trial period plan under current HAMP guidelines (or fully underwritten proprietary modification programs with a trial payment period) and who have made the required number of timely trial period payments, where the modification is underwritten prior to the trial period and has received any necessary investor, guarantor or insurer approvals.  The borrower shall then be converted by Servicer to a permanent modification upon execution of the final modification documents, consistent with applicable program guidelines, absent evidence of fraud."  (NMS Ex. A, § IV(A)(4)).

Compliance with these servicing standards expedites the loan modification process and provides needed relief to struggling homeowners.  *See, e.g.,* California Monitor, *The "Complete" Application Problem:  A Solution to Help Homeowners and Banks Work Together* (June 19, 2013), at 2 (Lasky Ex. 15) (noting that NMS "tried to improve the loan modification process" with the goal of "help[ing] homeowners and mortgage companies work together to see if a mortgage loan can be modified, and to protect homeowners during that process")[5]; Lynch Decl. ¶¶ 14-16 (Lasky Ex. 3).  The Loan Modification Timeline Requirements became effective on October 2, 2012, six months after the entry of the consent judgment.  *See* NMS Ex. E, § A.

**Wells Fargo's Repeated Violations of the NMS**

In the months since the servicing standards went into effect, HOPP Members have continuously reported that Wells Fargo has failed to comply with the Loan Modification Timeline Requirements.  *See* Cohen Decl. ¶¶ 11-12.

In support of this motion, NYAG has submitted sworn declarations with supporting documentation from HOPP Members detailing flagrant violations by Wells Fargo of these

---

[5] On March 16, 2012, the California Attorney General appointed the "California Monitor" to assist in monitoring the implementation of the National Mortgage Settlement in California.  *See* California Monitor, *About Us* (accessed June 21, 2013), *available at* http://californiamonitor.org/about-us/ (Lasky Ex. 16).

servicing standards with respect to 97 individual borrowers. *See* Cohen Exs. 2-98.[6] For the Court's convenience, NYAG has provided a chart summarizing relevant information from the submitted declarations and supporting materials. *See* Cohen Ex. 1. The declarations establish that Wells Fargo has repeatedly violated *each* of the Loan Modification Timeline Requirements and oftentimes violated *multiple* servicing standards in connection with the loan modification process of individual borrowers. Since HOPP Members assist only a small percentage of borrowers with distressed loans serviced by Wells Fargo in New York State, these declarations serve as examples of what is plainly a much larger pattern of non-compliance by Wells Fargo. *See* Cohen Decl. ¶ 19. Nonetheless, even standing alone, the declarations demonstrate that Wells Fargo has repeatedly breached its obligations under the NMS.

     1.    <u>Wells Fargo Has Failed to Acknowledge Receipt</u>

The declarations document that Wells Fargo has repeatedly failed to acknowledge in writing its receipt of documents submitted by borrowers within three business days, as required by Section IV(F)(1) of the servicing standards. *See* Cohen Ex. 1. This servicing standard does not have an associated metric and is thus not subject to the Monitor's review procedures. *See* NMS Ex. E, Schedule E-1.

The experience of Moises and Michele Simancas is one example of the Bank's violation of this servicing standard. The Simancases submitted a loan modification application package to Wells Fargo on October 24, 2012. *See* Moises & Michele Simancas Decl. ¶ 54 (Cohen Ex. 82). Wells Fargo did not provide a written acknowledgment of receipt in response to this submission. *See id.* ¶ 6. Instead, the first communication from the Bank was a November 2, 2012 letter that

---

[6] As several housing counselors and legal service providers have submitted multiple declarations on behalf of different borrowers, citations to these declarations are in the form "[Name of Borrower] Decl." In order to protect their privacy, this memorandum employs pseudonyms to refer to those borrowers who have not consented to having their names disclosed publicly. Exhibit 1 to the Cohen Declaration, which NYAG has sought to file under seal, identifies the borrowers referenced herein by their full names.

requested additional documents and information. *See id.* ¶¶ 7-9.  Later requests by the Bank

spanning the timeframe December 2012 through April 2013, often sought materials that had

already been submitted to the Bank.  *See id.* ¶¶ 10-20.  Other demands, such as those contained

in a March 28, 2013 letter to the Simancas from the Bank, were simply incomprehensible:

> 1. UREES ARE PRESENT ON 2011 TAXES IAO $4250. IS B1
> CLAIMING UREEDURING THE YEAR? IF SO, HOW MUCH
> PER PAY PERIOD. 2. NEW HAMP REQUIREMENT PER FRI
> 3/22/13-NEED SEPARATE HARDSHIP AFFIDAVIT S&D FOR
> B2 ONLY. 3. THE HOLIDAY PAY FOR UNIFORMED
> FORCES IAO $1936.38 IS THISPAY FOR NEW YEARS ONLY
> OR IS THIS PAID > 1 TIME PER YEAR? 4. PG 2 OF MCU
> BNK STMT HAS LARGE DEPOSITIAO $5830, WHAT IS
> THIS? IS THIS RECURRING OR 1 TIME? 5. IS BWR PAYING
> ON ANY OF THE LIENS/JUDGMENTSON CBR? JUDGMENT
> IAO $1576 CIVIL COURT NY RICHMONDBCH JUDGMENT
> IAO $1808 CIVIL COURT NY RICHMOND BC H JUDGMENT
> IAO $2344 CIVIL COURT RICHMOND BCH IF SO, MOW
> MUCH PER MONTH?

Moises & Michele Simancas Decl. Ex. C (capitalization in original).

Another homeowner, Mirza Baig, submitted his application to Wells Fargo on December

3, 2012, but the Bank never provided a written acknowledgement of receipt.  *See* Mirza Baig

Decl. ¶¶ 5-6 (Cohen Ex. 13).  Instead, Wells Fargo first responded to the application on

December 11, 2012, when it made a request for additional documents.  *See* Mirza Baig Decl.

Exs. B-C.  In the months that followed, Wells Fargo made repeated additional requests for

application-related materials, oftentimes because the documents that Mr. Baig submitted

previously had "expired" as a result of the Bank's delay.  *See* Mirza Baig Decl. ¶ 12.  Finally, at

a May 17, 2013 settlement conference, the court overseeing Mr. Baig's case required the Bank to

make a decision on the application by June 7, 2013.  *See id.* ¶ 14.  The Bank ignored this

deadline and instead requested additional materials from Mr. Baig on June 20, 2013, two weeks

*after* the court-ordered deadline to render a decision on the application.  *See id.*

2.      Wells Fargo Has Failed to Notify Borrowers of Missing Documents

The declarations also demonstrate that Wells Fargo has regularly failed to notify borrowers of deficiencies in their submissions within five business days of the servicer's receipt of new information, as required by Section IV(F)(2) of the servicing standards.  *See* Cohen Ex. 1. The Monitor has also determined that the Bank has repeatedly violated this requirement.  *See* June 18, 2013 Monitor Report for Wells Fargo at 31 (Lasky Ex. 14).

For example, Carol M. submitted a loan modification application to Wells Fargo on October 1, 2012.  *See* Carol M. Decl. Ex. A (Cohen Ex. 61).  Wells Fargo's attorneys first requested additional information in connection with the application at a November 8, 2012 court conference, more than a month later.  *See* Carol M. Decl. ¶¶ 5-6.  Over the course of the next seven months, the Bank made repeated piecemeal demands for additional documents or information, often for materials that had been provided in Carol M.'s initial submission, such as the Bank's February 27, 2013 demand for an "IRS Form 4506T" and "hardship letter."  *Id.* ¶¶ 8, 13-14.  In other cases, the Bank's request for additional materials were due to the fact that the documents that Carol M. originally submitted in October 2012 had gone "stale" as a result of the Bank's delay in reviewing her application.  *See id.* ¶¶ 14, 21.

Similarly, Pedro Lebron submitted his loan modification application to Wells Fargo on January 3, 2013.  *See* Pedro Lebron Decl. Ex. A (Cohen Ex. 60).  The Bank first requested additional materials on January 16, 2013.  *See* Pedro Lebron Decl. Exs. B-C.  On January 31, 2013, April 3, 2013, April 22, 2013, and June 10, 2013, Wells Fargo made a series of requests for additional materials in connection with Mr. Lebron's application.  *See* Pedro Lebron Decl. ¶¶ 9-18.  Most of the documents demanded by Wells Fargo in these requests had either already been previously provided to the Bank (such as Mr. Lebron's 2011 tax return) or could have been identified as missing by the Bank immediately upon Mr. Lebron's initial submission (such as a

13

hardship affidavit "per HAMP guidelines"). *Id.* ¶¶ 9, 11.  Other demands by the Bank pertained to trivial matters, such as the request for a "signed and dated" "letter of explanation" for the "$2.00 listed as other" on a paystub Mr. Lebron had submitted.  Pedro Lebron Decl. Ex. I.  On June 17, 2013, less than thirty days after the Bank's June 10th request and before Mr. Lebron had an opportunity to submit documents in response thereto, Wells Fargo denied Mr. Lebron's loan modification application.  *See* Pedro Lebron Decl. Ex. M.

      3.      <u>Wells Fargo Has Failed to Allow Adequate Time to Supplement Submissions</u>

Wells Fargo has also regularly failed to allow borrowers at least thirty days to supplement their submissions after being notified of missing information or documentation, as required by Section IV(F)(3) of the servicing standards.  *See* Cohen Ex. 1.

For instance, on October 5, 2012, Jamie Yates submitted a loan modification application to Wells Fargo.  *See* Jamie Yates Decl. Ex. D (Cohen Ex. 95).  At a November 19, 2012 court settlement conference, the referee directed Wells Fargo to make a determination on Ms. Yates' application by December 3, 2012.  *See* Jamie Yates Decl. ¶ 10.  Wells Fargo ignored this order and instead on December 4, 2012 requested, for the first time, documents that were allegedly missing from Ms. Yates' October 5th submission.  *See* Jamie Yates Decl. Ex. F.  The Bank, through its counsel, required that the "requested documentation should be provided by your client within 5-7 business days to move forward with a review for a possible loan modification or other foreclosure alternative" and warned that "[w]ithout the requested information, a review according to underwriting guidelines cannot be completed, nor will a final review decision be possible."  *Id.*  The Bank's attorney also explained that "[a]fter all necessary application materials are timely received and validated as sufficient, the review process generally takes 30-45 days before a determination regarding eligibility for a loan modification or foreclosure alternative can be made."  *Id.*

4. <u>Wells Fargo Has Failed to Make Timely Determinations on Complete Loan Modification Applications</u>

Wells Fargo has also repeatedly failed to adhere to the requirement that it make a determination on the disposition of a loan modification application within thirty days of the receipt of a complete application, as required by Section IV(F)(4) of the servicing standards. *See* Cohen Ex. 1.

As an example, on February 24, 2013, Marie Larose submitted a loan modification application to Wells Fargo. *See* Marie Larose Decl. Ex. A (Cohen Ex. 57). On May 30, 2013, more than three months after the submission of her application, Wells Fargo made its first request for allegedly missing documents. *See* Marie Larose Decl. ¶ 8. It is clear that Wells Fargo did not actually require those materials in order to render a decision, however, as the Bank approved Ms. Larose for a trial loan modification on the very next day. *See* Marie Larose Decl. Ex. E.

5. <u>Wells Fargo Has Failed to Promptly Convert from Trial Modifications to Permanent Modifications</u>

Finally, Wells Fargo has failed to comply with its obligation to promptly convert borrowers from trial modifications to permanent modifications once the borrowers have satisfied the requirements of their trial period plans, as required by Section IV(A)(4) of the servicing standards. *See* Cohen Ex. 1. This servicing standard does not have an associated metric.

Henry S. is one of the New York homeowners subjected to this misconduct. On July 25, 2012, Wells Fargo informed Henry S. that he was approved for a trial loan modification. *See* Henry S. Decl. Ex. A (Cohen Ex. 83). Under the terms of his trial plan, Henry S. was required to make monthly trial period payments on August 1, 2012, September 1, 2012, and October 1, 2012. *See id.* The letter represented that "[a]fter all trial period payments are timely made, your mortgage will be permanently modified." *Id.* Henry S. made the required payments, as well as

additional monthly payments through April 1, 2013, but was not converted to a permanent loan

modification as promised.  *See id.*  Instead, on April 3, 2013, the Bank first notified Henry S. that

he would not be converted to a permanent modification at that time because of alleged title issues

related to his property.  *See id.*

In short, although they reflect just a small sample of a much larger problem, the

declarations submitted herein establish pervasive non-compliance with the NMS's Loan

Modification Timeline Requirements by Wells Fargo.  The stories of each of the 97 borrowers

depict a painful and abusive loan modification process that unlawfully impedes homeowners'

efforts to obtain mortgage relief.

**Wells Fargo's Conduct Substantially Harms New York Borrowers**

Wells Fargo's failure to comply with its court-ordered commitments causes substantial

tangible harm to borrowers throughout New York.  The Bank's disregard of its timeline

obligations leads to increased debt for borrowers making it less likely that they will be able to

obtain a loan modification and thereby avoid foreclosure.

Interest due on mortgage loans continues to accrue at the interest rate provided for by the

original loan documents throughout the period of the Bank's delays, as opposed to the

substantially reduced interest rate under the eventual loan modifications, if granted.  *See* Lynch

Decl. ¶ 27 (Lasky Ex. 3).  Moreover, Wells Fargo assesses delinquency-related fees and costs to

homeowners who fall behind on their monthly mortgage payments.  These include late fees,

property preservation fees, property inspection fees, "Broker Price Opinion" fees, and

foreclosure-related fees and costs.  *See id.* ¶ 25.  In addition, escrow arrears, consisting of tax,

insurance, and association dues increase each month that a loan remains delinquent.  *See id.* ¶ 26.

The interest, delinquency-related fees, and escrow arrears (collectively, "arrears") that accrue

during the period of delinquency are capitalized into the new principal balance when borrowers'

loans are modified.  *See id.* ¶ 30.  Thus, those borrowers who are fortunate enough to have their

loans modified end up owing more than they otherwise would have if not for the Bank's delays.

*See, e.g.,* Marie Larose Decl. ¶ 10 (Cohen Ex. 57); Mirza Baig Decl. ¶ 15 (Cohen Ex. 13).

For other borrowers, the increased arrears that result from Wells Fargo's delays can price

them out of eligibility for a loan modification.  Although there are variations between the several

different loan modification programs available to borrowers, for each of the programs the greater

the amount of arrears that the servicer must capitalize into the proposed modified principal

balance, the less likely it is that borrowers will qualify for a modification under the program's

parameters.  *See* Lynch Decl. ¶¶ 31-41.  Accordingly, Wells Fargo's delays in the loan

modification review process cost homeowners money and hurt their chances to qualify for a loan

modification program.  *See id.* ¶¶ 40-41.[7]

Borrowers are not the only individuals who bear the costs of the Bank's delays.  Wells

Fargo's non-compliance with its NMS obligations requires housing counselors and legal services

attorneys to expend endless hours resubmitting loan modification materials that have either been

lost by the Bank or have become "stale" as a result of the Bank's delays.  *See* Lynch Decl. ¶¶ 51-

52.  The Bank also squanders judicial resources through an excessively protracted foreclosure

settlement process that is the product of the Bank's continued piecemeal requests for additional

documents and prolonged decision-making process.  *See id.* ¶ 53.[8]

---

[7] *See also* Written Testimony of Debby Goldberg (National Fair Housing Alliance) Before the Subcommittee on
Housing, Transportation and Community Development of the United States Senate Committee on Banking, Housing
and Urban Affairs, *Helping Homeowners Harmed by Foreclosures:  Ensuring Accountability and Transparency in
Foreclosure Reviews* (Apr. 17, 2013), at 6 (Lasky Ex. 17) (testifying that in some cases due to delays in loan
modification application process "the mounting arrearages made [borrowers] ineligible for the modification they
requested").

[8] In a 2012 report, New York's Chief Administrative Judge found that "the number of foreclosure settlement
conferences remains high," and thus substantial "court time [is] necessitated by the large number of appearances."
A. Gail Prudenti, Chief Administrative Judge, *2012 Report of the Chief Administrator of the Courts:  Pursuant to
Chapter 507 of the Laws of 2009*, at 3 (Lasky Ex. 18).  The report further concluded that "issues relating to
document exchange and the absence of anyone from the bank with full decision-making authority limit the
productivity of the conference."  *Id.*

## ARGUMENT

I.     **THE COURT HAS JURISDICTION TO ENFORCE THE CONSENT JUDGMENT AGAINST WELLS FARGO**

Wells Fargo has repeatedly failed to abide by its loan modification obligations under the consent judgment.  As a result of the Bank's failure to comply with these obligations, homeowners throughout New York State have struggled to obtain relief to which they are entitled under the NMS.  The Court should grant NYAG's motion to enforce the consent judgment and require Wells Fargo to adhere to its court-ordered commitments to help New York homeowners.

It is fundamental that federal courts have the power to compel parties to abide by the terms of a consent decree.  *See Frew v. Hawkins*, 540 U.S. 431, 440 (2004); *United States v. Alcoa, Inc.*, 533 F.3d 278, 286 (5th Cir. 2008).  Indeed, it is well established that a court not only has the *authority* to enforce compliance with its consent decrees, it has "an *affirmative duty*" to do so "where the performance of one party threatens to frustrate the purpose of the decree." *Berger v. Heckler*, 771 F.2d 1556, 1568 (2d Cir. 1985) (emphasis added); *accord Shy v. Navistar Int'l Corp.*, 701 F.3d 523, 532 (6th Cir. 2012).  This is because a "defendant who has obtained the benefits of a consent decree – not the least of which is the termination of the litigation – cannot then be permitted to ignore such affirmative obligations as were imposed by the decree." *Berger*, 771 F.2d at 1568.[9]  This is particularly applicable here, where 49 states and several federal agencies released their rights to pursue Wells Fargo for widespread and flagrant unlawful

---

[9] The fact that a defendant may not have intended to violate a settlement is not a defense in an action to enforce a consent judgment, as the focus of the inquiry should be on the defendant's ultimate compliance with its obligations. *Cf. McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949) (holding that the "absence of willfulness does not relieve from civil contempt" because the purpose of civil contempt is "to enforce compliance with an order of the court or to compensate for losses or damages sustained by reason of noncompliance"); *Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd.*, 885 F.2d 1, 5 (2d Cir. 1989) ("[S]anctions for civil contempt can be imposed without a finding of willfulness.").

conduct.  In exchange for the release of these claims, the Bank agreed to comply with a set of

very specific obligations, including the servicing standards enumerated in the NMS.

As a party to the consent judgment, NYAG may bring an action to enforce the

requirements of the NMS.  Consent judgments are construed in accordance with principles of

contract law.  *See United States v. Bank of Am.*, Civ. No. 12-361 (RMC), 2013 U.S. Dist. LEXIS

18527, at *16 (D.D.C. Feb. 12, 2013); *Segar v. Mukasey*, 508 F.3d 16, 21 (D.C. Cir. 2007).  In

accordance with basic contract law, a party to a consent decree has the right to seek specific

performance of its requirements.  *See Berger*, 771 F.2d at 1564 (holding that, because a consent

decree is a "contract embodying promises made" by one party to another, a party to the decree

could "challenge noncompliance with [term of decree] and sue to enforce the promise it

contained").  As one court within this district explained, "[b]asic principles of contract law

confer standing upon a promisee to a consent decree to bring an action against a breaching

promisor for specific performance of the promisor's obligations."  *Palmer v. Shultz*, Civ. No. 76-

1439, 1988 U.S. Dist. LEXIS 16522, at *8 (D.D.C. Dec. 28, 1988).

In multiple ways, the text of the NMS confirms that any party to the consent judgment

has the right to sue for its enforcement.  As to enforcement of the servicing standards (NMS Ex.

A) and consumer relief requirements (NMS Ex. D), paragraph 6 of the consent judgment

specifically requires that those terms are to be enforced pursuant to Exhibit E of the agreement.

*See* Consent Judgment ¶ 6.  Exhibit E expressly provides that "[a]n enforcement action may be

brought by ***any Party to this Consent Judgment*** or the Monitoring Committee."  NMS Ex. E,

§ J(2) (emphasis added).  Section J(3)(a) of Exhibit E further makes clear that a party to the

agreement may bring an action "to enforce the obligations of Servicer" by seeking "[a]n order

directing non-monetary equitable relief, including injunctive relief [or] directing specific

performance," as NYAG does here.  NMS Ex. E, § J(3)(a).  The same section restricts the award

of *civil penalties* to cases where there is an uncured Potential Violation identified by the Monitor.
NYAG does not request an award of civil penalties here, but rather seeks only specific
performance or other equitable relief – remedies expressly authorized for breaches of the
servicing standards.

In correspondence prior to this proceeding, Bank of America, Wells Fargo's co-
Defendant, has taken the extreme position that a party to the agreement may sue to enforce the
agreement only after the Monitor has identified an "uncured Potential Violation" through his
statistical analysis of the performance metrics applicable to certain provisions of the agreement.[10]
*See* Letter from Meyer G. Koplow to Eric T. Schneiderman, New York Attorney General (May
7, 2013), at 3 (Lasky Ex. 19).  NYAG anticipates that Wells Fargo will repeat this argument.
But nothing in the NMS establishes any such limitation on the parties' authority to enforce the
consent judgment, and this position would render many provisions of the NMS unenforceable at
all, something the parties surely could not have intended.

Section J(3) of Exhibit E provides:

> In the event of an action to enforce the obligations of Servicer and
> to seek remedies for an uncured Potential Violation for which
> Servicer's time to cure has expired, the sole relief available in such
> an action will be:
>
> (a) Equitable Relief.  An order directing non-monetary equitable
>     relief, including injunctive relief, directing specific
>     performance under the terms of this Consent Judgment, or
>     other non-monetary corrective action.
>
> (b) Civil Penalties.  The Court may award as civil penalties an
>     amount not more than $1 million per uncured Potential
>     Violation; or, in the event of a second uncured Potential
>     Violation of Metrics 1.a, 1.b, or 2.a (*i.e.*, a Servicer fails the

---

[10] As discussed earlier, a "Potential Violation" of the consent judgment occurs when the Monitor, through his
sampling processes, determines that a Defendant has exceeded the threshold error rate for a metric in a given
quarter.  *See* NMS Ex. E, § E(1).  The Monitor may declare an "uncured Potential Violation" if the Defendant fails
to timely cure the Potential Violation in accordance with the procedures set forth in Section E(3) of Exhibit E.  *See*
NMS Ex. E, § E(3).

> specific Metric in a Quarter, then fails to cure that Potential
> Violation, and then in subsequent Quarters, fails the same
> Metric again in a Quarter and fails to cure that Potential
> Violation again in a subsequent Quarter), where the final
> uncured Potential Violation involves widespread
> noncompliance with that Metric, the Court may award as civil
> penalties an amount not more than $5 million for the second
> uncured Potential Violation.

NMS Ex. E, § J(3).  This language does not state that an uncured Potential Violation is a

precondition to any enforcement action.

Nor would such a restriction on the parties' ability to enforce the NMS make sense,

considering the consent judgment as a whole.  *See Washington Metro. Area Transit Auth. v.*

*Mergentime Corp.*, 626 F.2d 959, 961 (D.C. Cir. 1980) ("Court should construe the contract as a

whole so as to give meaning to all of the express terms.").  That is because many requirements of

the NMS, including many of its enumerated servicing standards, are not associated with a

performance metric and therefore cannot constitute an uncured Potential Violation pursuant to

the Monitor's procedures.  *See* NMS Ex. E, § E(1).  If an uncured Potential Violation was a

prerequisite to any enforcement action, many servicing standards of the NMS could not be

enforced.[11]  That is an absurd interpretation of the NMS's provisions.

Moreover, by its own terms, Exhibit E applies to a broad set of claims, including, but

certainly not limited to, those addressed by "uncured Potential Violations."  For example, under

the NMS, Wells Fargo must offer relief to consumers through principal reductions in connection

with loan modifications, as well as other forms of loss mitigation, ***valued at more than $3.4***

***billion***.  *See* Consent Judgment ¶ 5; NMS Ex. D.  None of the agreement's "Consumer Relief

Requirements" have associated metrics, and thus cannot result in a Potential Violation.  *See*

---

[11] Indeed, the servicers would never be able to bring suit to enforce any part of the consent judgment, such as the agreement's releases.  *Cf. Bank of Am.*, 2013 U.S. Dist. LEXIS 18527, at *8 (holding False Claims Act suit brought by Department of Justice against Wells Fargo not barred by NMS release).

NMS Ex. E, Schedule E-1; NMS Ex. E, § E(1).  Yet they are enforceable under the NMS as expressly provided in Section J(3)(c)(3) of Exhibit E, which sets out how a payment is to be distributed if a Defendant fails to abide by the "Consumer Relief requirements."[12]  For all these reasons, the banks' proposed construction of the enforcement provisions in the consent judgment is misplaced.

## II.   WELLS FARGO HAS REPEATEDLY VIOLATED THE CONSENT JUDGMENT

As the submitted evidence establishes, Wells Fargo has repeatedly and persistently violated each of the five Loan Modification Timeline Requirements to the detriment and harm of numerous New York homeowners.

### 1.   The Bank Has Failed to Acknowledge Receipt of Application Documents

Section  IV (F)(1) of the servicing standards requires a Defendant to provide a written acknowledgment of receipt within three business days whenever a borrower submits documents "in connection with a first lien loan modification application."  NMS Ex. E, § IV(F)(1).  This provision also stipulates that, in its "*initial* acknowledgment" following the borrower's first submission, the servicer must describe the loan modification process.  *Id.* (emphasis added).  Wells Fargo has repeatedly failed to comply with these requirements in connection with the loan modification application process for New York homeowners.  In some instances, the Bank failed to provide a written acknowledgment in response to the initial submission of application materials by a homeowner.  In other cases, the Bank failed to acknowledge the receipt of supplementary materials sent in by the homeowner after the initial application.  In either circumstance, Wells Fargo failed to comply with its obligations under the agreement.  All told,

---

[12] That subsection provides:  "In the event of a payment due under Paragraph 10.d of the Consumer Relief Requirements, 50% of the payment shall be allocated to the United States, and 50% of the payment shall be allocated to the State Parties to the Consent Judgment, divided among them in a manner consistent with the allocation in Exhibit B of the Consent Judgment."  NMS Ex. E, § J(3)(c)(3).  Paragraph 10.d of the Consumer Relief Requirements requires a Defendant to pay an amount equal to 125% of its unmet commitment amount if it fails to meet its consumer relief obligations within three years of its "Start Date."  NMS Ex. D, §10.d.

among NYAG's sample of 97 borrowers, there were at least 41 violations of this servicing standard.[13]

　　　　　　2.　　The Bank Has Failed to Notify Borrowers of Document Deficiencies

Section IV(F)(2) of the servicing standards requires a Defendant to inform the homeowner within five business days of any "known deficiency" in the borrower's submission whenever the borrower submits new information or documentation for the first time ("initial submission of information") in connection with a loan modification application.  NMS Ex. E, § IV(F)(2).  Here again, Wells Fargo failed to timely provide the required notification both when a New York homeowner first submitted an application and when the homeowner supplemented the application with additional new information in response to the Bank's demands.  All told, among NYAG's sample of 97 borrowers, there were at least 69 violations of this servicing standard.[14]

---

[13] *See* Juliana A. Decl. (Cohen Ex. 3); Laura A. Decl. (Cohen Ex. 4); C.A. Decl. (Cohen Ex. 9); Miguel A. Decl. (Cohen Ex. 10); Rachel A. Decl. (Cohen Ex. 12); Mirza Baig Decl. (Cohen Ex. 13); Connie B. Decl. (Cohen Ex. 15); Marco C. Decl. (Cohen Ex. 19); Michael C. Decl. (Cohen Ex. 22); Anna C. Decl. (Cohen Ex. 24); Andrew C. Decl. (Cohen Ex. 26); Pedro C. Decl. (Cohen Ex. 28); Nicole D. Decl. (Cohen Ex. 32); Issa E. Decl. (Cohen Ex. 35); James E. Decl. (Cohen Ex. 36); Toni G. Decl. (Cohen Ex. 42); G.G. Decl. (Cohen Ex. 43); Joyce H. Decl. (Cohen Ex. 45); Jarrod H. Decl. (Cohen Ex. 47);  Julia K. Decl. (Cohen Ex. 53); Nicholas L. Decl. (Cohen Ex. 56); Bryan L. Decl. (Cohen Ex. 58); G.L. Decl. (Cohen Ex. 59); Carol M. Decl. (Cohen Ex. 61); M.M. Decl. (Cohen Ex. 64); D. N. Decl. (Cohen Ex. 67);  Manny P. Decl. (Cohen Ex. 70); Blake R. Decl. (Cohen Ex. 72); Evelyn R. Decl. (Cohen Ex. 73); Victoria R. Decl. (Cohen Ex. 74); Anthony R. Decl. (Cohen Ex. 76); Martin and Eva Sanchez Decl. (Cohen Ex. 78); Moises and Michele Simancas Decl. (Cohen Ex. 82); Gary S. Decl. (Cohen Ex. 84); Sophia T. Decl. (Cohen Ex. 87); M.V. Decl. (Cohen Ex. 90); Jane V. Decl. (Cohen Ex. 91); Cary W. Decl. (Cohen Ex. 92); Steven and Jamie Yates Decl. (Cohen Ex. 95); F.Z. Decl. (Cohen Ex. 96); Maria M. Decl. (Cohen Ex. 98).

[14] *See* Juliana A. Decl. (Cohen Ex. 3); Laura A. Decl. (Cohen Ex. 4); A.A Decl. (Cohen Ex. 5); Qinji and Edward Allen Decl. (Cohen Ex. 6); Marie A. Decl. (Cohen Ex. 7); Pamela A. Decl. (Cohen Ex. 8); C.A. Decl. (Cohen Ex. 9); Miguel A. Decl. (Cohen Ex. 10); Manuel A. Decl. (Cohen Ex. 11); Rachel A. Decl. (Cohen Ex. 12); Mirza Baig Decl. (Cohen Ex. 13); Jessica B. Decl. (Cohen Ex. 13); Connie B. Decl. (Cohen Ex. 15); Joanne B. Decl. (Cohen Ex. 16); Theresa B. Decl. (Cohen Ex. 17); Marco C. Decl. (Cohen Ex. 19); Vincent C. Decl. (Cohen Ex. 21); Michael C. Decl. (Cohen Ex. 22); S.C. Decl. (Cohen Ex. 23); Anna C. Decl. (Cohen Ex. 24); Hong C. Decl. (Cohen Ex. 25); Andrew C. Decl. (Cohen Ex. 26); Nicole D. (Cohen Ex. 32); Phyllis D. Decl. (Cohen Ex. 34); James E. Decl. (Cohen Ex. 36); Michael Fn. Decl. (Cohen Ex. 37); Michael Fh. Decl. (Cohen Ex. 38); Leslie F. Decl. (Cohen Ex. 39); Dorothy G. Decl. (Cohen Ex. 40); Richard G. Decl. (Cohen Ex. 41); Toni G. Decl. (Cohen Ex. 42); G.G. Decl. (Cohen Ex. 43); N.H. Decl. (Cohen Ex. 44); Joyce H. Decl. (Cohen Ex. 45); Jarrod H. Decl. (Cohen Ex. 47); Tanya I. Decl. (Cohen Ex. 48); Adele F. Decl. (Cohen Ex. 49); Ilsa J. Decl. (Cohen Ex. 51); Julia K. Decl. (Cohen Ex. 53); Marie L. Decl. (Cohen Ex. 55); Nicholas L. Decl. (Cohen Ex. 56); Marie Larose Decl. (Cohen Ex. 57); Bryan L. Decl. (Cohen Ex. 58); G.L. Decl. (Cohen Ex. 59); Pedro Lebron Decl. (Cohen Ex. 60); Carol M. Decl. (Cohen Ex. 61); Ruben M. Decl. (Cohen Ex. 62); Eddie M. Decl. (Cohen Ex. 64); M.M. Decl. (Cohen Ex. 65); Timothy M.

Indeed, the Monitor recently determined that the Bank committed a Potential Violation of the metric associated with this servicing standard. *See* June 18, 2013 Monitor Report for Wells Fargo at 31 (Lasky Ex. 14). Thus, it is clear that Wells Fargo is not compliant with Section IV(F)(2) of the servicing standards.

### 3. The Bank Has Failed to Allow Thirty Days to Supplement

Section IV(F)(3) of the servicing standards requires a Defendant to allow a borrower at least thirty days from the time of a missing documents notification to supplement his or her submission before the servicer makes a decision on whether to grant the loan application. *See* NMS Ex. E, § IV(F)(3). Nonetheless, Wells Fargo often violated this standard by either demanding that a borrower provide additional application materials within less than thirty days, or denying a loan modification application on the basis of purportedly missing documents without allowing the borrower at least thirty days to supplement his or her submission. All told, among NYAG's sample of 97 borrowers, there were at least 23 violations of this servicing standard.[15]

### 4. The Bank Has Failed to Make Timely Decisions

Section IV(F)(4) requires a Defendant to render a decision on a loan modification application within thirty days of its completion, "absent compelling circumstances beyond

---

Decl. (Cohen Ex. 66); D.N. Decl. (Cohen Ex. 67); Teresa P. Decl. (Cohen Ex. 68); Tori P. Decl. (Cohen Ex. 69); Manny P. Decl. (Cohen Ex. 70); Blake R. Decl. (Cohen Ex. 72); Victoria R. Decl. (Cohen Ex. 74); Anthony R. Decl. (Cohen Ex. 76); Edward R. Decl. (Cohen Ex. 77); Carlos S. Dec. (Cohen Ex. 79); Moises and Michele Simancas Decl. (Cohen Ex. 82); Ross S. Decl. (Cohen Ex. 85); Sophia T. Decl. (Cohen Ex. 87); Thomas T. Decl. (Cohen Ex. 88); M.V. Decl. (Cohen Ex. 90); Jane V. Decl. (Cohen Ex. 91); Cary W. Decl. (Cohen Ex. 92); Steven and Jamie Yates Decl. (Cohen Ex. 95); F.Z. Decl. (Cohen Ex. 96); Maria M. Decl. (Cohen Ex. 98).

[15] *See* Juliana A. Decl. (Cohen Ex. 3); Marie A. Decl. (Cohen Ex. 7); Jessica B. Decl. (Cohen Ex. 14); Marco C. Decl. (Cohen Ex. 19); Vincent C. Decl. (Cohen Ex. 21); Andrew C. Decl. (Cohen Ex. 26); Nicole D. Decl. (Cohen Ex. 32); Issa E. Decl. (Cohen Ex. 35); Michael Fh. Decl. (Cohen Ex. 38); N.H. Decl. (Cohen Ex. 44); Jarrod H. (Cohen Ex. 47); Debra J. Decl. (Cohen Ex. 52); Kirstie K. Decl. (Cohen Ex. 54); Bryan L. Decl. (Cohen Ex. 58); Pedro Lebron Decl. (Cohen Ex. 60); Pamela M. Decl. (Cohen Ex. 63); M.M. Decl. (Cohen Ex. 65); Teresa P. Decl. (Cohen Ex. 68); Paul R. Decl. (Cohen Ex. 75); Thomas T. Decl. (Cohen Ex. 88); Jane V. Decl. (Cohen Ex. 91); Compton W. Decl. (Cohen Ex. 93); Steven and Jamie Yates Decl. (Cohen Ex. 95).

Servicer's control." NMS Ex. E, § IV(F)(4).  Wells Fargo has repeatedly violated this

requirement.  In some of these cases, the Bank failed to make a determination within thirty days

of the Bank's notification that a homeowner's application was complete.  Often, the Bank does

not even disclose to a borrower when an application is complete.  As discussed above, however,

Section IV(F)(2) of the servicing standards requires the Bank to notify a homeowner within five

business days of any known deficiency in a borrower's application.  *See* NMS Ex. E, § IV(F)(2).

An application thus should be deemed complete when the Bank has not made a request for

additional documents or materials during this five-day period.  Accordingly, the Bank also

violated the servicing standards whenever it took more than thirty days from a borrower's

submission of information to render a decision with no timely document requests outstanding to

the borrower.  *See* Ex. E, §§ IV(F)(2), (4).  All told, among NYAG's sample of 97 borrowers,

there were at least 53 violations of this servicing standard.[16]

### 5.   The Bank Has Failed to Promptly Convert to Permanent Modifications

Finally, Section IV(A)(4) of the servicing standards requires a Defendant to "promptly"

send a borrower a permanent loan modification agreement once the borrower has satisfied the

requirements of a trial period plan and to convert the borrower to a permanent loan modification

---

[16] *See* Juliana A. Decl. (Cohen Ex. 3); A.A. Decl. (Cohen Ex. 5); Qinji and Edward Allen Decl. (Cohen Ex. 6); Marie A. Decl. (Cohen Ex. 7); Pamela A. Decl. (Cohen Ex. 8); C.A. Decl. (Cohen Ex. 9); Miguel A. Decl. (Cohen Ex. 10); Manuel A. Decl. (Cohen Ex. 11); Rachel A. Decl. (Cohen Ex. 12); Jessica B. Decl. (Cohen Ex. 14); Joanne B. Decl. (Cohen Ex. 16); Rhoda C. Decl. (Cohen Ex. 20); Vincent C. Decl. (Cohen Ex. 21); Michael C. Decl. (Cohen Ex. 22); Anna C. Decl. (Cohen Ex. 24); Andrew C. Decl. (Cohen Ex. 26); Silvia C. Decl. (Cohen Ex. 29); Nicole D. Decl. (Cohen Ex. 32); Phyllis D. Decl. (Cohen Ex. 34); James E. Decl. (Cohen Ex. 36); Michael Fn. Decl. (Cohen Ex. 37); Dorothy G. Decl. (Cohen Ex. 40); Richard G. Decl. (Cohen Ex. 41); Toni G. Decl. (Cohen Ex. 42); G.G. Decl. (Cohen Ex. 43); Tanya I. Decl. (Cohen Ex. 48); Adele F. Decl. (Cohen Ex. 49); Paul J. Decl. (Cohen Ex. 50); Ilsa J. Decl. (Cohen Ex. 51); Marie L. Decl. (Cohen Ex. 55); Nicholas L. Decl. (Cohen Ex. 56); Marie Larose Decl. (Cohen Ex. 57); G.L. Decl. (Cohen Ex. 59); Ruben M. Decl. (Cohen Ex. 62); Eddie M. Decl. (Cohen Ex. 64); M.M. Decl. (Cohen Ex. 65); Brandon P. Decl. (Cohen Ex. 71); Blake R. Decl. (Cohen Ex. 72); Evelyn R. Decl. (Cohen Ex. 73); Paul R. Decl. (Cohen Ex. 75); Anthony R. Decl. (Cohen Ex. 76); Martin and Eva Sanchez Decl. (Cohen Ex. 78); Deborah S. Decl. (Cohen Ex. 80); L.S. Decl. (Cohen Ex. 81); Gary S. Decl. (Cohen Ex. 84); Ross S. Decl. (Cohen Ex. 85); M.V. Decl. (Cohen Ex. 90); Cary W. Decl. (Cohen Ex. 92); E.W. Decl. (Cohen Ex. 94); Steven and Jamie Yates Decl. (Cohen Ex. 95); F.Z. Decl. (Cohen Ex. 96); Steven G. Decl. (Cohen Ex. 97); Maria M. Decl. (Cohen Ex. 98).

upon the borrower's execution of the final modification documents.  NMS Ex. E, § IV(A)(4).

Yet Wells Fargo often delayed the conversion of a New York homeowner from a trial to a

permanent modification for a prolonged period of time, despite the borrower's compliance with

the terms of the trial period plan.[17]  All told, among NYAG's sample of 97 borrowers, there were

at least 11 violations of this servicing standard.[18]

### 6. The Experiences of Borrowers in Other States Confirm Wells Fargo's Numerous Violations of the Agreement

NYAG is not the only party to the agreement to have identified Wells Fargo's continued

non-compliance with these servicing standards.  In its June 27, 2013 letter, the Monitoring

Committee informed NYAG that the non-compliance identified by New York was "consistent

with the issues the Committee has previously identified through its members' own interactions

with distressed borrowers as well as through its work with" the Monitor.  Letter from NMS

Monitoring Committee to NYAG, at 1 (Jun. 27, 2013) (Lasky Ex. 12).  The Monitoring

Committee also acknowledged that "[o]ther states not on the Committee" had also shared their

concerns with the Committee.  *Id.*

Indeed, in a May 1, 2013 letter to the Monitor, the Massachusetts Attorney General's

office wrote that the loan modification reviews by each of the Defendants "extend[s] well

beyond the 30 days contemplated under the Settlement."  Letter from Justin J. Lowe,

Massachusetts Assistant Attorney General, to Joseph A. Smith, Jr., Monitor of National

---

[17] In addition to violating the NMS, Wells Fargo also breaches its contractual obligations to New York homeowners when it fails to promptly convert them to permanent loan modifications after they completed the trial period plans. *See Corvello v. Wells Fargo Bank, NA*, No. 11-16234, 2013 U.S. App. LEXIS 16415, at *3 (9th Cir. Aug. 8, 2013) (holding that Wells Fargo breached requirements of trial period plans with homeowners when "the bank had accepted and retained the payments demanded by the TPP, but neither offered a permanent modification, nor notified plaintiffs they were not entitled to one, as required by the terms of the TPP"); *accord Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 562-63 (7th Cir. 2012).

[18] *See* M.A. Decl. (Cohen Ex. 2); Lascell B. Decl. (Cohen Ex. 18); K.C. Decl. (Cohen Ex. 27); Irma C. Decl. (Cohen Ex. 30); G.D. Decl. (Cohen Ex. 31); Monica D. Decl. (Cohen Ex. 33); Tiffany H. Decl. (Cohen Ex. 46); Carlos S. Decl. (Cohen Ex. 79); Henry S. Decl. (Cohen Ex. 83); Joan T. Decl. (Cohen Ex. 86); Robert V. Decl. (Cohen Ex. 89).

Mortgage Settlement, at 2 (May 1, 2013) (Lasky Ex. 20).  In particular, Massachusetts noted, "[b]orrowers working with our office are often caught in an endless document chase where, as a result of a Servicer's delay, a borrower's documents 'time out' of the Servicer's system, resulting in the Servicer again requesting the same documents from the homeowner."  *Id.*

Reports from consumer advocates similarly lament the continued non-compliance of Wells Fargo and the other Defendants with the Loan Modification Timeline Requirements.  For example, in a recent nationwide survey conducted by the National Housing Resource Center, 73% of the responding housing counselors reported that the Defendants "rarely" or "never" render a decision within thirty days of receiving a complete loan modification application.  *See* National Housing Resource Center, *National Mortgage Settlement Servicing Standards and Noncompliance: Results of a National Housing Counselor Survey* (Jun. 5, 2013), at 2 (Lasky Ex. 21).  Nearly as many of the surveyed housing counselors (60%) responded that the Defendants "rarely" or "never" comply with the NMS requirement that a servicer provide a missing documents letter within five business days of receiving materials from a borrower.  *See id.*  A survey by the California Reinvestment Coalition specific to California borrowers found similar results:  the NMS timelines for responding to loan modification applications "are rarely honored," with more than half of the surveyed counselors indicating that Wells Fargo in particular either "rarely" or "never" acknowledges receipt of a loan modification application within three business days.  California Reinvestment Coalition, *Chasm Between Words and Deeds IX:  Bank Violations Hurt Hardest Hit Communities* (April 2013), at 2, 7-8 (Lasky Ex. 22).  The California housing counselors likewise reported that Wells Fargo regularly fails to comply with its obligations to notify borrowers of missing documents within five business days and to render a decision within thirty days of a completed application.  *See id.* at 8.  A plurality

27

of the survey respondents answered Wells Fargo when asked which servicer was "the worst at keeping people in their homes where that should be possible."  *Id.* at 17.

The experiences of borrowers throughout the country appear to mirror those of New York borrowers and confirm that Wells Fargo has repeatedly violated the timeline requirements of the NMS to the detriment and harm of New York homeowners.  Wells Fargo's non-compliance with the court-ordered settlement terms cannot continue.

## III.    THE COURT SHOULD EXERCISE ITS AUTHORITY TO GRANT EQUITABLE RELIEF SUFFICIENT TO PROTECT NEW YORK HOMEOWNERS

As set forth above, Wells Fargo has routinely violated the Loan Modification Timeline Requirements.  These violations, which often financially benefit the Bank, will continue to harm homeowners throughout New York absent the Court's intervention.  The Court should exercise its discretion to order equitable relief sufficient to stop Wells Fargo's persistent non-compliance with the NMS Loan Modification Timeline Requirements and to mitigate the harm to New York homeowners.

In an action to enforce the obligations of a Defendant, the NMS authorizes the Court to issue "[a]n order directing non-monetary equitable relief, including injunctive relief, specific performance under the terms of this Consent Judgment, or other non-monetary corrective action."  NMS Ex. E, § J(3).  Courts have made clear that "[r]elief that enforces a consent decree, even if compensatory in purpose and effect is an equitable order."  *Shy v. Navistar Int'l Corp.*, 701 F.3d 523, 533 (6th Cir. 2012); *see also Cook v. City of Chicago*, 192 F.3d 693, 695 (7th Cir. 1999) ("From the standpoint of interpretation a consent decree is a contract, but from the standpoint of remedy it is an equitable decree.").  The Court has wide discretion to fashion appropriate equitable remedies in response to Wells Fargo's defiance of the consent judgment. *See Shy*, 701 F.3d at 533 ("In enforcing a consent decree a federal court has broad equitable remedial powers and the court's choice of remedies is reviewed for an abuse of discretion.");

*United States v. Alcoa, Inc.*, 533 F.3d 278, 286 (5th Cir. 2008) ("[D]istrict courts have wide

discretion to enforce decrees and to implement remedies for decree violations."); *Berger v.*

*Heckler*, 771 F.2d 1556, 1568 (2d Cir. 1985) ("Where a right and a violation have been shown,

the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and

flexibility are inherent in equitable remedies.").  In exercising this discretion, the ultimate

objective of the Court should be to "fashion equitable relief that is designed to make a party

whole for his or her loss." *Shy*, 701 F.3d at 533; *cf. McComb v. Jacksonville Paper Co.*, 336

U.S. 187, 193 (1949) ("The measure of the court's power in civil contempt proceedings is

determined by the requirements of full remedial relief." ).

NYAG respectfully submits that the remedy directed by the Court should, at a minimum,

incorporate the following components:

*First*, the Court should direct specific performance requiring Wells Fargo to comply with

the Loan Modification Timeline Requirements with respect to New York homeowners.

*Second*, the Court should order Wells Fargo to take such steps as are necessary to ensure

its compliance with the NMS servicing standards, such as requiring that key Bank staff and

decision-makers are assigned early in the loan modification process thereby avoiding repetitive

requests for paperwork.  *See* NMS Ex. A, § IX(B)(1) (requiring that "in each instance in [the]

Agreement in which Servicer is required to ensure adherence to, or undertake to perform certain

obligations," the Servicer must "authorize and adopt such actions on behalf of Servicer as may

be necessary for Servicer to perform such obligations and undertakings").

*Third*, for any violations of Sections IV(F)(2) and IV(F)(4), the Court should enjoin the

Bank from commencing a new foreclosure action, or proceeding to a foreclosure sale in the case

of a borrower currently in foreclosure, until such time as the Bank has made a decision on the

application.  These servicing standards were designed to expedite the loan modification review

and approval process and thereby increase the likelihood that borrowers could avoid foreclosure and keep their homes.  By defying the deadlines imposed by the servicing standards, Wells Fargo has undermined this objective and put numerous New York borrowers at enhanced risk of foreclosure.  *See* Lynch Decl. ¶¶ 31-41 (Lasky Ex. 3); *see also* California Monitor, *The "Complete" Application Problem:  A Solution to Help Homeowners and Banks Work Together* (June 19, 2013), at 2 (Lasky Ex. 15) (finding that because of the "dysfunctional" loan modification process of the past six years, "[m]illions of homes were lost to foreclosures that could have been prevented, and communities and families suffered the consequences").  Accordingly, the Court should mitigate the harm to borrowers from Wells Fargo's non-compliance by prohibiting the Bank from foreclosing on their homes until it has made a determination on the borrowers' applications.  *See Berger*, 771 F.2d at 1568 (holding that the district court has "broad" equitable relief powers "where the performance of one party threatens to frustrate the purpose of the decree").  This approach would be consistent with the recommendation of the California Monitor that the foreclosure process be "paused" once homeowners have submitted their initial loan modification applications, even if the applications were not yet complete.  California Monitor, *The "Complete" Application Problem:  A Solution to Help Homeowners and Banks Work Together* (June 19, 2013), at 8-9 (Lasky Ex. 15).

*Fourth*, for any violations of Sections IV(F)(1)-(4) of the servicing standards, the Court should enjoin the Bank from assessing any additional interest or default-related fees or charges to the borrower's account until such time as the Bank has made a decision on the application.  In addition, for any violations of Section IV(A)(4) of the servicing standards, the Court should require the Bank to set the modification effective date (*i.e.,* the date when the reduced modified interest rate goes into effect) as the month following the last month of the trial period plan and require that the Bank reapply payments received after the final trial payment accordingly.  For

this violation, the Court should also require the Bank to remove any delinquency-related fees from the borrower's account that accrued after the final month of the trial period plan and refund any fees paid by the borrower after that time.  As it stands now, Wells Fargo benefits from its own delays, as interest and fees that may be recovered upon foreclosure continue to be assessed on borrowers who are struggling to modify their mortgage loans.  *See* California Monitor, *The "Complete" Application Problem:  A Solution to Help Homeowners and Banks Work Together* (June 19, 2013), at 6 (Lasky Ex. 15) (noting that "banks have no incentive to hasten loan modifications to be complete," as the "more fees accumulate—if a property will be foreclosed ultimately—the higher profits a servicer can earn").  New York homeowners, on the other hand, bear the brunt of the Bank's delays because even if their loans ultimately are modified, arrears that accrued during the periods of the Bank's delays are capitalized into their new principal balances.  *See* Lynch Decl. ¶¶ 24-30.  The Court should remediate this harm to New York homeowners by enjoining Wells Fargo from continuing to collect additional fees and interest on these loans while it is not compliant with its NMS obligations.  *See Shy*, 701 F.3d at 533 (relief for violation of consent decree should "make a party whole for his or her loss").

      *Fifth*, and finally, the Court should order such other equitable relief as it may deem just and proper.

## CONCLUSION

For the foregoing reasons and for the protection of New York homeowners, NYAG

respectfully requests that the Court grants its Motion to enforce the Consent Judgment, holds that

Wells Fargo has violated its obligations under the servicing standards, and issues an Order

providing for the equitable relief set forth in Section III of this memorandum.

Dated: New York, New York
     October 2, 2013

                    Respectfully submitted,
                    ERIC T. SCHNEIDERMAN

                    Attorney General of the State of New York
                    Attorney for Plaintiff


By:   */s/ Brian N. Lasky*
                    Brian N. Lasky
                    Assistant Attorney General
                    Bureau of Consumer Frauds and Protection
                    120 Broadway, 3rd Floor
                    New York, NY 10271
                    (212) 416-8300

Of Counsel:

JANE M. AZIA
Bureau Chief
Consumer Frauds and Protection Bureau

LAURA J. LEVINE
Deputy Bureau Chief

ADAM H. COHEN
MELISSA J. O'NEILL
Assistant Attorneys General

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

----------------------------------------------------------------X

UNITED STATES OF AMERICA, et al.,

                          Plaintiffs,          Case No. 1:12-cv-00361-RMC

v.

BANK OF AMERICA CORP., et al.,

                          Defendants.

----------------------------------------------------------------X

## CERTIFICATE OF SERVICE

      I, BRIAN N. LASKY, hereby certify that on the 2nd day of October 2013, I served a true and correct copy of the following papers on counsel for all parties through this Court's Electronic Case Filing system:  (1) the Motion and Memorandum of Law in Support of New York Attorney General's ("NYAG") Motion to Enforce the Consent Judgment Against Wells Fargo Defendants; (2) the Declaration of Brian N. Lasky in support of NYAG's Motion and the exhibits annexed thereto; (3) the Declaration of Adam H. Cohen in support of NYAG's Motion; and (4) the Proposed Order.

      In addition, the exhibits to the Declaration of Adam H. Cohen, which NYAG has sought permission to file under seal, were served by overnight courier on counsel for defendant Wells Fargo at the following address:

David V. Gorsche
Assistant General Counsel
Wells Fargo - Law Department
Consumer Lending & Corporate Regulatory Division
800 Walnut Street, N0001-11B
Des Moines, IA  50309

Dated:  October 2, 2013
        New York, New York

                          By:   */s/ Brian N. Lasky*
                                Brian N. Lasky
                                Assistant Attorney General
                                Bureau of Consumer Frauds and Protection
                                120 Broadway, 3rd Floor
                                New York, NY 10271
                                (212) 416-8300