UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 1:12-cv-00361-RMC |
| BANK OF AMERICA CORP., *et al.*, | ) ) | |
| Defendants. | ) ) ) ) | |

## WELLS FARGO'S OPPOSITION TO NEW YORK ATTORNEY GENERAL'S MOTION TO ENFORCE THE CONSENT JUDGMENT

Wells Fargo & Company and Wells Fargo Bank, N.A. (collectively, "Wells Fargo")

respectfully submit this Opposition to the Motion to Enforce the Consent Judgment Against

Wells Fargo Defendants filed by Plaintiff Eric T. Schneiderman, Attorney General of the State of

New York (the "NYAG").

## PRELIMINARY STATEMENT

On October 2, 2013, the NYAG filed a motion purportedly seeking to enforce the

Consent Judgment entered against Wells Fargo (hereinafter "NYAG Motion").  Wells Fargo

agrees with the NYAG that the express terms of the Consent Judgment negotiated by the Parties

govern, but the NYAG's motion ignores the Consent Judgment's unambiguous and express

terms and plain language.  The NYAG is simply not entitled to relief based on those terms and

that language.  The NYAG does not allege, for instance, that Wells Fargo has failed to live up to

its commitments in the Consent Judgment to provide borrowers relief by reducing the principal

owed by borrowers whose homes are worth less than the outstanding principal.  To the contrary, Wells Fargo has **already** provided more than **$4.4 billion** in relief, including in excess of $175 million in New York.  *See* Declaration of Alan Jones at ¶ 4 (attached hereto as Exhibit 1).[1]  Nor does the NYAG allege that Wells Fargo has erroneously foreclosed on New York homeowners or wrongfully failed to accord relief to distressed borrowers.

Instead, the NYAG bases its motion on purported examples of Wells Fargo failing to meet documentation and decision-making timetables – examples that, if accurate, involve less than .025% of the loans Wells Fargo services in New York (97 out of roughly 450,000 loans).  *See, e.g. id.* at ¶ 2.  The NYAG claims that these examples demonstrate a pattern of disregard for the terms of the Consent Judgment.  The reality, however, is that the NYAG makes a broadside attack on the Consent Judgment - an attack that flagrantly ignores its terms.  The Consent Judgment contains a heavily negotiated and complex out-of-court enforcement framework designed to ensure that Wells Fargo and the other signatory banks adhere to the standards of conduct that the Consent Judgment prescribes.

The Consent Judgment provides that the independent third-party Monitor, alone, is tasked with measuring and ensuring Wells Fargo's compliance with the Servicing Standards through the use of specifically negotiated "Metrics" that anticipate some minimal tolerance for error.  Contrary to the NYAG's argument, the use of metrics to judge Wells Fargo's compliance is not simply an option: under the unambiguous terms of the Consent Judgment, Wells Fargo's "compliance with the Servicing Standards **shall** be assessed via metrics."  Consent Judgment Ex. E § C(11) (emphasis added).  If Wells Fargo self-reports or the Monitor finds that Wells Fargo

---

[1]      This Court need look no further than the plain and unambiguous language of the Consent Judgment to rule on the present motion.  Nonetheless, to provide context, Wells Fargo submits Mr. Jones' short declaration.

has failed one of these defined Metrics, the Consent Judgment provides Wells Fargo with the right to cure that "Potential Violation." The Consent Judgment then permits a party, including the NYAG, to file an enforcement action *only* if there is an "uncured Potential Violation." *Id.* at Ex. E § J(3). This provision is both **express** and **clear** under the Consent Judgment.

The NYAG has not alleged – and cannot allege – any uncured Potential Violation by Wells Fargo. In fact, as the Monitor has confirmed, Wells Fargo has satisfied all of the Metrics developed under the Consent Judgment except for one, as to which, in a single reporting period Wells Fargo missed the required 95 percent target by less than 3 percent. Wells Fargo self-reported the Potential Violation and has been actively cooperating with the Monitor and Monitoring Committee to cure this lone Potential Violation, as the Consent Judgment requires. The Consent Judgment gives Wells Fargo an absolute right to cure such a violation, and the NYAG is not entitled to "any remedy" if Wells Fargo does so. *Id*. at Ex. E § E(1), (6).

Despite the plain language of the Consent Judgment, the NYAG seeks to end-run the entire mechanism for testing the Metrics and identifying, curing and if necessary enforcing Potential Violations. Apparently, the NYAG believes that any State can run into Court whenever it views the actions of Wells Fargo (or any of the other four banks that entered similar consent judgments) as being inconsistent with that State's desires, regardless of whether its views are embodied in the express terms of the Consent Judgment. Indeed, the NYAG asks the Court to ignore the entire negotiated process set forth in the Consent Judgment and intervene based on untested hearsay from 97 proffered declarations – none of which are from borrowers, but rather from various loan counselors, staff attorneys, and paralegals. The NYAG is essentially asking, without any legal basis, for this Court to grant sweeping relief beyond the terms of the Consent Judgment. In short, the NYAG's Motion is a counterproductive and misguided attempt to

preempt or evade the bargained-for terms of the Consent Judgment.  Accordingly, the Court

should deny the NYAG's Motion based on the express terms of the Consent Judgment and as a

matter of law. [2]

## STATEMENT OF FACTS

I.    **Relevant Provisions of the Consent Judgment**

On April 4, 2012, the Court approved a national settlement with five banks, including

Wells Fargo, by entering a consent judgment with each bank.  In the Consent Judgment (Docket

No. 14), Wells Fargo agreed to pay approximately $5.9 billion, including $1 billion to the

plaintiff State governments (over $100 million to the NYAG), $1.5 billion to borrowers whose

homes were sold or taken in foreclosure, and an additional $3.4 billion in future consumer relief

by, for example, reducing the principal owed by borrowers whose homes were worth less than

the outstanding principal.  *See* Consent Judgment ¶¶ 3-5 & Exs. B, C, D.  Wells Fargo also

committed to abide by 304 wide-ranging Servicing Standards regarding its servicing of

residential mortgage loans.[3]  *See, e.g.*, *id.* at ¶ 2 & Ex. A.  In exchange, the Consent Judgment

provided Wells Fargo a release from liability and a detailed mechanism for avoiding future

actions.  *See id.* at ¶¶ 9–10 & Exs. F, G.

---

[2]      If the Court permits the NYAG to maintain this purported enforcement action, Wells Fargo would ask the Court for permission to seek discovery on an expedited basis on the 97 double-hearsay declarations and a short evidentiary hearing to verify and determine the truth of the allegations and whether any actually violate the express terms of the Consent Judgment.  *See* Motion for Extension of Time to Respond to Legal Deficiencies in the NYAG's Motion to Enforce the Consent Judgment and for Briefing and Consideration of the Factual Issues to be Stayed until after the Court Considers the Legal Deficiencies (Docket No. 102).  Based upon the facts in the record at this point, none do.

[3]      The Servicing Standards apply largely to "loans secured by owner-occupied properties that serve as the primary residence of the borrower." They are spelled out in Exhibit A to the Consent Judgment, captioned "Settlement Term Sheet."  Consent Judgment at A-1.

A.      *The Role of the Monitor and Monitoring Committee in the Enforcement Procedure*

The Consent Judgment provides for this Court to retain jurisdiction "to enforce its terms," *id.* at ¶ 13, and sets up a comprehensive enforcement framework, *id.* at ¶¶ 6–8 & Ex. E.  This enforcement framework depends expressly upon the "responsibility" of the third-party Monitor appointed by the parties, Joseph A. Smith, Jr., to "determine whether" Wells Fargo "is in compliance with the Servicing Standards and the Mandatory Relief Requirements," and the "Consumer Relief Requirements."  *Id.* at ¶ 7 & Ex. E §§ C(5), (11).  The framework also contemplates that a "Monitoring Committee" will serve "as the representative of the participating state and federal agencies in the administration of all aspects" of the Consent Judgment.  *Id.* at ¶ 8 & Ex. E.  The enforcement framework clearly and purposely treats litigation as a backstop – to occur only in the case of an uncured "Potential Violation" of the Consent Judgment Metrics.

B.      *The Metric-Centered Enforcement Procedure*

The Consent Judgment anticipates and sets up statistical testing on twenty-nine defined "Metrics" to evaluate Wells Fargo's adherence to the Servicing Standards.  *Id.* at Ex. E § C(11).  Indeed, the express terms of the Consent Judgment require that Wells Fargo's "compliance with the Servicing Standards shall be assessed via metrics."  *Id.*  Importantly, the Consent Judgment provides a "Threshold Error Rate" for each Metric and defines what an "error" for each Metric is.[4]  *Id.* at Ex. E1.  Two Metrics are relevant in this case.  They are detailed below.

---

[4]     For Metrics that are more likely to result in harm to borrowers, the Threshold Error Rate is lower.  For instance, the "foreclosure sale in error" Metric has a tolerance threshold of 1%.  *Id.* at Ex. E1-1.

| Metric | Test Questions | Error | Threshold Error Rate |
|---|---|---|---|
| Metric 19: "loan modification document collection timeline" (*Id.* at E1-10) | (1) "Did the Servicer notify borrower of any known deficiency in borrower's initial submission of information, no later than 5 business days after receipt, including any missing information or documentation"; and (2) "Was the Borrower afforded 30 days from the date of Servicer's notification of any missing information or documentation to supplement borrower's submission of information prior to making a determination on whether or not to grant an initial loan modification?" | "[t]he total # of loans processed outside the allowable timelines as defined under each timeline requirement tested." | 5% |
| Metric 20: "loan modification decision/notification timeline" (*Id.* at E1-11) | (1) "Did the servicer respond to request for a modification within 30 days of receipt of all necessary documentation?" (2) "Denial Communication:  Did the servicer notify customers within 10 days of denial decision?" | "[t]he total # of loans processed outside the allowable timelines as defined under each timeline requirement tested." | 10% |

By design, the Metrics do not test all of the Servicing Standards.  Instead, the Consent Judgment provides a means to promulgate additional Metrics, if needed to address perceived deficiencies.[5] In fact, the Monitor has already notified this Court that he has exercised his authority under the Consent Judgment to adopt several such new Metrics.  *See, e.g.*, Docket Nos. 80-84.  To test against the various Metrics, Wells Fargo is tasked in the first instance with "designat[ing] an

---

[5]      The Consent Judgment includes two mechanisms permitting the Monitor to "supplement[]" the Metrics. *See id.* at Ex. E § C(11).  First, the Monitor can, in consultation with Wells Fargo and the Monitoring Committee, add new Metrics (along with Threshold Error Rates for those metrics) designed to test compliance with "material terms of the Servicing Standards." *Id.* at Ex. E § C(12).  Moreover, if the Monitor ultimately concludes that Wells Fargo has engaged in a "pattern of noncompliance" that is "reasonably likely to cause harm" to borrowers, then the Monitor "may propose an additional Metric and associated Threshold Error Rate." *Id.* at Ex. E § C(23).

internal quality control group" known as the "Internal Review Group" (IRG), which is responsible for conducting statistical tests that measure Wells Fargo's compliance with the Metrics.  Consent Judgment Ex. E §§ C(7) - C(10).  That "test work" must adhere to methods and procedures set forth in a "Work Plan" adopted by agreement of the Monitor and Monitoring Committee.  *Id.* at Ex. E §§ C(13) - C(15).  Wells Fargo must "report the results" of its statistical testing in "Quarterly Reports" submitted to the Monitor.  *Id.* at Ex. E §§ C(11), D(1).

Ultimately, the Monitor determines whether Wells Fargo "is in compliance with the Servicing Standards" measuring against the specific Metrics.  *Id.* at Ex. E §§ C(5), C(11). Indeed, the Monitor provides reports on Wells Fargo's compliance to the Monitoring Committee and the Court.  *Id*. at Ex. E §§ D(3) - (4). If the Monitor "reasonably determines" that the work of the IRG is unreliable or that the IRG "did not correctly implement the Work Plan in some material respect," then "the Monitor may direct that the [IRG's] work on the Metrics (or parts thereof) be reviewed by Professionals or a third party."[6]  *Id.* at Ex. E § C(22).

C.     *The Right to Cure a Potential Violation*

When the Monitor reports a failed Metric, that does not mean the Consent Judgment has been violated or that there is a right to seek judicial redress.  Rather, a Metric failure gives rise to a Potential Violation.  *Id.* at Ex. E § E(1).  Under the Consent Judgment's express terms, a Potential Violation triggers a non-judicial mechanism under which Wells Fargo **has the right to cure that Potential Violation** and to "remediate any material harm" to borrowers.[7]  *See id.* at Ex. E §§ E(1) – E(6).

---

[6]        The Monitor may employ attorneys and professional-services firms.  *Id.* at Ex. E § C(2).

[7]        If the Monitor concludes that a Potential Violation is so egregious that it reflects a "widespread" error, then Wells Fargo must take additional steps to "identify other borrowers who may have been

The Consent Judgment clearly provides that Wells Fargo has both the "right" and the "obligation" to "cure any Potential Violation" and that Wells Fargo can do so by successfully implementing a corrective-action plan approved by the Monitor and not failing the same Metric again for a defined time (the "Cure Period").  *Id.* at Ex. E §§ E(2), E(3), E(5).  The Consent Judgment is explicit and unambiguous:  if Wells Fargo cures a Potential Violation by satisfying these two requirements, then "*no Party shall have any remedy under this Consent Judgment (other than [to borrower-specific remediation] under Section E.5) with respect to such Potential Violation.*"  *Id.* at Ex. E § E(6) (emphasis added).

> D.     *Enforcement Actions Only Permitted for Uncured Potential Violations*

In short, the Consent Judgment employs a judicial backstop designed to ensure that Wells Fargo abides by the framework of compliance.  If Wells Fargo does not cure a failed Metric identified by the Monitor, the Consent Judgment permits a judicial enforcement action in this Court, after appropriate notice to the Monitoring Committee, if the Monitoring Committee declines to bring action.  *Id.* at Ex. E §§ J(1) - J(2).  The Consent Judgment is clear that an enforcement action is only "available" "for an uncured Potential Violation for which [Wells Fargo's] time to cure has expired."[8]  *Id.* at Ex. E § J(3).  The flow chart on the next page illustrates the carefully negotiated, step-by-step Metric enforcement process that does not permit prosecution of enforcement actions in the absence of an uncured Potential Violation.

---

harmed" and must "remediate all such harms to the extent that the harm has not been otherwise remediated."  *Id.* at Ex. E § E(5).

[8]     Notwithstanding the monitor-centered and metrics-based mechanism for compliance, the Consent Judgment does not "interfere with existing consumer complaint resolution processes," and Wells Fargo committed in the Consent Judgment to "continue to respond in good faith to individual consumer complaints provided to it by the State Attorneys General." *Id.* at Ex. E § H.  Tellingly, there is no claim that Wells Fargo has failed to do so.

**Servicing Standard Enforcement Process Under the National Mortgage Settlement**



## II.     The Enforcement Process Is Working As Intended

As required by the Consent Judgment, Wells Fargo established an IRG, *see* NYAG

Motion, Lasky Decl. Ex. 14 (June 18, 2013 Monitor Report for Wells Fargo) at 8 (hereinafter,

"Monitor Report"), that conducts compliance reviews pursuant to the Work Plan negotiated with

the Monitor and reviewed by the Monitoring Committee.  Consent Judgment Ex. E § C(7).

   *A.     Wells Fargo's Compliance with the Metrics*

On November 14, 2012, Wells Fargo's IRG timely filed its first Quarterly Report with

the Monitor.  Monitor Report at 16.  The First Quarterly Report concluded that Wells Fargo had

not exceeded the Threshold Error Rate for any of the tested Metrics.  *Id.*  On February 14, 2013,

Wells Fargo's IRG timely filed its second Quarterly Report with the Monitor.  *Id.*  That report

concluded that Wells Fargo had not exceeded the Threshold Error Rate for any of the Metrics

tested, except for Metric 19.  *Id.* at 17.  Metric 19 contains an Error Threshold Rate of 5 percent,

which Wells Fargo exceeded by 2.84 percent.  *Id.*  In other words, Metric 19 requires 95 percent

compliance, and Wells Fargo achieved 92.16 percent.

Pursuant to the enforcement process described above, Wells Fargo met with the

Monitoring Committee on February 26, 2013, to explain the nature of, and discuss remedial

plans to cure, the Potential Violation.  *Id.* at 32.  Wells Fargo then consulted with the Monitor to

develop a Corrective Action Plan.  *Id.* at 33.  As a result of these consultations and the Monitor's

qualitative review of the individual errors, the Monitor concluded that Wells Fargo's

noncompliance was "not widespread" in part because Wells Fargo's error rate exceeded the

Threshold Error Rate by "only 2.84%." *Id.*

B.     *The Ongoing Cure Period for Wells Fargo's Single Failed Metric*

Wells Fargo timely submitted a proposed Corrective Action Plan to the Monitor in early

March 2013 and an amended Corrective Action Plan in June 2013.  *Id.*; *see also* National

Servicing Standards:  Metric 19 – Action Plan Review (June 17, 2013) (hereinafter "CAP")

(attached hereto as Exhibit 2).  The purpose of Wells Fargo's Corrective Action Plan was to

remedy the single Potential Violation.  Monitor Report at 33.  The Monitor reviewed and

approved Wells Fargo's Corrective Action Plan determining that the Corrective Action Plan

would "reasonably be expected to lower [Wells Fargo's] error rate for Metric 19 to a level below

the Threshold Error Rate of 5% during the Cure Period."  *Id.* at 34-35.  The Monitor approved

Wells Fargo's Corrective Action Plan on June 17, 2013.  The following day, the Monitor issued

and filed with this Court his first Compliance Report.  The report was the first public

announcement of Wells Fargo's Potential Violation of a single Servicing Standard Metric.  The

report assured this Court that Wells Fargo's Corrective Action Plan is "currently undergoing

testing and verification" and that the Monitor would provide an update on the results in the next

report after Wells Fargo had its opportunity to cure.  *Id.* at 34.

In July 2013, Wells Fargo commenced testing for errors in accordance with the

Corrective Action Plan. *See* Jones Decl. at ¶ 10.  The cure period testing ended on August 20,

2013, and Wells Fargo will issue a report on its compliance to the Monitor on November 14,

2013.  *Id*.  Wells Fargo understands and believes that the Monitor will provide an update on the

results of Wells Fargo's Corrective Action Plan in the next Monitor's Report.  Monitor Report at

34.

## III.   The NYAG's Purported Enforcement Action

On May 6, 2013 – before the Monitor had even issued his first compliance report – the

11

NYAG sent a letter to the Monitoring Committee and issued a press release complaining of a supposed "persistent pattern of non-compliance" with Servicing Standards by Wells Fargo and Bank of America.  *See* May 6, 2013 NYAG Letter to the Monitoring Committee, *available at* http://www.ag.ny.gov/pdfs/Letter%20to%20Monitoring%20Committee%20NYS%20AG%205%206%2013.pdf; *A.G. Schneiderman to Sue Wells Fargo & Bank of America for Violating National Mortgage Settlement*, New York State Office of the Attorney General (May 6, 2013), *available at* http://www.ag.ny.gov/press-release/ag-schneiderman-sue-wells-fargo-bank-america-violating-national-mortgage-settlement-0.  The NYAG letter to the Monitoring Committee and the press release ignored the results of the process set forth in the Consent Judgment – results that showed that Wells Fargo had a single Potential Violation, for which it has a right to cure. Instead, the NYAG cited *ad hoc* complaints that Wells Fargo allegedly violated various Servicing Standards.  *See* May 6, 2013 NYAG Letter.  On May 23, 2013, the NYAG again wrote the Monitoring Committee regarding the alleged "pattern of non-compliance" providing "revised and updated" examples of complaints received.[9]  *See* NYAG Motion, Lasky Decl. Ex. 11 (May 23, 2013 NYAG Letter to Monitoring Committee).

The NYAG issued yet another press release on June 19, 2013 – the day after the Monitor's Compliance Report publicly announced that Wells Fargo had a single Potential Violation.  The press release asserted incorrectly that "Wells Fargo is failing to live up to its obligations under the Settlement."  *See  Statement from A.G. Schneiderman Regarding the National Mortgage Settlement Monitor's Finding that Wells Fargo Failed to Comply with Timeline Servicing Standards*, New York Office of the Attorney General (June 19, 2013),

---

[9]     The NYAG's second letter to the Monitoring Committee failed to provide the Monitoring Committee with notice of NYAG's intent to bring an enforcement action, as required by Consent Judgment Exhibit E § J(2).

*available at* http://www.ag.ny.gov/press-release/statement-ag-schneiderman-regarding-national-mortgage-settlement-monitors-finding.

On June 27, 2013, the Monitoring Committee formally responded by letter to the NYAG. *See* NYAG Motion, Lasky Decl. Ex. 12 (June 27, 2013 Monitoring Committee Letter to NYAG) (hereinafter "Monitoring Committee Letter"). The letter confirmed that the concerns raised by the NYAG were "being addressed through the robust formal compliance oversight process under the Settlement." *Id.* at 2. The Monitoring Committee's letter also reassured the NYAG that "changes, which should result in improvements for borrowers, are underway;" noted that the negotiated enforcement process was the most efficient means of achieving the NYAG's requested relief; and opined that an enforcement action would only result in counterproductive, "protracted litigation." *Id.* The letter concluded with an assurance that the Monitoring Committee would remain "actively engaged" at every step of the compliance oversight process by, among other things, reviewing Wells Fargo's Corrective Action Plan over the coming months. *Id.*

While the process of curing Wells Fargo's single Potential Violation is underway and nearly complete (its compliance report is due to be filed on November 14, 2013), the NYAG prematurely filed his Motion to Enforce on October 2, 2013. Conspicuously, the NYAG's Motion does not allege any uncured Potential Violations by Wells Fargo. Instead, the Motion seeks expansive equitable relief based on 97 third-party declarations – not one of which is from an actual borrower, but rather all are from loan counselors, staff attorneys, and paralegals – that assert servicing errors allegedly experienced by certain New York homeowners. None of the purported servicing errors alleged by the NYAG have resulted in an uncured Potential Violation

by Wells Fargo, and therefore the NYAG lacks any basis under the Consent Judgment for the

requested relief.  Consent Judgment Ex. E §§ E(6), J(3)

## **LEGAL STANDARD**

As this Court emphasized in a previous case concerning the same Consent Judgment at

issue in this Motion, "[a] consent decree must be construed according to principles of contract

interpretation."  *United States v. Bank of Am.*, 922 F. Supp. 2d 1, 6 (D.D.C. 2013) (Collyer, J.)

(citation omitted); *see also Segar v. Mukasey*, 508 F.3d 16, 21 (D.C. Cir. 2007).  "The meaning

of a consent decree, like a contract, should be determined within its four corners."  *Bank of Am.*,

922 F. Supp. 2d at 6 (citation omitted).  The NYAG agrees.  NYAG Motion at 19.

A "'cardinal principle of contract construction [is] that [the] document should be read to

give effect to all its provisions.'"  *United States v. Ins. Co. of N. Am.*, 83 F.3d 1507, 1511 (D.C.

Cir. 1996) (quotation omitted); *United States v. Western Elec. Co.*, 894 F.2d 1387, 1391 (D.C.

Cir. 1990) (In interpreting "consent decree provision," the "purpose of the provision in the

overall context of the judgment at the time the judgment was entered" is relevant.); *Bank of*

*America*, 922 F. Supp. 2d at 6–7 ( "[C]ourt must be careful not to interpret the decree by

reference to the purposes of one of its parties, but may "refer[] to the document's . . . purpose.").

Thus, to comply with this principle, a contract should be read "as a whole 'to give meaning to all

of its provisions and to render them consistent with each other.'"  *Beal Mortg., Inc. v. FDIC*, 132

F.3d 85, 88 (D.C. Cir. 1998) (quoting *United States v. Ins. Co. of N. Am.*, 83 F.3d 1507, 1511

(D.C. Cir. 1996)).

Standard principles of contract interpretation dictate that the "plain and unambiguous

meaning of an instrument is controlling."  *WMATA v. Mergentime Corp.*, 626 F.2d 959, 961

(D.C. Cir. 1980); *see also Segar*, 508 F.3d at 22.  In other words, where the contract is

unambiguous, courts are "constrained by the terms" of the contract, *see Pigford v. Veneman*, 292 F.3d 918, 924 (D.C. Cir. 2002) (a court's right to enforce a consent decree is limited by the plain language of the enforcement clause), and "the words in the contract [are presumed to] have their ordinary meaning." *Bank of Am.*, 922 F. Supp. 2d at 6 (citation omitted). "The question of whether an agreement is clear or ambiguous is one of law for the court." *Id.* "Where the contract is unambiguous, as evidenced by the plain language of the contract, the court's inquiry is at an end, and the plain language of the contract controls." *Id.* (citation omitted).

Thus, the principal question for this Court is whether Wells Fargo agreed in the Consent Judgment that other Parties may bring enforcement actions concerning Servicing Standards without regard to whether Wells Fargo breached a Metric in the Consent Judgment and without regard to whether Wells Fargo is in the process of or already has cured any such breaches. The answer is "No".

## <u>ARGUMENT</u>

The NYAG says that he is asking the Court to enforce "the terms of the bargain" contained in the Consent Judgment. The NYAG is incorrect. The express terms of the Consent Judgment permit the NYAG to file an enforcement action pertaining to a Servicing Standard *only* after Wells Fargo has been given notice of a Potential Violation and failed to cure that Potential Violation. But, the NYAG alleges no such uncured Potential Violation. Consent Judgment Ex. E § J(3). Nor can he do so as there is none. The "bargain" struck by Wells Fargo with all parties to the Consent Judgment mandates a specific enforcement process in which the Monitor identifies Potential Violations. *Id.* at Ex. E § E(5). Wells Fargo then has the *absolute right* under the terms of the Consent Judgment to cure any Potential Violation, and the parties, including the NYAG, explicitly waived their right to "any remedy" if Wells Fargo does so. *Id.* at

Ex. E § E(1), (6).  The NYAG's Motion seeks to usurp the role of both the Monitor and the NYAG's own representatives on the Monitoring Committee and to disregard the mechanism for enforcement the NYAG agreed to just eighteen months ago.  Thus, he asks the Court to order equitable relief on the basis of (1) a single Potential Violation and (2) conduct that is not even a Potential Violation, despite the uncontested fact that there is no uncured Potential Violation.

Wells Fargo and the numerous other parties invested significant time and resources in negotiating and crafting the Consent Judgment.  Wells Fargo has since invested substantial time and resources in complying with the Consent Judgment.  To that end, Wells Fargo has satisfied each of the Metrics used to evaluate its compliance with the Consent Judgment except for a single Metric that it missed by less than 3 percent (achieving over 92% compliance) in one reporting period and which Wells Fargo is in the process of curing, as it has the right to do. Thus, there are no uncured Potential Violations that could serve as the basis for an enforcement action by the NYAG.  Instead, the NYAG relies solely upon untested double hearsay from 97 declarations anecdotally recounting alleged violations of the Servicing Standards experienced by certain New York homeowners, none of whom have submitted a single declaration of their own. While Wells Fargo regrets any delays or other errors encountered by these homeowners, the experiences of 97 homeowners do not establish a violation of any Metric for which specific threshold error rates were expressly agreed to in the Consent Judgment.

The Consent Judgment was a heavily-negotiated, Court-approved settlement.  As part of the agreement, the Parties decided not to test all Servicing Standards; instead, they agreed that compliance with the Standards would be measured by defined Metrics.  Under the Consent Judgment, a Servicer like Wells Fargo only commits a Potential Violation if it fails to comply with the Threshold Error Rate associated with a Metric.  The Consent Judgment establishes a

robust sampling process that the Monitor and Monitoring Committee are required to employ and then allows Wells Fargo to systematically identify and correct any Potential Violations.  Only if a Potential Violation goes uncured is an enforcement action permitted.  The Consent Judgment clearly and unambiguously sets forth this process.  It also makes clear that there are no remedies where Wells Fargo cures a Potential Violation.  If no remedy is available where a Potential Violation has been cured, then clearly no remedy is available absent a Potential Violation in the first place.  Therefore the NYAG's Motion must be denied.

## I.     The Consent Judgment Permits Enforcement Actions Only For Uncured Potential Violations

The NYAG seeks to rewrite the Consent Judgment.  The NYAG argues that he has the authority to ask the Court to enforce *any* "obligations of the Servicer," but ignores the explicit terms of the Consent Judgment cited and quoted in his own brief.  The NYAG's ability to seek equitable relief and/or civil penalties is set forth in Exhibit E § J(3):

> **Enforcement Action.**  In the event of an action to enforce the obligations of Servicer and to seek remedies for an ***uncured Potential Violation*** for which Servicer's time to cure has expired, the sole relief available in such an action will be . . . .

Consent Judgment Ex. E § J(3) (emphasis added).  This language is clear and unambiguous.

Thus, the NYAG (and all other parties) may only seek relief for "uncured Potential Violations."

*Id*.  The NYAG argues that it would be "extreme" and "absurd" to find that Parties are limited to challenging only uncured Potential Violations, but the Consent Judgment explicitly bars Parties from any other action:

> In the event a Potential Violation is cured as provided in Sections E.3, above, then ***no Party shall have any remedy*** under this Consent Judgment (other than the remedies in Section E.5) with respect to such Potential Violation.

*Id*. at Ex. E § E(6) (emphasis added).  Thus, the Consent Judgment "expressly addresses" enforcement actions, and the provisions are "clear and unambiguous, as evidenced by its plain language." *Bank of Am.*, 922 F. Supp. 2d at 8, 10.  Simply stated, "[t]he plain language of the [Consent Judgment] governs, and it does not have the meaning ascribed to it by [the NYAG]." *Id*. at 11.  Indeed, when asked by the NYAG to consider bringing an action outside of this process, the Monitoring Committee flatly rejected the NYAG's proposal stating that it would only bring an action if Servicers "fail to correct their deficiencies through the formal corrective action and monitoring process."  Monitoring Committee letter at 3.

      A.       *The NYAG Ignores the Process to Create New Metrics.*

The NYAG's sole argument in support of his incorrect reading of the Consent Judgment's Servicing Standard enforcement provisions is that certain Standards do not have associated Metrics; and therefore, violation of those Servicing Standards could never give rise to an uncured Potential Violation, making enforcement of those Servicing Standards impossible. NYAG Motion at 21.  This assertion is simply not true, and the NYAG's "leap of logic is not consistent with the Consent Judgment." *Bank of Am.*, 922 F. Supp. 2d at 9.  The Consent Judgment gives the Monitor the authority in two separate places for two different reasons to add additional Metrics for Servicing Standards if, for example, he finds that there is a "pattern of noncompliance."  Consent Judgment Ex. E § C(23).  Indeed, the Monitor already has added several Metrics, and the Monitoring Committee has stated that "new metrics" may be added to address "additional issues of concern," including those raised by the NYAG.  Monitoring Committee Letter at 2.

To the extent the NYAG believes Wells Fargo has violated Servicing Standards for which no metric has been established, the specific remedy provided by the Consent Judgment is

for the NYAG to work through the Monitor and Monitoring Committee to add any appropriate new Metrics; measure Wells Fargo's compliance with any such Metrics through the required sampling procedure; allow Wells Fargo an opportunity to cure any Potential Violations; and seek court enforcement only if and when any Potential Violation remains uncured.  The NYAG blatantly disregards this agreed-upon enforcement process.  Instead of working through the Monitor and Monitoring Committee, the NYAG preempted the entire process by providing notice of its enforcement action on May 6 – over a month before the Monitor even had an opportunity to issue his *first report* on Wells Fargo's compliance.  *See* May 6, 2013, NYAG letter.

> B.     *The NYAG Ignores the Threshold-Error Rates in the Consent Judgment and Instead Argues for a Perfect-Implementation Standard.*

The NYAG seeks not only to do away with the enforcement process mechanism, but to also ignore the negotiated error-tolerance thresholds and to hold Wells Fargo to a perfect-implementation standard.  Under the NYAG's theory, any party to the five consent judgments can run to this Court whenever there is a single failure to meet any of the 304 Servicing Standards.  But the parties to the consent judgments (including the NYAG) did not agree to measure adherence in this way, and Wells Fargo certainly did not agree to defend a plethora of litigation based on individualized errors and mistakes.  Permitting the NYAG to proceed here would disregard the Threshold Error Rates negotiated by the parties (and approved by the Court) and substitute zero-error thresholds.

Allowing the NYAG to sue Wells Fargo based upon 97 alleged violations would vitiate the bargained-for settlement between the Parties.  The entire agreed-upon enforcement process – which was precisely intended to avoid costly litigation – would be rendered a nullity.  Permitting

the NYAG to bypass this bargained-for arrangement would be highly prejudicial to Wells Fargo, which has invested heavily in the settlement process based upon the assurance that it would be provided an opportunity to work toward compliance with the Metrics instead of being subject to the perpetual threat of legal action by any of the Plaintiffs.  Furthermore, permitting the NYAG to abrogate the enforcement process would place the Court in the positions of Monitor and Monitoring Committee, with responsibility to regulate and remedy any issues regarding the various banks' compliance with the numerous Servicing Standards on an ongoing basis.  The Court is ill-suited to regulate the mortgage industry in such detail on an ongoing basis, and the Consent Judgment contains a detailed mechanism designed to avoid this result.

## II.      The NYAG's Focus on the Consumer Relief Requirements is Misplaced.

The NYAG also argues that the Court should ignore the plain language of § J(3)(a) and (b) because interpreting that language as written would prevent the parties from enforcing "any part of the consent judgment, such as the agreement's releases" or the Consumer Relief Requirements.  NYAG Motion at 21-22, n. 11.  This argument is a red herring – the NYAG does not allege any violation of the Consent Judgment's releases or Consumer Relief Requirements.  Instead, the NYAG alleges violations of the Servicing Standards for which the Consent Judgment provides a clear enforcement process that prohibits the NYAG's enforcement action.

Moreover, the NYAG is incorrect in its implication that the Consent Judgment does not elsewhere address how violations of the Consumer Relief Requirements are to be handled.  Exhibit D, which is titled "Consumer Relief Requirements" covers the penalties associated with meeting those requirements at § 10(d).  *See* Consent Judgment Ex. D §10(d) ("If Servicer fails to meet the commitment set forth in these Consumer Relief Requirements within three years . . . , Servicer shall pay an amount equal to 125% of the unmet commitment amount . . . .").  Exhibit F

– the "Federal Release" portion of the Consent Judgment – makes clear the Wells Fargo is "obligated to make [those] payments (the "Consumer Relief Payments") in the event that it does not . . . complete the Consumer Relief Requirements set forth in Exhibit D . . . ."  *See id.* Ex. F, at F-12.  Paragraph 12 to the Consent Judgment unambiguously states that "any State Party may withdraw from the Consent Judgment and declare it null and void with respect to [Wells Fargo] if [Wells Fargo] does not make the Consumer Relief Payments … and fails to cure such non-payment within thirty days of written notice by the party."  *See id.* ¶ 12.

In other words, the Consent Judgment has a clear process for handling a failure to meet the Consumer Relief Requirements (which has not been alleged).  That process involves Wells Fargo having to pay Consumer Relief Payments if it fails to meet Consumer Relief Requirements.  If Wells Fargo fails to make those payments, the NYAG or any another Party can give Wells Fargo notice of such failure and Wells Fargo has thirty days to cure.  If Wells Fargo still fails to make the payments, the NYAG can withdraw from the Consent Judgment and declare it null and void.[10]  Far from the NYAG's suggestion, the Consent Judgment anticipates exactly what is to occur when the Consumer Relief Requirements are violated.  These are expressly different from enforcement for failure to meet Servicing Standard Metrics.

Indeed, as the NYAG acknowledges, the Consumer Relief Requirements are specifically referenced elsewhere in the same section (§ J(3)) that addresses enforcement of uncured Potential Violations of Servicing Standard Metrics.  *See* NYAG Motion at 22.  The fact that

---

[10]  As with a Potential Violation of a Servicing Standard Metric, even if there were a violation of the Consumer Relief Requirements, which there is clearly not, the time to raise that allegation would be in 2015 as the Consent Judgment allows three years for Wells Fargo to complete its Consumer Relief obligations.  Moreover, if there was any violation of those Requirements, the appropriate action – withdrawal from the Consent Judgment – could come only after Wells Fargo had been given notice that it failed to pay the mandatory fines and then did not pay the fines even after being given notice.

Consumer Relief Requirements are referenced specifically in the same enforcement provision but are not included in the section pertaining to uncured Potential Violations reinforces the exclusivity of the framework in § J(3)(a) and (b) for violations of Servicing Standard Metrics. *See O'Melveny & Myers v. F.D.I.C.,* 512 U.S. 79, 86-87 (1994) ("*Expressio unius est exclusio alterius*": the expression of one thing excludes the addition of another).

## III.    The NYAG Does Not Allege Any Uncured Potential Violations

The NYAG does not purport to bring an enforcement action challenging any uncured Potential Violation, and therefore his Motion should be denied based solely on the "plain language" of the Consent Judgment. *Bank of Am.*, 922 F. Supp. 2d at 6.  Nevertheless, Wells Fargo believes it is useful for the Court to understand the status of its compliance with each of the five Servicing Standards that are referenced in the NYAG's Motion.

### A.    *The NYAG Has Brought This Action Even Though the Cure Period for Wells Fargo's Single Violation Is Ongoing.*

With respect to Servicing Standards IV(F)(2) and IV(F)(3), Metric 19 specifies an Error Threshold Rate of 5 percent.  Consent Judgment Ex. E1-10.  Wells Fargo self-reported a Potential Violation with respect to this standard on February 14, 2013.  In its first report on June 18, 2013, the Monitor noted that Wells Fargo was compliant with respect to 92 percent of the tested sample instead of the required 95 percent, concluding that the error "was not widespread." *See* Monitor Report at 17, 33.  Wells Fargo subsequently worked with the Monitor and Monitoring Committee to craft a detailed Corrective Action Plan to address the Potential Violation, and Wells Fargo is currently implementing that plan. *See* CAP.  Reports from Wells Fargo and the Monitor on the success of the Corrective Action Plan are forthcoming.  Jones Decl. at ¶ 10.

The Consent Judgment expressly prohibits the NYAG from bringing an enforcement action challenging this Potential Violation unless and until Wells Fargo fails to cure. Consent Judgment Ex. E § E(6). Thus, the motion with regard to Servicing Standards IV(F)(2) and (F)(3) is premature. Moreover, allowing this action to proceed based on allegations concerning the same conduct for which Wells Fargo has received a Potential Violation would make its bargained-for and clearly-defined "right to cure" no right at all. *See Martinsville Nylon Employees Council Corp. v. NLRB*, 969 F.2d 1263, 1267 (D.C. Cir. 1992) (Contracting parties "ought not be presumed to have included in their agreement a meaningless provision."). Indeed, any party could circumvent Wells Fargo's right to cure by styling a motion as one to enforce the Servicing Standards.

  B.  *The NYAG Improperly Seeks to Enforce Metrics That Wells Fargo Has Passed.*

With respect to Servicing Standard IV(F)(4), Metric 20 specifies an Error Threshold Rate of 10 percent. Consent Judgment Ex. E1-11. The Monitor found that Wells Fargo complied with this standard, with an error rate of less than 10 percent. *See* Monitor Report at 17. Therefore, there is no Potential Violation – much less an uncured Potential Violation – that can serve as the basis of the NYAG's enforcement action. In pursuing an action for an alleged breach of a Servicing Standard that *admittedly* does not amount to a Potential Violation, the NYAG seeks a remedy that is not only inconsistent with the Metrics-based process detailed above, but also logically absurd. Such a remedy would mean that Wells Fargo would have the right to cure *egregious* errors identified by the Monitor as exceeding the Threshold Error Rate — and thus avoid judicial review and liability as to those errors — but have no right to cure less significant or benign errors before being brought before the Court. Such a scheme makes no sense. *See National Ass'n of Gov't Employees, Local R5-136 v. FLRA*, 363 F.3d 468, 476 (D.C.

Cir. 2004) (rejecting reading of contract that leads to "absurd" and "bizarre results").  Moreover,

by this logic, any Party may sidestep Wells Fargo's right to cure by simply bringing an action to

remedy errors falling below the Threshold Error Rates.  Enabling such an attempt would vitiate

the Consent Judgment's express limitation that if a "Potential Violation is cured … no Party shall

have any remedy under this Consent Judgment."  Consent Judgment Ex. E § E(6).

       C.     *The NYAG Improperly Seeks to Enforce Servicing Standards for Which There Is No Metric.*

With respect to Servicing Standards IV(A)(4) and IV(F)(1), there are not yet any Metrics

associated with these standards, nor has the Monitor proposed any Metrics or accompanying

Threshold Error Rates for them.  In the absence of Metrics and Threshold Error Rates,

compliance with these Standards is within the exclusive responsibility of the Monitor.[11]  Since a

Potential Violation only occurs when "the Servicer has exceeded the Threshold Error Rate set for

a Metric in a given Quarter," *id.* at Ex. E § E(1), Wells Fargo cannot have committed a Potential

Violation associated with these Servicing Standards, let alone an uncured Potential Violation.  In

the absence of an uncured Potential Violation, the Consent Judgment prohibits an enforcement

action pertaining to these Servicing Standards.  *Id.* at Ex. E § E(6).

**IV.**    **If Permitted to Proceed, This Motion Will Render the Out-Of-Court Enforcement Process of the Consent Judgment Meaningless**

Permitting the NYAG's motion to bring judicial action for the violations asserted would

turn the Monitor- and Metric- centered process into a charade, flout the obvious purposes of the

Consent Judgment, and contravene the canon that "the Court should construe [a] contract as a

whole so as to give meaning to all of the express terms."  *WMATA*, 626 F.2d at 961.

---

[11]     *Id.* at Ex. E §C(5).  To the extent NYAG believes the Metrics should test for these two Standards, the Consent Judgment anticipates that the Monitor can fill that gap.  *See id.* at Ex. E §§ C(12), C(23).

A.      *The NYAG Seeks to Undermine the Monitor's Role in the Enforcement Process.*

Permitting the NYAG to pursue this end-run enforcement effort would displace the role of the Monitor in evaluating Wells Fargo's compliance and disregard the Monitor's findings (including findings of *no* Potential Violations).  Under the Consent Judgment, it is the Monitor's "responsibility" — not that of the NYAG — "to determine whether [Wells Fargo] is in compliance with the Servicing Standards."  *Id.* at Ex. E § C(5).  To assist the Monitor in carrying out his functions, the Consent Judgment grants the Monitor investigatory powers.  *Id.* at Ex. E §§ C(16) – C(21).  In addition, the Consent Judgment gives the Monitor quasi-adjudicatory authority, including authorization to make "findings" as to whether Wells Fargo has failed the Metrics.  *Id.* at Ex. E § D(5).  The Monitor also has the authority to create new Metrics — an authority he has recently exercised — and thus to update and modify the rules by which Wells Fargo's compliance will be evaluated.  *Id.* at Ex. E § C(11) (metrics set forth in Schedule E-1 may be "supplemented from time to time"); *id.* at Ex. E §§ C(12), C(23) - C(25) (granting Monitor authority to supplement Metrics).  And the Monitor is given the policing function of evaluating Wells Fargo's design and implementation of corrective-action plans focused on remediating past breaches and preventing future ones.  *Id.* at Ex. E § E(3).  The NYAG should not be permitted to bypass the Monitor's well-defined roles.

B.      *The NYAG Seeks to Nullify the Cure Provisions of the Consent Judgment.*

Permitting the NYAG's enforcement motion to proceed would also nullify the concept of remediation that is a basic premise of the Consent Judgment.  Under the Consent Judgment, Wells Fargo has the "obligation" to cure Metric-based Potential Violations, not just the "right" to do so.  *Id.* at Ex. E § E(5).  This obligation is evidenced by the fact that curing a failure requires Wells Fargo (1) to implement a Monitor-approved, corrective-action plan under the supervision

of the Monitor **and** (2) not to fail the Metric again.  *Id.* at Ex. E § E(3).  The NYAG's motion contravenes this remediation framework because it asks this Court, rather than the Monitor, to prescribe a new remediation scheme, not contemplated by the Consent Judgment.  NYAG Br. 29. This scheme would put the Court in the position of having to evaluate and consider all alleged violations no matter their scope or the violator's efforts (and success) to remediate.  Because evaluating Wells Fargo's compliance with the Servicing Standards requires consideration of "polycentric problem[s] that cannot easily be resolved through a traditional courtroom-bound adjudicative process," measuring and ensuring ongoing compliance without relying on a third-party expert such as the Monitor would be extremely difficult and time-consuming.  *N.Y. State Ass'n for Retarded Children, Inc. v. Carey*, 706 F.2d 956 at 963-65, 971-72 (2d Cir. 1983) (upholding appointment of special master to evaluate compliance with consent judgment); *see also Madani v. Equilon Enters. LLC*, 2009 WL 2148664, at *15 (C.D. Cal. July 13, 2009) ("Courts are ill-equipped to engage in what inevitably would require on-going micro-management of complex business affairs.").  The NYAG should not be permitted to sidestep the clear remediation process that all parties agreed to by bringing claims of violations directly to this Court.

  C.  *The NYAG's Enforcement Regime Would Lead to an Explosion of Litigation.*

  Permitting this motion to proceed would also be contrary to another goal of the Consent Judgment: abating litigation while establishing a robust and centralized process for enforcing compliance.  The NYAG's construction of the Consent Judgment, if accepted, would have the perverse effect of spawning rather than abating litigation and would thus run afoul of a core purpose of the Consent Judgment.  The NYAG's attempt to displace the Monitor-centered remediation framework in favor of a litigation-focused scheme is "inconsistent with the cardinal

interpretive principle that we read a contract 'to give meaning to all of its provisions and to render them consistent with each other.'" *Beal Mortg.*, 132 F.3d at 88 (quoting *Ins. Co. of N. Am.*, 83 F.3d at 1511). The NYAG should not be permitted to turn the Consent Judgment into a vehicle for extensive and protracted litigation.

## <u>CONCLUSION</u>

For the foregoing reasons, Wells Fargo respectfully requests that the Court deny the NYAG's Motion to Enforce the Consent Judgment Against Wells Fargo Defendants.

DATED: October 25, 2013

Respectfully submitted,

By: */s/ J. Robert Robertson*
J. Robert Robertson (D.C. Bar # 501873)
Corey W. Roush (D.C. Bar # 466337)
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
Tel:     (202) 637-5600
Fax:     (202) 637-5910

David Dunn (D.C. Bar # 250621)
HOGAN LOVELLS US LLP
875 Third Avenue
NY, NY 10022
Tel:     (212) 918-3000
Fax:     (212) 918-3100

Robert R. Maddox (D.C. Bar # 497495)
BRADLEY ARANT BOULT CUMMINGS LLP
1819 5th Avenue N
Birmingham, AL 35203
Tel:     (205) 521-8000
Fax:     (205) 488-6454

Email: robby.robertson@hoganlovells.com
        corey.roush@hoganlovells.com

david.dunn@hoganlovells.com
rmaddox@babc.com

*Attorneys for Defendants Wells Fargo & Company
and Wells Fargo Bank, N.A.*

## <u>CERTIFICATE OF SERVICE</u>

I, J. Robert Robertson, hereby certify that on October 25, 2013, I served a true and correct copy of the foregoing "WELLS FARGO'S OPPOSITION TO NYAG'S MOTION TO ENFORCE THE CONSENT JUDGMENT" on counsel for all parties through this Court's Electronic Case Filing System.

DATED:  October 25, 2013                   By: _/s/ J. Robert Robertson_