IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

----------------------------------------------------------------X

UNITED STATES OF AMERICA, et al.,

                             Plaintiffs,          Case No. 1:12-cv-00361-RMC

v.                                  ORAL HEARING REQUESTED

BANK OF AMERICA CORP., et al.,

                             Defendants.

----------------------------------------------------------------X

**PLAINTIFF NEW YORK ATTORNEY GENERAL'S REPLY MEMORANDUM OF
LAW IN FURTHER SUPPORT OF MOTION TO ENFORCE THE CONSENT
JUDGMENT AGAINST WELLS FARGO DEFENDANTS**

ERIC T. SCHNEIDERMAN
Attorney General of the State of New York
Attorney for Plaintiff
120 Broadway
New York, NY 10271

Of Counsel:

JANE M. AZIA
Bureau Chief
Consumer Frauds and Protection Bureau

LAURA J. LEVINE
Deputy Bureau Chief

ADAM H. COHEN
BRIAN N. LASKY
MELISSA J. O'NEILL
Assistant Attorneys General

## **TABLE OF CONTENT**

PRELIMINARY STATEMENT ............................................................................................................1

ARGUMENT ...............................................................................................................................2

    I.    NYAG MAY ENFORCE THE CONSENT JUDGMENT...............................................................2

        A.  The Consent Judgment Expressly Authorizes NYAG's Suit ...............................2

        B.  Wells Fargo's Construction Would Lead to Absurd Results...................................5

              1.  Wells Fargo's Interpretation Would Preclude State-Specific Enforcement of the Agreement.........................................................................................5

              2.  Wells Fargo's Interpretation Would Render Most Servicing Standards Unenforceable ...........................................................................................9

              3.  Wells Fargo's Interpretation Would Undermine Enforcement of the Consumer Relief Requirements ...............................................................11

        C.  Wells Fargo's Persistent Violations of the Consent Judgment Will Justify an Award of Equitable Relief ...................................................................................12

    II.  THE CONSENT JUDGMENT'S CURE PROVISION DOES NOT SHIELD WELLS FARGO FROM LIABILITY ............................................................................................................13

        A.  The Cure Provision Only Applies to "Potential Violations" of the Agreement ....14

        B.  NYAG May Enforce Each of the Servicing Standards.........................................15

CONCLUSION.............................................................................................................................17

**TABLE OF AUTHORITIES**

**CASES**                                                                                           **Page(s)**

*Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284 (D.C. Cir. 1998) .....................................................5

*Badgley v. Varelas*, 729 F.2d 894 (2d Cir. 1984) .......................................................................13

*Berger v. Heckler*, 771 F.2d 1556 (2d Cir. 1985) ........................................................................2

*Cook v. City of Chicago*, 192 F.3d 693 (7th Cir. 1999) ...............................................................3

*Evans v. Fenty*, 480 F. Supp. 2d 280 (D.D.C. 2007) ..................................................................13

*Lancaster v. Tilton*, No. C 79-01630 WHA,
    2007 U.S. Dist. LEXIS 48403 (N.D. Cal. Jun. 21, 2007) ........................................................13

*Massachusetts v. Microsoft Corp.*, 373 F.3d 1199 (D.C. Cir. 2004) .............................................7

*McComb v. Jacksonville Paper Co.*, 336 U.S. 187 (1949) ...........................................................17

*Mead Corp. v. ABB Power Generation, Inc.*, 319 F.3d 790 (6th Cir. 2003) ..................................4

*New York State Ass'n for Retarded Children, Inc. v. Carey*,
    511 F. Supp. 1165 (E.D.N.Y. 1982) ....................................................................................13

*Palmer v. Shultz*, Civ. No. 76-1439,
    1988 U.S. Dist. LEXIS 16522 (D.D.C. Dec. 28, 1988) ...........................................................2

*Segar v. Mukasey*, 508 F.3d 16 (D.C. Cir. 2007)........................................................................2

*Shy v. Navistar Int'l Corp.*, 701 F.3d 523 (6th Cir. 2012)..........................................................16

*United States v. Bank of Am.*, 922 F. Supp. 2d 1 (D.D.C. 2013) ...................................................2

*United States Steel v. M. DeMatteo Constr. Co.*, 315 F.3d 43 (1st Cir. 2002) ...............................4

*Washington Metro. Transit Auth. v. Mergentime Corp.*, 626 F.2d 959 (D.C. Cir. 1980)...............9

**OTHER AUTHORITY**

10-53 Corbin on Contracts § 948 (rev. 2013) ...............................................................................3

NYAG respectfully submits this Reply Memorandum of Law in further support of the

Motion to Enforce the Consent Judgment against the Wells Fargo Defendants ("Motion").[1]

## PRELIMINARY STATEMENT

The consent judgment entered by this Court in April 2012 contains 304 highly specific

standards governing the manner by which Wells Fargo and the other Defendants are to service

residential mortgages throughout the nation, including in New York.  Since those servicing

standards became mandatory more than a year ago, NYAG has been inundated with complaints

from homeowners, housing counselors, and legal services providers protesting that Wells Fargo

has failed to abide by the plain terms of the consent judgment.  These complaints show that

Wells Fargo has repeatedly and persistently stymied the application process for obtaining

modifications of borrowers' mortgage loans to the substantial harm of New York homeowners.

The Bank's violations of the consent judgment are numerous, ranging from the failure to provide

a simple and prompt acknowledgment of receipt upon the submission of application-related

materials to the failure to make a timely decision on homeowners' applications once they are

complete.  The 97 declarations that NYAG has submitted in support of the Motion evidence the

Bank's pattern of non-compliance.

In response, Wells Fargo argues that it cannot be held accountable for its violations of

the consent judgment because, purportedly, NYAG is without any authority to enforce the

agreement to which it is a party.  Wells Fargo does not contest that ordinarily a party to a consent

judgment may sue to enforce its terms.  Instead, the Bank argues, that *this agreement* turns the

usual practice on its head and only allows a party to enforce its terms after the Monitor of the

consent judgment has first declared a nationally systemic and uncured violation of the settlement.

---

[1] Unless otherwise specified, capitalized terms herein have the same meaning as in the October 2, 2013 Memoranda of Law in Support of the Motion.

The consent judgment says no such thing.  The agreement explicitly provides that "any Party to this Consent Judgment" may bring "an action to enforce the obligations of Servicer," including Wells Fargo, and thereby obtain an "order directing non-monetary equitable relief." NMS Ex. E, §§ J(2), (3).[2]  This is precisely what NYAG has done here:  brought an enforcement action seeking an order from the Court directing Wells Fargo to comply with the consent judgment's servicing standards, as well as other related equitable relief that will help effectuate the Bank's compliance with the servicing standards.  NYAG's authority to enforce the consent judgment is thus clear and grounded in the language of the agreement itself.  The Court should allow this action to proceed and deny Wells Fargo's efforts to continue to avoid its obligations to New York homeowners.

## ARGUMENT

### I.    NYAG MAY ENFORCE THE CONSENT JUDGMENT

#### A.    The Consent Judgment Expressly Authorizes NYAG's Suit

The parties agree that the construction of the consent judgment is governed by contract law.  *See* NYAG Mem. at 19; Wells Fargo Mem. at 14 (both citing *United States v. Bank of Am.*, 922 F. Supp. 2d 1, 6 (D.D.C. 2013) and *Segar v. Mukasey*, 508 F.3d 16, 21 (D.C. Cir. 2007)). Under "[b]asic principles of contract law," a "promisee to a consent decree," like NYAG, always has standing "to bring an action against a breaching promisor for specific performance of the promisor's obligations."  *Palmer v. Shultz*, Civ. No. 76-1439, 1988 U.S. Dist. LEXIS 16522, at *8 (D.D.C. Dec. 28, 1988); *see also Berger v. Heckler*, 771 F.2d 1556, 1564 (2d Cir. 1985) (holding that because consent decree "is a contract embodying promises" made by the defendant "in exchange for the termination of [plaintiff's] action," plaintiff could "challenge

---

[2] The consent judgment with exhibits is attached as Exhibit 1 to the September 27, 2013 Declaration of Brian N. Lasky ("Lasky Declaration") submitted in support of the Motion.  All references to "Lasky Ex. __" are to exhibits attached to the Lasky Declaration.  All references to "Cohen Decl." are to the November 14, 2013 Declaration of Adam H. Cohen submitted in support of the Motion.

noncompliance with [term of decree] and sue to enforce the promise it contained").  Wells Fargo does not dispute this fundamental tenet of contract law.  *Cf.* 10-53 Arthur L. Corbin, *Corbin on Contracts* § 948 (rev. 2013) ("The first rule to be stated is that for any breach that has occurred, be it large or small, 'partial' or 'total,' an action can be maintained and the law will give an appropriate remedy.").

The consent judgment itself confirms NYAG's authority to sue to enforce the Bank's compliance with the agreement.  Section J(2) of the "Enforcement Terms" of the consent judgment provides in plain terms that "[a]n enforcement action may be brought by *any party to this Consent Judgment* or the Monitoring Committee."  NMS Ex. E, § J(2) (emphasis added).  The immediately subsequent section, Section J(3), in turn sets forth the remedies available to a party upon such a suit and draws a sharp distinction between two types of actions.  *See Cook v. City of Chicago*, 192 F.3d 693, 698 (7th Cir. 1999) ("[I]f parties to a consent decree wish to cabin the district court's equitable discretion by stipulating the remedies for breach [of a consent decree], they are free to do so.").  In a suit of the first type, "*an action to enforce the obligations of Servicer*," the "sole relief available" to the Plaintiff is "[a]n order directing non-monetary equitable relief, including injunctive relief, directing specific performance under the terms of this Consent Judgment, or other non-monetary corrective action."  NMS Ex. E, § J(3) (emphasis added).  This is the form of action NYAG has brought here – an action to enforce the servicing standards of the consent judgment seeking non-monetary equitable relief – as expressly authorized by the consent judgment.[3]

---

[3] Wells Fargo implies in a footnote that NYAG failed to provide the Monitoring Committee proper notice of NYAG's intention to bring this enforcement action, as required by Section J(2) of Exhibit E.  *See* Wells Fargo Mem. at 12 n.9.  This argument is without merit.  By letter of May 6, 2013, NYAG wrote to the Monitoring Committee to detail Wells Fargo's non-compliance with the National Mortgage Settlement's servicing standards and asked that the Committee consider the correspondence notice of NYAG's intention to bring an enforcement action against the Bank.  *See* Cohen Decl. ¶ 11.  On May 23, 2013, NYAG again wrote to the Monitoring Committee to provide a "revised and updated" packet of supporting materials and acknowledged that given the supplementary materials "the 21 day period for the Monitoring Committee's consideration of this matter (pursuant to Exhibit E, Section J2 of the

3

Section J(3) also envisions a second type of suit, one "to seek remedies for an uncured Potential Violation for which Servicer's time to cure has expired." *Id.* In this second type of suit, the Court may award the Plaintiff substantial "civil penalties" of up to "$1 million per uncured Potential Violation," or even more in the case of certain repeat "uncured Potential Violations." *Id.* NYAG does not predicate its action upon an "uncured Potential Violation" and thus does not seek an award of civil penalties.

The distinction between these two forms of actions drawn by the consent judgment is logical. Where, as here, a state identifies that a Defendant is failing to comply with the agreement, that state may seek an equitable order requiring the Defendant to hold up its end of the bargain in that jurisdiction. The state may not, however, seek civil penalties against the Defendant in such an action. Instead, only if the Monitor has determined that the Defendant's violations are of a national scale, and that the bank has failed to timely cure its noncompliance, may the Defendant be held responsible for an award of substantial civil penalties.

In its opposition brief, Wells Fargo attempts to conflate these two forms of actions and erroneously argues that "the NYAG (and all other parties) may only seek relief for 'uncured Potential Violations.'" Wells Fargo Mem. at 17. Any limitation on the common law right of a party to enforce a consent judgment must be clear and express in the agreement, which is not the case here. *See Mead Corp. v. ABB Power Generation, Inc.*, 319 F.3d 790, 796 (6th Cir. 2003) (holding that "where a contract fails to expressly exclude the owner's common law remedies, or to limit plaintiff's remedies to those expressly stipulated in the contract, a party can still invoke the independent remedies"); *United States Steel v. M. DeMatteo Constr. Co.*, 315 F.3d 43, 49 (1st Cir. 2002) (holding that "if a contract does not specify that the remedies identified are exclusive, or that they abrogate the common law remedies available, the common law remedies

Consent Judgment) should begin upon" the Committee's receipt of the May 23rd letter. Letter from NYAG to NMS Monitoring Committee, at 2 (May 23, 2013) (Lasky Ex. 11).

still apply").[4]  To the contrary, the consent judgment expressly refers to "an action to enforce the obligations of Servicer," and Wells Fargo cannot simply write this language out of the agreement.  The Bank's interpretation of the agreement would render this language redundant and meaningless, as any suit based on an "uncured Potential Violation" is necessarily also "an action to enforce the obligations of Servicer" under the agreement.  The Court should eschew Wells Fargo's construction, which fails to give meaning to *all* of the language of the consent judgment.  *See Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1302 (D.C. Cir. 1998) ("We assume that the parties intended for every part of the agreement to have meaning; interpretations that would render a portion of the agreement ineffective or mere surplusage are traditionally disfavored by courts.").  Instead, the express language of the consent judgment must control and NYAG should be permitted to seek enforcement of the servicing standards.

###    B.    Wells Fargo's Construction Would Lead to Absurd Results

The construction of the consent judgment offered by Wells Fargo – that a party may only sue if the Monitor has first found an "uncured Potential Violation" of the agreement – would lead to absurd results that are contrary to a proper reading of the agreement as a whole.  For this reason as well, the Court should reject the Bank's proposed construction.

####    1.    Wells Fargo's Interpretation Would Preclude State-Specific Enforcement of the Agreement

Under Wells Fargo's construction of the consent judgment, an individual state would be powerless to seek enforcement of the consent judgment in response to problems peculiar to that state.  This is not a reasoned reading of the agreement.

---

[4] For example, the consent judgment could have, *but does not*, provided as follows:  "The only enforcement action permitted under this consent judgment is one based upon an uncured Potential Violation for which Servicer's time to cure has expired.  In the event of such an action, the sole relief available to the party will be . . ."  This is in marked contrast to the language actually agreed to by the parties as reflected in the agreement.  *See* NMS Ex. E, § J(3).

The Monitor's compliance review process is national in focus.  Each Defendant first reviews a randomly selected sample of their nationwide "full population of loans" to determine whether the bank passed the relevant metric during the test period.  Office of Mortgage Settlement Oversight, *Summary of Compliance: A Report from the Monitor of the National Mortgage Settlement*, at 4 (Jun. 19, 2013) (Lasky Ex. 13).  The Monitor, with help from other professionals, then analyzes a sub-sample of these loans to confirm the accuracy of the results reported by the bank.  *See id.*; June 18, 2013 Monitor Report for Wells Fargo at 28 (Lasky Ex. 14).  The Monitor may only declare a "Potential Violation" of the consent judgment if a bank exceeds the threshold error rate for the metric during the relevant quarter.  NMS Ex. E, § E(1). The Monitor does not review a Defendant's state-specific performance in assessing whether it has committed a "Potential Violation"; thus, a bank's failure to comply with the servicing standards in one state will not result in a "Potential Violation" if the bank is elsewhere complying with its obligations under the agreement.  *See* Office of Mortgage Settlement Oversight, *Summary of Compliance: A Report from the Monitor of the National Mortgage Settlement*, at 4 (Jun. 19, 2013) (Lasky Ex. 13).  Wells Fargo's interpretation of the enforcement procedures of the consent judgment – that a party may only bring an enforcement action after the Monitor has found an "uncured Potential Violation" – would therefore deprive a state from seeking redress for compliance problems that are specific to that state, rather than national in scope.

There are significant variations among the forty-nine states that are a party to the consent judgment that make this concern far from hypothetical.  For example, in New York, unlike most other states, the loan modification application and review process often occurs in the context of a court-supervised judicial foreclosure settlement conference process that is required by Rule 3408 of the New York Civil Practice Law and Rules.  *See* Cohen Decl. ¶ 3.  As a result,

communications concerning the loan modification process often occur between the Bank's foreclosure counsel, on the one hand, and the borrower's legal representative, on the other.  *See id.* ¶¶ 6-8.  This differs from the typical process in many other states in which borrowers, or their representatives, communicate directly with employees of the Bank.  *See id.* ¶ 4.

A large share of the declarations submitted by NYAG in support of the Motion emanate from this settlement conference context.  *See id.* ¶ 9.  These declarations show, among other things, that the Bank, through its lawyers, (1) routinely fails to acknowledge receipt of application-related materials within three business days (as required by Section IV(F)(1) of the servicing standards), (2) routinely fails to notify homeowners of any allegedly missing information within five business days of receiving documentation from the homeowners (as required by Section IV(F)(2) of the servicing standards), and (3) routinely fails to allow borrowers at least thirty days to provide any purportedly missing information (as required by Section IV(F)(3) of the servicing standards).  *See id.* ¶¶ 9-10.  In short, the declarations establish that Wells Fargo is failing to ensure that its outside counsel are complying with the servicing standards governing communications made on behalf of the Bank during the loan modification application and review process.[5]

Under Wells Fargo's construction of the consent judgment, states like New York would be helpless to address these sorts of state-specific compliance problems.  A more sensible reading of the agreement is one in which the Monitor procedures *complement*, rather than *supplant* entirely, the traditional right of a plaintiff to seek to enforce a settlement against a non-compliant defendant.  *See Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1243-44 (D.C. Cir.

---

[5] Wells Fargo argues that the declarations submitted by NYAG constitute "untested double hearsay."  Wells Fargo Mem. at 16.  The Bank does not explain, however, why declarations submitted by legal advocates or housing counselors attesting to those individuals' *own interactions* with the Bank would constitute "double hearsay."  In any event, Wells Fargo will be free to make whatever arguments it sees fit about the quality of NYAG's proof after this action is permitted to proceed to the fact-finding stage.

2004) (holding committee of experts retained to assist in monitoring of consent decree was not "intended as a substitute for the enforcement authority of the United States"; "[t]hus, viewed in context, the Government's ability to enforce the decree is clearly strengthened, not diminished, by the existence of the Technical Committee").  Under this framework, the Monitor conducts a nationwide statistical review to ensure that the Defendants are complying with their obligations under the consent judgment on a national level.  If the Monitor finds that a Defendant has violated the agreement, and if the Defendant fails to timely cure this violation, the Defendant may be liable for substantial monetary penalties.  States, meanwhile, retain their traditional right to compel compliance with the consent judgment should a Defendant fail to carry out the agreement at the state-level.  This is the enforcement framework expressly provided for by the consent judgment and agreed to by the parties.  *See* NMS Ex. E, § J.

Moreover, the equitable relief sought by NYAG is consistent with, and reinforces, the Monitor's ongoing oversight of the consent judgment.  In this action, NYAG asks the Court to direct the Bank to comply with the subject servicing standards with respect to New York homeowners.  In addition, NYAG seeks an order requiring Wells Fargo to take certain commonsense steps that will help ensure the Bank's compliance, such as requiring that the Bank assign key staff and decision-makers early in the loan modification review process for New York homeowners.  These relatively modest steps are critical to the successful effectuation of the servicing standards and should have been implemented by Wells Fargo soon after it entered into this agreement.  *See* NMS Ex. A, § IX(B)(1) (requiring that "in each instance in [the] Agreement in which Servicer is required to ensure adherence to, or undertake to perform certain obligations," the Servicer must "authorize and adopt such actions on behalf of Servicer as may be necessary for Servicer to perform such obligations and undertakings").  Thus, far from "undermin[ing] the Monitor's Role in the Enforcement Process," Wells Fargo Mem. at 25, the

relief sought by NYAG will instead bolster the Monitor's existing efforts to ensure the Bank's compliance with the requirements of the consent judgment.

2.    Wells Fargo's Interpretation Would Render Most Servicing Standards Unenforceable

Construing the consent judgment to permit enforcement actions only upon the Monitor's finding of an "uncured Potential Violation" would render entire portions of the settlement unenforceable.  This is an irrational interpretation of the agreement that the Court should avoid. *See Washington Metro. Transit Auth. v. Mergentime Corp.*, 626 F.2d 959, 961 (D.C. Cir. 1980) ("Court should construe the contract as a whole so as to give meaning to all of the express terms.").

The consent judgment mandates 304 servicing standards, but the agreement only includes thirty-three performance metrics by which the Monitor is to assess compliance.  *See* NMS Ex. A; NMS Ex. E, Schedule E-1.[6]  Accordingly, hundreds of servicing standards, including two of the standards that NYAG now seeks to enforce by this action (NMS Ex. A, §§ IV(A)(4), IV(F)(1)), do not have an associated metric and are thus not subject to the Monitor's compliance review. There can never be a "Potential Violation" of a servicing standard that does not have an associated metric because the consent judgment expressly limits "Potential Violations" to those instances where the Defendant "has exceeded the Threshold Error Rate set for a Metric in a given Quarter."  NMS Ex. E, § E(1).  Therefore, if Wells Fargo was right that a party may only sue on the basis of an "uncured Potential Violation," hundreds of servicing standards contained in the agreement would be completely unenforceable.

---

[6] As originally filed, the consent judgment included twenty-nine metrics.  *See* NMS Ex. E, Schedule E-1.  On October 2, 2013, the Monitor filed a notice with the Court that he had added four additional metrics, resulting in a total of thirty-three performance metrics.  *See* Monitor's Notice to District Court of Additional Metrics (Cohen Ex. 1).

Wells Fargo defends its interpretation of the agreement by noting that the consent judgment affords the Monitor some circumscribed authority to add additional metrics.  But the limited ability of the Monitor to propose new metrics is clearly insufficient to close the gaping hole in enforcement that would result from adopting the Bank's interpretation of the agreement.

The consent judgment sets forth two circumstances under which the Monitor may add additional metrics.  Under Section C(12) of Exhibit E, the Monitor "may add up to three additional Metrics and associated Threshold Error Rates" that "relate to material terms of the Servicing Standards" and are "similar" to the existing metrics provided for under the agreement.  NMS Ex. E, § C(12).  The metrics promulgated by the Monitor on October 2, 2013 exhausted his authority to propose three metrics under Section C(12).  *See* Monitor's Notice to District Court of Additional Metrics at 1-2 (Cohen Ex. 2).  Two of the five servicing standards that form the basis of NYAG's enforcement action – Sections IV(F)(1) and IV(A)(4) of the servicing standards – remain without associated metrics to this day.

Section C(23) of Exhibit E offers the only other authority for the Monitor to add an additional metric.  Under that section, the Monitor may add an additional metric if he affirmatively determines that a Defendant has "engaged in a pattern of noncompliance with a material term of the Servicing Standards."  NMS Ex. E, § C(23).   But, much of the information that the Defendants are required to turn over to the Monitor only bears upon the Defendants' compliance with the performance metrics, so the Monitor is handicapped in his ability to identify a "pattern of noncompliance" with respect to a servicing standard that does not have an associated metric.[7]  In short, the Monitor's limited authority to add additional metrics does not,

---

[7] In several places, the consent judgment limits the Monitor's access to information that relates to the Defendants' compliance with servicing standards that are already subject to existing metrics (or with the consumer relief requirements).  For example, the consent judgment requires the Defendants to provide the Monitor "with access to all work papers prepared by the Internal Review Group in connection with determining compliance with the Metrics or satisfaction of the Consumer Relief Requirements."  NMS Ex. E, § C(18).  Likewise, the agreement authorizes the Monitor "to interview Servicer's employees and agents," but only "provided that the interviews shall be limited

and cannot, compensate for the ability of a Plaintiff to bring an action to enforce the servicing standards.

### 3.  Wells Fargo's Interpretation Would Undermine Enforcement of the Consumer Relief Requirements

Wells Fargo's proposed construction of the consent judgment would also render largely unenforceable the $3.4 billion in consumer relief through loan modifications with principal reduction and other loss mitigation, and the $903 million of refinancing relief (collectively, the "consumer relief requirements"), that the Bank is required to pay.  *See* Consent Judgment ¶ 5. Paragraph 6 of the Consent Judgment provides that both "[t]he Servicing Standards and Consumer Relief Requirements . . . shall be enforced in accordance with the authorities provided in the Enforcement Terms, attached hereto as Exhibit E."  Consent Judgment ¶ 6.  Section J(3) of Exhibit E, entitled "Enforcement Action," in turn, sets forth procedures for an action to enforce the servicing standards or the consumer relief requirements.  NMS Ex. E, § J(3).  The fact that an action to enforce the consumer relief requirements is governed by that section is confirmed by Subsection J(3)(c)(3), which specifies how a payment is to be allocated if a Defendant fails to abide by the "Consumer Relief requirements."  NMS Ex. E, § J(c)(3).

The failure to comply with the consumer relief requirements can never constitute a "Potential Violation," however, as the consumer relief requirements are not subject to the Monitor's performance metrics.  *See* NMS Ex. E, § E(1).  Accordingly, under Wells Fargo's strained interpretation of the agreement, the Plaintiffs will be entirely unable to sue to force compliance with the consumer relief requirements.  This is not a reasonable interpretation of the consent judgment; instead, a party must be able to sue "to enforce the obligations of Servicer," NMS Ex. E, § J(3), including with respect to the consumer relief requirements.

---

to matters related to Servicer's compliance with the Metrics or the Consumer Relief Requirements."  NMS Ex. E, § C(21).  The foregoing information may be of little, if any, value to the Monitor in determining whether the Defendants are complying with servicing standards that do not have associated metrics.

Wells Fargo defends its proposed interpretation of the agreement by noting that Paragraph 12 of the consent judgment allows a Plaintiff to "withdraw from the consent judgment and declare it null and void with respect to that party" if a Defendant fails to comply with its consumer relief obligations.  Consent Judgment ¶ 12; *see also* Wells Fargo Mem. at 21.  But nothing in Paragraph 12 states or implies that the extreme remedy of complete withdrawal from the agreement (with no express tolling of the statute of limitations on Plaintiff's claims during the period in which the consent judgment was in effect) is the only option available to a Plaintiff upon a Defendant's failure to provide the required consumer relief.  Rather, Section J(3) of Exhibit E makes clear that a Plaintiff may also bring an "Enforcement Action" relating to the "Consumer Relief requirements."  NMS Ex. E, §§ J(3), J(c)(3).  Any such enforcement action would be, like the present action, "an action to enforce the obligations of Servicer" under Section J(3) of the consent judgment.  NMS Ex. E, § J(3).

### C.  Wells Fargo's Persistent Violations of the Consent Judgment Will Justify an Award of Equitable Relief

Wells Fargo contends NYAG is seeking to hold the Bank to a "perfect-implementation standard" in which the Bank may be held liable "whenever there is a single failure to meet any of the 304 servicing standards."  Wells Fargo Mem. at 19.  According to Wells Fargo, a holding that a party may sue regardless of whether the Monitor has found an "uncured Potential Violation" would "substitute zero-error thresholds" for the threshold error rates contained in the agreement.  *Id.*  This argument is nonsense and ignores the reality of the Bank's pattern of non-compliance reflected in the 97 declarations submitted with NYAG's motion.

Courts are regularly tasked with the responsibility for determining whether a party has violated the terms of broad-based consent judgments like the National Mortgage Settlement.  These courts have had little difficulty in differentiating isolated violations of an agreement from a pattern of repeated and persistent non-compliance with the requirements of a consent judgment,

as is the case here. *See, e.g.*, *Badgley v. Varelas*, 729 F.2d 894, 902 (2d Cir. 1984) (enjoining officials from transferring individuals to correctional facility following court's finding of "persistent violation of the population limit of the consent judgment"); *Evans v. Fenty*, 480 F. Supp. 2d 280, 325 (D.D.C. 2007) (holding plaintiffs had established violation of consent orders upon court's finding "that there had been systemic, continuous, and serious noncompliance" with the orders); *Lancaster v. Tilton*, No. C 79-01630 WHA, 2007 U.S. Dist. LEXIS 48403, at **17, 20 (N.D. Cal. Jun. 21, 2007) (finding defendants in contempt based upon "clear and convincing evidence" that "provision of the consent decree has been and continues to be persistently violated"); *New York State Ass'n for Retarded Children, Inc. v. Carey*, 511 F. Supp. 1165, 1179 (E.D.N.Y. 1982) (appointing special master after the court did "not find substantial performance" with requirements of consent judgment).

NYAG does not seek a "perfect-implementation standard," nor does it expect that the Court will apply one. Instead, the Court will determine whether Wells Fargo has persistently failed to comply with its obligations to New York homeowners under the consent judgment. Although this is a question for another day, NYAG submits that the 97 declarations submitted with the Motion persuasively establish the Bank's non-compliance.[8]

## II.    THE CONSENT JUDGMENT'S CURE PROVISION DOES NOT SHIELD WELLS FARGO FROM LIABILITY

Wells Fargo contends that NYAG's action somehow impermissibly "circumvent[s]" the right to cure a "Potential Violation" provided for by the consent judgment. Wells Fargo Mem. at 23. To the contrary, the cure provision is expressly limited to actions based on a "Potential

---

[8] Wells Fargo indicates in its brief that if the Court permits NYAG to proceed in this action, the Bank will ask the Court to allow wide-ranging discovery relating to the 97 declarations submitted by NYAG in support of the Motion. *See* Wells Fargo Mem. at 4 n.2. Although this is a discovery issue for another day, suffice it to say that NYAG will oppose any such request to delay the resolution of this matter so as to allow the Bank to pursue unneeded and invasive non-party discovery. The materials relevant to the Bank's defense of this action – such as correspondence from the Bank sent to borrowers or their representatives – should be available in the Bank's own files. Wells Fargo's contention that it will require protracted non-party discovery appears to be yet another effort by the Bank to delay compliance with the consent judgment.

Violation" and thus in no way limits an action merely seeking equitable enforcement of the servicing standards, as is the case here.

**A.      The Cure Provision Only Applies to "Potential Violations" of the Agreement**

By its express language, the cure provision of the consent judgment is limited to the remediation of "Potential Violations":  "Servicer shall have a right to cure ***any Potential Violation***."  NMS Ex. E, § E(2) (emphasis added).  Wells Fargo nonetheless argues that it "makes no sense" that the Bank would have the right to cure "Potential Violations" identified by the Monitor, but not other forms of non-compliance with the agreement's requirements.  Wells Fargo Mem. at 23.  The Bank again fails to recognize the important distinction drawn by the consent judgment between an "action to enforce the obligations of Servicer" and one "to seek remedies for an uncured Potential Violation."  NMS Ex. E, § J(3).

As explained above, the consent judgment limits the award of monetary penalties to those actions that are premised on an "uncured Potential Violation" of the agreement.  NMS Ex. E, § J(3)(b).  Actions merely to enforce a servicer's obligations, that are not based on a "Potential Violation" of the agreement, are limited to "non-monetary equitable relief," such as an order "directing specific performance under the terms of this Consent Judgment."  NMS Ex. E, § J(3)(a).  In order to limit their financial obligations under the agreement, the Defendants negotiated for, and obtained, a right to remediate any violations found by the Monitor prior to the imposition of punitive monetary penalties.  *See* NMS Ex. E, § E(2).  There is no corresponding right to cure in the agreement with respect to an action that is not premised on a "Potential Violation" for the simple reason that the "sole relief" available in such an action is non-monetary equitable relief that would bring the Defendant into compliance with the consent judgment. NMS Ex. E, § J(3).  A cure provision for such actions would serve merely to delay a Plaintiff's

ability to compel compliance with the express terms of the consent judgment.  This is yet another reason why Wells Fargo's proposed construction of the agreement should be rejected.

**B.     NYAG May Enforce Each of the Servicing Standards**

In his June 18, 2013 Monitor Report, the Monitor declared a "Potential Violation" of "Metric 19" by Wells Fargo, concluding that the Bank had exceeded the threshold error rate for this metric for the fourth quarter of 2012.  *See* June 18, 2013 Monitor Report at 17, 31 (Lasky Ex. 15).  This metric covers two of the servicing standards that form the basis for this enforcement action:  Sections IV(F)(2) and IV(F)(3) of the servicing standards.  *Id.* at 31.

The Monitor's report confirms what the NYAG's own investigation has revealed:  Wells Fargo is routinely failing to provide a missing documents notification within five business days of its receipt of materials from homeowners (Section IV(F)(2)) and then is routinely failing to allow homeowners at least thirty days from the missing documents notification to supplement their submissions (Section IV(F)(3)).  Nonetheless, Wells Fargo paradoxically argues that the Monitor's confirmation that Wells Fargo has failed to comply with its NMS obligations divests the NYAG of its ability to enforce the terms of the settlement.  This is a misreading of the consent judgment.

In support of its argument, Wells Fargo principally relies upon Section E(6) of Exhibit E of the NMS, which provides in full:  "In the event a Potential Violation is cured as provided in Sections E.3, above, then no Party shall have any remedy under this Consent Judgment (other than the remedies in Section E.5) with respect to such Potential Violation."  NMS Ex. E., § E(6).  Wells Fargo does not actually contend that its "Potential Violation" "is cured" as required by Section E(6), nor could it.  In order for a "Potential Violation" to be cured, Wells Fargo must have satisfactorily completed a "Corrective Action Plan" approved by the Monitor and the Monitor must then confirm that the Bank did not fail the same metric during  the "Cure Period,"

which is generally the first full quarter after the completion of the Corrective Action Plan. *See* NMS Ex. E, § E(3). Wells Fargo was to report its results for the Cure Period to the Monitor on November 14, 2013. *See* Wells Fargo Mem. at 11. Even if the Bank reported at that time that it did not exceed the threshold error rate for Metric 19, the "Potential Violation" will not be cured until such time as "the Monitor confirms the accuracy" of the Bank's reported results. NMS Ex. E, § E(3). Thus, the Bank's "Potential Violation" is not cured at this time (and may never be cured, depending upon the Monitor's findings) and nothing in the consent judgment requires NYAG to defer bringing an enforcement action while Wells Fargo undertakes its curative efforts.[9]

If the Monitor ultimately determines that Wells Fargo has cured its "Potential Violation," the Court should still require Wells Fargo to remediate the harm it has caused to the homeowners identified by NYAG who were victims of the Bank's violations of these servicing standards. The consent judgment requires the Bank to remediate any harm it has induced through its violations of the agreement to individual borrowers identified during the monitoring process. *See* NMS Ex. E, § E(5) (requiring, *inter alia*, that "Servicer must remediate any material harm to particular borrowers identified through work conducted under the Work Plan"). The agreement thus recognizes that the Bank has an affirmative duty to act to undo the harm it has caused when individual cases of non-compliance are brought to its attention. Consistent with this acknowledgment in the agreement, the Court should invoke its equitable powers to likewise require Wells Fargo to remediate the harm it has caused through its violations of the consent judgment to the homeowners identified by NYAG. *See Shy v. Navistar Int'l Corp.*, 701 F.3d

---

[9] Wells Fargo erroneously cites Section E(6) of Exhibit E for the proposition that the "Consent Judgment expressly prohibits the NYAG from bringing an enforcement action challenging this Potential Violation unless and until Wells Fargo fails to cure." Wells Fargo Mem. at 23. Nowhere does the consent judgment say that a state must defer bringing an action to enforce until such time as the Defendant has tried, and failed, to cure its non-compliance. Instead, Section E(6) merely limits the relief available to a state once a "Potential Violation" "is cured." NMS Ex. E, § E(6).

523, 533 (6th Cir. 2012) ("Where a consent decree is violated, the court should fashion equitable

relief that is designed to make the party whole for his or her loss."); *see also McComb v.*

*Jacksonville Paper Co.*, 336 U.S. 187, 193 (1949) ("The measure of the court's power in civil

contempt proceedings is determined by the requirements of full remedial relief.").

## CONCLUSION

For the foregoing reasons, NYAG respectfully requests that the Court hold that NYAG's

action to enforce the consent judgment is proper and that the Court allow this action to proceed

to a factual determination as to Wells Fargo's violations of the consent judgment.

Dated:  New York, New York
        November 15, 2013

                                                    Respectfully submitted,
                                                    ERIC T. SCHNEIDERMAN

                                                    Attorney General of the State of New York
                                                    Attorney for Plaintiff


                                            By:   */s/ Brian N. Lasky*
                                                    Brian N. Lasky
                                                    Assistant Attorney General
                                                    Bureau of Consumer Frauds and Protection
                                                    120 Broadway, 3rd Floor
                                                    New York, NY 10271
                                                    (212) 416-8300

Of Counsel:

JANE M. AZIA
Bureau Chief
Consumer Frauds and Protection Bureau

LAURA J. LEVINE
Deputy Bureau Chief

ADAM H. COHEN
MELISSA J. O'NEILL
Assistant Attorneys General

17

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

-----------------------------------------------------------------X

UNITED STATES OF AMERICA, et al.,

                    Plaintiffs,        Case No. 1:12-cv-00361-RMC

v.

BANK OF AMERICA CORP., et al.,

                    Defendants.

-----------------------------------------------------------------X

## CERTIFICATE OF SERVICE

     I, BRIAN N. LASKY, hereby certify that on the 15th day of November 2013, I served a true and correct copy of the following papers on counsel for all parties through this Court's Electronic Case Filing system:  (1) the Reply Memorandum of Law in Further Support of New York Attorney General's ("NYAG") Motion to Enforce the Consent Judgment Against Wells Fargo Defendants; and (2) the Declaration of Adam H. Cohen in support of NYAG's Motion and the exhibits annexed thereto.

Dated:  November 15, 2013
       New York, New York

                    By:    */s/ Brian N. Lasky*
                           Brian N. Lasky
                           Assistant Attorney General
                           Bureau of Consumer Frauds and Protection
                           120 Broadway, 3rd Floor
                           New York, NY 10271
                           (212) 416-8300