# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**UNITED STATES OF AMERICA,** *et. al.,*

      Plaintiffs,

v.

                                       CASE NO. **1:12-CV-00361-RMC**

**BANK OF AMERICA CORP.,**
**WELLS FARGO BANK, N.A.,** *et. al.,*

      Defendants,

v.

**DANIEL J. LEVITAN,**

      Intervenor.

_____/

## DANIEL J. LEVITAN'S MOTION TO INTERVENE; FOR ENFORCEMENT OF THE CONSENT JUDGMENT (DOC. 14); AND/OR IN THE ALTERNATIVE, FOR ORDER TO SHOW CAUSE FOR WELLS FARGO FOR CONTEMPT OF COURT

**COMES NOW** Movant, Daniel J. Levitan, ("Levitan" or "Movant") and asserts a right to intervene pursuant to 24(a)(2) Fed. R. Civ. P.; to enforce rights under the Consent Judgment of the Court (Doc. 14) (Effective April 4, 2012 (4/4/12)) ("Judgment"). *See* Judgment Section VII ¶ 13. Alternatively, pursuant to 24(b)(1)(B) Fed. R. Civ. P. Movant seeks to be granted leave by the Court for permissive intervention.

    1. Levitan seeks to enforce the terms of the Consent Judgment, and for the Court to issue its' Order to Show Cause to Wells Fargo for contempt of court by violation of that Consent Judgment. (Doc. 14). Levitan seeks relief from the Court based on his Factual Assertions herein;

1



RECEIVED
Mail Room

MAY 3 0 2014

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

and moves the Court to issue its' Order to Show Cause why Defendant Wells Fargo, should not be held in contempt of court for their willful violation of the Consent Judgment.

2. Levitan seeks for Wells Fargo to immediately purge themselves of the contempt by strict compliance with the Court's Consent Judgment and in the Levitan's Foreclosure by informing the Florida Courts of the past unlawful acts of counsel, for Wells Fargo to move to set aside the Foreclosure Judgment, enter into good faith settlement negotiations, and/or to financially remediate the Levitan's for Wells Fargo's illegal practices and conduct in the Levitan Foreclosure proceedings. Time is of the essence on this matter.

3. The Court retains jurisdiction to enforce the requested relief, as well as to enforce the intent and terms of the Judgment. _See_ Judgment, Section VII ¶¶ 13-15. In support thereof Movant states as follows.

## A. FACTUAL ASSERTIONS

4. Movant is a party defendant to an action styled _UBS Real Estate Securities, Inc. v. Pamela H. Levitan, Daniel J. Levitan, et. al._, Case No. 2008-CA-003766, Circuit Court First Judicial Circuit, Escambia County, Florida,[1] ("Levitan Foreclosure" or "Foreclosure"), that is foreclosure of the subject real property located at 1257 Greystone Lane, Pensacola, Florida 32514; is a Plaintiff party in _Daniel J. Levitan, Pamela H. Levitan v. Wells Fargo Bank, N.A., Wells Fargo Home Mortgage, Inc., UBS Real Estate Securities, Inc._, Case No. 2012-CA-001721, Circuit Court First Judicial Circuit, Escambia County, Florida; seeking relief against Wells Fargo for their illegal conduct in the Levitan Foreclosure, pursuant to the Florida Civil Remedies for Criminal practices Act §772.101, _et. seq._, Fla. Stat. ("Florida RICO" or "RICO" lawsuit); _See_ Exhibit A, Amended Complaint, and Movant is also the Appellant in _Daniel J. Levitan, Pamela H. Levitan v. UBS Real Estate Securities, Inc._, Case No. 1D12-2512, and 1D12-4003, District

---

[1] http://www.escambiaclerk.com

Court of Appeal, First District, State of Florida [2] ("Foreclosure Appeals") on appeal of the

Foreclosure judgment.

5.  The Consent Judgment (Doc. 14) provides and alleges "that Wells Fargo & Company

and Wells Fargo Bank, N.A. (collectively, "Defendant") violated, among other laws, the Unfair

and Deceptive Practices laws of the Plaintiff States,[3] (State of Florida), the False Claims Act,

[4]Financial Institutions Reform, Recovery, and Enforcement Act of 1989, the Servicemembers

---

[2] http://www.1dca.org

[3] *Florida's Unfair Deceptive Trade Practices Act* in pertinent part affords Levitan the right to intervene in this action related to his injury by Wells Fargo's willful refusal to abide by its' terms here; specifically provided for in the preamble of the Consent Judgment. §501.201. Fla. Stat. Short title This part shall be known and may be cited as the "Florida Deceptive and Unfair Trade Practices Act." §501.202. Fla. Stat. Purposes; rules of construction: The provisions of this part shall be construed liberally to promote the following policies: (1) To simplify, clarify, and modernize the law governing consumer protection, unfair methods of competition, and unconscionable, deceptive, and unfair trade practices. (2) To protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce. (3) To make state consumer protection and enforcement consistent with established policies of federal law relating to consumer protection. §501.203. Fla. Stat. Definitions As used in this chapter, unless the context otherwise requires, the term: (1) "Final judgment" means a judgment, including any supporting opinion, that determines the rights of the parties and concerning which appellate remedies have been exhausted or the time for appeal has expired. (2) "Enforcing authority" means the office of the state attorney if a violation of this part occurs in or affects the judicial circuit under the office's jurisdiction. "Enforcing authority" means the Department of Legal Affairs if the violation occurs in or affects more than one judicial circuit or if the office of the state attorney defers to the department in writing, or fails to act upon a violation within 90 days after a written complaint has been filed with the state attorney. (3) "Violation of this part" means any violation of this act or the rules adopted under this act and may be based upon any of the following as of July 1, 2013: (a) Any rules promulgated pursuant to the Federal Trade Commission Act, 15 U.S.C. § 41 *et seq.*;(b) The standards of unfairness and deception set forth and interpreted by the Federal Trade Commission or the federal courts; (c) Any law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices. (5) "Order" means a cease and desist order issued by the enforcing authority as set forth in §501.208 Fla. Stat. (6) "Interested party or person" means any person affected by a violation of this part or any person affected by an order of the enforcing authority. (7) "Consumer" means an individual; child, by and through its parent or legal guardian; business; firm; association; joint venture; partnership; estate; trust; business trust; syndicate; fiduciary; corporation; any commercial entity, however denominated; or any other group or combination. *See also* §501.211. Fla. Stat. Other individual remedies (1) Without regard to any other remedy or relief to which a person is entitled, anyone aggrieved by a violation of this part may bring an action to obtain a declaratory judgment that an act or practice violates this part and to enjoin a person who has violated, is violating, or is otherwise likely to violate this part. (2) In any action brought by a person who has suffered a loss as a result of a violation of this part, such person may recover actual damages, plus attorney's fees and court costs as provided in §501.2105 Fla. Stat.

[4] *See generally U.S. v Wells Fargo Bank, N.A.*, 2013 WL 5312564 (S.D.N.Y. 2013)(Government's civil fraud action against bank was not barred by consent judgment in which government released claims under False Claims Act (FCA), Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA) based solely on annual certifications; consent judgment did not release claims based on underlying conduct that was subject of such certifications, and allegations in government's complaint did not rely solely on annual certifications, as claims in complaint were primarily based on other actions, including bank's practices targeted at increasing loan origination

Civil Relief Act, and the Bankruptcy Code and Federal Rules of Bankruptcy Procedure." _See_, Consent Judgment Preamble. This provision specifically provides for Levitan's right of intervention in these proceedings as it forms the basic intent and rights of an aggrieved person for enforcement of the Consent Judgment; and to enforce the terms in this Court against Wells Fargo

6. In the Levitan Foreclosure, Wells Fargo as servicer for UBS, through their counsel, Florida Default Law Group ("FDLG") illegally obtained a default judgment against Movant and his wife Pamela Levitan in part by using the process in the mortgage industry that had become known as "dual tracking," "robo-signing" and "wet ink notes." Wells Fargo obtained judgment through use of those robo-signed affidavits that were false and fraudulent by their practices the affidavits were not made on personal knowledge of the affiant, although stated therein.

7. Wells Fargo did not properly create and file an assignment of the mortgage and mortgage note, as well as the adjustable rate rider prior to the filing of the Levitan Foreclosure complaint, used the process that became known as a "wet-ink note" thereby representing the mortgage and note to be originals when in fact the documents were high quality laser copies; again misrepresentation of a material fact, used in part to obtain final summary judgment. [5] Wells Fargo's unlawful prevented the Levitan's from asserting affirmative defenses of lack of standing to bring the Foreclosure, as it was abrogated by Wells Fargo's illegal conduct, and unsafe, unsound mortgage foreclosure practices, condemned by the Consent Judgment.

8. While the litigation was pending but prior to service of the Foreclosure complaint Movant and his wife contacted Wells Fargo by telephone and entered into forbearance

---

and bank's failure to report to Department of Housing and Urban Development (HUD) loans it knew to be materially in violation of HUD regulations. 31 U.S.C.A. § 3729 et seq.;  12 U.S.C.A. § 1833a.)

[5] _See generally_, http //www.stopforeclosurefraud.com

agreements, paid consideration for the forbearance, and paid over to Wells Fargo money in excess of $4,500 on the promises and the premise that Wells Fargo would direct their counsel FDLG to immediately suspend the foreclosure, would permanently modify the loan and place any arrearages at the back end of the loan. None of these obligations promised by Wells Fargo, nor the forbearances were ever fulfilled. *See*, Exhibit A, Amended Complaint Florida RICO.

9.   Based on Wells Fargo's material misrepresentations in the Foreclosure proceeding, Movant to his detriment relied on those promises, and FDLG was thereby able to obtain a default; and a final summary judgment based on the practice of "dual-tracking."

10. During the pending Foreclosure, Counsel for Wells Fargo, Florida Default Law Group ("FDLG") on September 14, 2010 affirmed in depositions that it had filed thousands of notices that they were withdrawing previously filed affidavits filed on behalf of Wells Fargo and other mortgage lenders. FDLG affiants who had signed the affidavits supporting the foreclosure judgment against Movant had previously admitted in depositions that thousands of these false or fraudulent affidavits were affirmed each month without knowledge of the contents and in many cases without even bothering to read the affidavits; this practice was the epitome of "robo-signing." *See*, footnote 3.

11. In the midst of the Levitan Foreclosure a family emergency/tragedy struck. Pamela Levitan's Mother had been unexpectedly diagnosed at Johns Hopkins Hospital in Baltimore, Maryland with stage IV small cell cancer. Pamela Levitan immediately filed a Notice of Unavailability stating unavailability because of a "family emergency" that she anticipated being unavailable from on or about May 15, 2011-July 1, 2011 as she had to depart Pensacola, Florida immediately for Baltimore Maryland to be at her Mother's hospital bedside, and to attend to her 80 + year old father. Within thirty (30) days thereof Pamela's Mother was dead. Absurdly,

Wells Fargo/UBS counsel, FDLG scheduled a hearing on the Levitan's Motion to Dismiss, and a hearing on the Motion for Summary Judgment in the midst of the Levitan Notice of Unavailability. [6] It was apparent that FDLG, counsel for Wells Fargo, was using the Notice of Unavailability as a means to gain a tactical and unfair advantage; the death of Pamela Levitan's Mother to obtain an *ex parte* final summary judgment through a hearing that the Levitan's never received a notice on. As a result of the plethora of illegal practices committed by UBS/Wells Fargo, they were able to obtain an *ex parte* judgment of foreclosure which they were not entitled.

12. Then to make matters worse, in February 2012, while there was a Court Ordered stay entered in the Levitan Foreclosure, pending the Foreclosure Appeal, Wells Fargo's agent Sell States Realty, a real estate broker located in Pensacola, Florida illegally entered the residence without permission or consent of the; changed the utilities (Electric & Water) accounts, broke into the house, changed the locks, placed a realtor's key box on the front door, and placed a "No Trespassing" sign in the front portico window taking over the Levitan's residence without permission or any known legal authority to do so. It was absurdity at its height. These illegal practices lead to the eventual filing of the Florida RICO lawsuit, in Pensacola, Florida. *See*, Ex. A. These practices by Wells Fargo are the very essence of the illegal conduct forming the basis of the Consent Judgment entered in this Court. (Doc. 14); that which Movant seeks to enforce against Wells Fargo at this time.

13. In the Judgment's preamble, the purpose stated is that it is "the intention of the United States and the States in effecting this settlement is to remediate harms allegedly resulting from the unlawful conduct of the Defendant" Wells Fargo. *Id.* Paragraph 2 of the Judgment provides that "Defendant shall comply with the Servicing Standards, attached hereto as Exhibit A, in

---

[6] Wells Fargo counsel FDLG had Pamela's cell phone number and email address and never attempted to contact her prior to scheduling the hearings on the Levitan's motions.

accordance with their terms and Section A of Exhibit E, attached hereto". *Id.* Movant is an aggrieved party pursuant to Section III ¶ 4 of the Judgment. *Id.* The agreement forming the basis of the Consent Judgment by Defendant Wells Fargo can be found in Exhibit A Settlement Term Sheet appended to the Consent Judgment. *Id.* Essentially, executives of Wells Fargo/UBS and their counsel have gotten a free pass, immunity from prosecution, instead of going to prison. This settled the illegal conduct of Wells Fargo and their attorneys during the foreclosure crisis for pennies on the dollar, and they received a mulligan for their efforts. The most egregious aspect of the whole matter is that counsel Carlton, Fields, Jorden, Burt, P.A. in West Palm Beach, Florida continues to defend the Wells Fargo's past practices on appeal rather than settling the matter and correcting their wrongs. It violates the intent and spirit of the Court's Consent Judgment, it is willful, and a contempt of the Courts Order.

14. Based on the allegations provided herein, Wells Fargo has willfully violated the terms of the Court's Order. Wells Fargo has violated the "Foreclosure and Bankruptcy Information and Documentation" ("Settlement") Section I A 1 of the Consent Judgment, by filing of the Levitan Foreclosure complaint alleging that no payments had been made subsequent to June 1, 2008; a material false representation employed by Wells Fargo to illegally obtain foreclosure against the Movant. Based on this false statement made in the Foreclosure, Wells Fargo was able to obtain a final summary judgment against the Levitans which Wells Fargo attorneys have failed to correct to this day; both in the trial court and on appeal.

15. Wells Fargo's affidavits in the Levitan Foreclosure are false and misleading of the amounts due and owing, not taking into account the money paid over to them, by the Levitans in consideration of the forbearance agreements, contrary to ¶ 8 Ex. A-2 of the Consent Judgment, in willful violation of the Settlement terms.

16. Wells Fargo has not made known to the Foreclosure court or the appellate court in Florida that material misrepresentations were made by Wells Fargo on the issue of standing, receipt of payment, of illegal tactics used to obtain final summary judgment, and that these facts were not based on personal knowledge as claimed in numerous affidavits, in willful violation of ¶ 16 Ex. A-3 of the Consent Judgment in violation of the Settlement terms.

17. Wells Fargo has willfully refused to fulfill ¶ 17 Ex. A-4 of the Consent Judgment in the Levitan Foreclosure in violation of the Settlement, by failing to provide to the Levitans notice at their address of record that prior to the sale that the affidavits filed in the action were not based on personal knowledge, that the verification required by the filing of amended affidavits were not independently verified, that counsel FDLG permitted the errors and material misrepresentations to go uncorrected, that is without informing the trial court or the appellate court on the appeal, and continue to litigate and defend the judgment. Wells Fargo has willfully refused to remediate the Movant for his injuries.

18. Wells Fargo has willfully failed to provide a statement to the Movant in violation of ¶ 18 Ex. A-4 of the Consent Judgment in violation of the Settlement.

19. Wells Fargo or their counsel is required to fix the errors addressed herein as through Wells Fargo's agreement in Exhibit E-12 ¶ 5 of the Consent Judgment, it places an affirmative obligation upon Wells Fargo and thus its' counsel "to cure a Potential Violation through the Corrective Action Plan, [Wells Fargo] must remediate any material harm to particular borrowers identified through work conducted under the Work Plan." *Id.* Again in the Levitan Foreclosure Wells Fargo has failed to do so, and still perpetuates the unlawful acts by continuing to defend them.

20. Wells Fargo has failed or otherwise refused to bring to the Levitan Foreclosure court's attention, or to the attention of the Foreclosure appellate court the fact that the transfer of the assignment of the mortgage was not completed prior to the filing of the Levitan Foreclosure complaint; that they had received payments from the Levitans against the loans, that Wells Fargo's agent Sell States Realty had taken over the residence without court order, essentially burglarizing the residence, in violation of the Levitan Foreclosure stay, and that Wells Fargo counsel Dean Morande, Esq., Michael Winston, Esq., Donna Eng, Esq., Carlton, Fields, Jorden, Burt, P.A., 525 Okeechobee Boulevard, Suite 1200, West Palm Beach, Florida 33401 to date have not made known to the Florida Courts the illegal practices conducted by the former Florida Default Law Group representing Wells Fargo/UBS in its unlawful practices to obtain the Foreclosure judgment. These facts violate not only the intent of the Settlement, it willfully violates nearly every aspect of the Judgment of the Court. It is in fact contempt of the Court's authority.

## B. MEMORANDUM OF LAW

Rule 24 of the Federal Rules of Civil Procedure provides for two types of intervention-- intervention as of right under Rule 24(a) and permissive intervention under Rule 24(b). Rule 24(c) imposes procedural requirements that an applicant must satisfy before intervention is permitted. First, the applicant must file a motion stating the grounds for his or her proposed intervention. Fed.R.Civ.P. 24(c). Next, the motion must "be accompanied by a pleading that sets out the claim or defense for which intervention is sought." Levitan does not move to assert separate claims,[7] and therefore a pleading requirement is not necessary in these proceedings as

---

[7] Levitan adopts those facts stated in the Consent Judgment, the Settlement and all attachments thereto as if set forth at length herein, and further asserts the Factual Assertions addressed herein as a basis for the requested relief as this Motion to Intervene and to Enforce the Judgment is a verified statement pursuant to 28 U.S.C. §1746.

he seeks to enforce a Judgment already rendered by the Court with the same claims that he alleges were committed by Wells Fargo in the Foreclosure actions.

### Intervention as of Right

Rule 24(a) governs an applicant's intervention as of right, providing that a court must allow an individual to intervene in an action where he, "is given an unconditional right to intervene by a federal statute" or "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest ." Fed.R.Civ.P. 24(a). There are four distinct requirements that intervenors must demonstrate:  "(1) the application to intervene must be timely;  (2) the applicant must demonstrate a legally protected interest in the action;  (3) the action must threaten to impair that interest;  and (4) no party to the action can be an adequate representative of the applicant's interests." *Karsner v. Lothian*, 532 F.3d 876, 885 (D.C.Cir.2008) (*quoting SEC v. Prudential Sec. Inc.*, 136 F.3d 153, 156 (D.C.Cir.1998)).

### Timeliness

First, the Court considers the timeliness of the motion.  In weighing the timeliness of a motion, the Court must consider: (1) the stage of the proceedings reached when the applicant seeks to intervene; (2) the prejudice that the resulting delay might cause to other parties; and (3) the reason for the delay. *Choike v. Slippery Rock Univ.*, 297 F. App'x 138, 140 (3d Cir.2008). Accordingly, Levitan does not seek to relitigate the claims nor continue discovery in the matter, or otherwise disturb settlement of the parties; unless of course Wells Fargo foregoes its right to purge itself from what is alleged as contempt of the court.  He seeks only to enforce the provisions of the settlement against in the form of equitable relief against Wells Fargo for failing

to fulfill its' terms which weighs in favor of his intervention. The right sought is timely under the terms enjoyed by Wells Fargo of the Consent Judgment.

**<u>Interest in Litigation</u>**

Under Rule 24(a)(2), Levitan is seeking to intervene as of right as he has an interest "relating to the property or transaction[8] which is the subject of the action" that is "significantly protectable." *Donaldson v. United States*, 400 U.S. 517, 531, 91 S.Ct. 534, 27 L.Ed.2d 580 (1971). This legal interest must be direct and "distinguished from interests of a general and indefinite character." *Mountain Top*, 72 F.3d at 366. "[I]ntervenors should have an interest that is specific to them, is capable of definition, and will be directly affected in a substantially concrete fashion by the relief sought." *Kleissler v. U.S. Forest Serv.*, 157 F.3d 964, 972 (3d Cir.1998);*see also Mountain Top*, 72 F.3d at 366 ("The applicant must demonstrate that there is a tangible threat to a legally cognizable interest to have the right to intervene."). An applicant's "mere economic interest in the outcome of the litigation is insufficient to support a motion to intervene." *Mountain Top*, 72 F.3d at 366. Movant meets each of the interest heretofore articulated.

Rule 24 does not specify what type of interest a party must have to intervene as a matter of right, but the Supreme Court has recognized that " '[w]hat is obviously meant ... is a significantly protectable interest.' " *Teague v. Bakker*, 931 F.2d 259, 261 (4th Cir.1991) (quoting *Donaldson v. United States*, 400 U.S. 517, 531, 91 S.Ct. 534, 27 L.Ed.2d 580 (1971)). Levitan seeks to intervene to enforce the provisions of the Consent Judgment that the Plaintiff parties to the action have already received the benefit of; a benefit which was to have trickled down to the Levitan Foreclosure based on Wells Fargo's affirmative duty to implement the specific portions

---

[8] It is the Consent Judgment and its attached Exhibits that provide for the agreement of Wells Fargo and its' obligations under that Judgment which is sought against them for enforcement by the Court.

of the Consent Judgment. Since the Government sought and received the same result that the movant is urging, a presumption arises that the movant's interest is adequately represented, so that the movant must show "adversity of interest, collusion, or nonfeasance." The open and obvious malfeasance of Wells Fargo can only be protected against if Movant is permitted to intervene and seek relief from the Court for what Wells Fargo was to have already completed. The Court's Consent Judgment specifically provides jurisdiction for the Court to enforce the Judgment. *Westinghouse Elec. Corp.*, 542 F.2d at 216. The Consent Judgment provides for the several law violations by Wells Fargo and under both State of Florida Law and under Federal law confer a right of Levitan to seek relief; relief that is already outlined in this court's Consent Judgment so that the matter will not have to be relitigated on equitable claims. *See* footnote 3 and 4 herein. However, the movant need not show that the representation by existing parties will definitely be inadequate in this regard. And, it is likely he could not, as not only can the United States seek the same relief sought by Levitan, *See, U.S. v. Wells Fargo Bank, N.A.*, 2013 WL 5312564 (S.D.N.Y. 2013)(Government's civil fraud action against bank was not barred by consent judgment in which government released claims under False Claims Act (FCA), Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA) based solely on annual certifications; consent judgment did not release claims based on underlying conduct that was subject of such certifications, and allegations in government's complaint did not rely solely on annual certifications, as claims in complaint were primarily based on other actions, including bank's practices targeted at increasing loan origination and bank's failure to report to Department of Housing and Urban Development (HUD) loans it knew to be materially in violation of HUD regulations. 31 U.S.C.A. § 3729 et seq.; 12 U.S.C.A. § 1833a.) it can further seek injunctive relief to prevent further injuries to other parties across the country, and require Wells Fargo

through administrative action to remediate Levitan's claim sought here.  It might be feasible for the Court to not only issue a Show Cause Order against Wells Fargo, it may be advisable to afford the Plaintiff parties a time to answer whether or not they will also seek administrative action against Wells Fargo for the willful violations outlined herein. *See Trbovich v. UMWA*, 404 U.S. 528, 538 n. 10, 92 S.Ct. 630, 30 L.Ed.2d 686 (1972).  Levitan need only demonstrate "that representation of his interest 'may be' inadequate." *Id.* For this reason, the Supreme Court has described the applicant's burden on this matter as " 'minimal.' " *Teague*, 931 F.2d at 262 (quoting *Trbovich*, 404 U.S. at 538 n. 10, 92 S.Ct. 630). In this context, without action by the United States Levitan should be afforded the right to intervene and request relief based on the Consent Judgment of the Court, as without further request for enforcement by the Plaintiff's Levitan will be left without timely equitable relief to enforce the provisions of the Consent Judgment.

### Article III Standing

It is axiomatic that  Article III requires a showing of injury-in-fact, causation, and redressability.  The leading Supreme Court case, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), describes the first element as including a showing of an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.  *Id.* at 560, 112 S.Ct. 2130.  Levitan points to the economic interest of being unable to enforce provisions conferred in the Consent Judgment entered by the Court. That much is clear.  Levitan shows by the facts, that Wells Fargo willful violations of the Consent Judgment in the Levitan Foreclosure that his economic interest faces an imminent, threatened invasion--i.e., one that is not conjectural or speculative. Exhibit E-12 ¶ 5 of the Consent Judgment places an affirmative obligation upon Wells Fargo and thus its' counsel

"to cure a Potential Violation through the Corrective Action Plan, [Wells Fargo] must remediate any material harm to particular borrowers identified through work conducted under the Work Plan." *Id.* "[T]he underlying rationale for this requirement is clear:  because a Rule 24 intervenor seeks to participate on an equal footing with the original parties to the suit, he must satisfy the standing requirements imposed on those parties." *City of Cleveland v. NRC*, 17 F.3d 1515, 1517 (D.C.Cir.1994).

This federal judgment provides and concludes that Wells Fargo must implement specific practices; practices which Levitan points to of Wells Fargo's non-compliance in the State of Florida courts, i.e. the Levitan Foreclosure. Levitan enjoys Article III standing pursuant to the Consent Judgment [9] in concept as embodied in Rule 24 as he has an interest "relating to" the property or transaction at issue in the litigation; that is the Consent Judgment. (Doc.14).

To establish standing under Article III, Levitan shows by the factual assertions herein that:  (1) he has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action [or inaction] of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury has been redressed by entry of the Judgment in this Court.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992);  *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C.Cir.2002).  The requisite showing for standing of injury-in-fact and causation are closely related to the second and third factors under  Rule 24(a), which require a showing of interest in the subject matter of the lawsuit and the potential impairment of that

---

[9] In the Consent Judgment's preamble, the purpose stated is that it is "the intention of the United States and the States in effecting this settlement is to remediate harms allegedly resulting from the unlawful conduct of the Defendant" Wells Fargo. *Id.*  Paragraph 2 of the Consent Judgment provides that "Defendant shall comply with the Servicing Standards, attached hereto as Exhibit A, in accordance with their terms and Section A of Exhibit E, attached hereto". *Id.*  Movant is an aggrieved party pursuant to Section III ¶ 4 of the Consent Judgment. *Id.*  The general agreement of the Consent Judgment by Defendant Wells Fargo can be found in Exhibit A Settlement Term Sheet appended to the Consent Judgment. *Id.*

interest absent intervention in the suit. *See, e.g., Roeder v. Islamic Republic of Iran*, 333 F.3d

228, 233 (D.C.Cir.2003) ("[A]ny person who satisfies Rule 24(a) will also meet Article III's

standing requirement."); *Defenders of Wildlife v. Jackson*, 284 F.R.D. 1, 5, 2012 WL 896141, at

*4 (D.D.C.2012) (noting that outcome is the same whether standing is considered separately or

as part of Rule 24(a)(2) interest requirements); *Akiachak Native Cmty. v. U.S. Dep't of Interior*,

584 F.Supp.2d 1, 7 (D.D.C.2008) ("The standing inquiry is repetitive in the case of intervention

as of right because an Intervenor who satisfies Rule 24(a) will also have Article III standing.").

To be sure, Levitan indicates as a proposed Intervenor and by his factual assertions his

standing is satisfied under Article III; then that "is alone sufficient to establish that [he] has 'an

interest relating to the property or transaction that is the subject of the action.' " *Fund for*

*Animals*, 322 F.3d at 735 (quoting Fed.R.Civ.P. 24(a)(2)). That statement could be thought to

suggest that the third-party aspect of prudential standing is applicable here--and similarly, that

Rule 24's phrase "relating to the property or transaction that is the subject of the action"

(emphasis added) has no meaning beyond Article III's requirements.[10]

---

[10] In *Fund for Animals*, The D.C. Circuit relied on previous cases that had equated the legally protected interest requirement of Article III with the "interest" of Rule 24. Id. at 735. That equation is undeniable with respect to the kind of interest that Rule 24 protects. As indicated therein, however, the "relating to" language suggests a sort of nexus requirement more akin to third-party prudential standing. But in *Fund for Animals*, the Court recognized that the statute in question had been interpreted by the Supreme Court to eliminate prudential standing considerations and to extend standing to the full limits of Article III. *Id.* at 734 n. 6. The standing dispute there was only whether the intervenor, a Mongolian agency, had adduced sufficient evidence for the proposition that listing argali sheep as an endangered species would adversely affect Mongolian tourism. *Id.* at 733-34. Because prudential standing was irrelevant in that case, the broad language quoted above must be understood in context as not precluding considerations of prudential standing under different statutes and in this instance, both should apply and countenance intervention. See, *Deutsche Bank Nat. Trust Co. v. F.D.I.C.*, 717 F.3d 189, 192, 196 (C.A.D.C. 2013), *Bldg. & Constr. Trades Dep't, AFL-CIO v. Reich*, 40 F.3d 1275, 1282 (D.C.Cir.1994). Prudential standing, like Article III standing, is a threshold, jurisdictional concept. *Steffan v. Perry*, 41 F.3d 677, 697 (D.C.Cir.1994) (en banc). Federal courts may consider third-party prudential standing even before Article III standing, *see Kowalski v. Tesmer*, 543 U.S. 125, 129, 125 S.Ct. 564, 160 L.Ed.2d 519 (2004), so there is no problem deciding prudential standing as an alternative holding as it is appropriate to do so. *See Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 807 (D.C.Cir.1987).

Of course, Levitan is seeking to intervene, or to otherwise enforce the Court's Consent Judgment, or a *rule nisi*. It is not to bring a cause of action separate and apart under the Judgment itself. He moves to intervene to enforce the terms of the Judgment so that Wells Fargo will be required to do as they agreed to do in the first place. It is asserted that if in the Levitan Foreclosure Wells Fargo fulfilled their duties under the Judgment the Levitan's home would never had been foreclosed on, as the documentation and acts committed by Wells Fargo in an unsafe and unsound manner; that Wells Fargo and their counsel FDLG would have been barred from foreclosing in the first place; that is the unlawful use of "robo-signing," "dual-tracking," and "wet-ink notes" and other unlawful, unsafe, unsound practices that lead to the wrongful foreclosure. The basic point remains that the Judgment is meant to protect Levitan's rights against Wells Fargo's unsafe, unsound foreclosure practices committed by Wells Fargo in the Foreclosure proceedings; acts that continue as the present counsel for Wells Fargo/UBS has not made the courts aware of the previously unsound practices as required in the Judgment; and thereby the Levitan's rights are not being protected. Insofar as Levitan wishes to be heard on the specific question of interpretation of the Judgment, he is effectively seeking to enforce the rights he has under the Judgment which the doctrine of prudential standing affords, and an Order to Show Cause is the logical first step in this event. *Steffan v. Perry*, 41 F.3d 677, 697 (D.C.Cir.1994) (en banc).

21. As quoted in *In re, Endangered Species Act Section 4 Deadline Litigation-MDL No. 2165*, 704 F.3d 972, 976-977 (C.A.D.C. 2013) the Court held:

> "The Supreme Court has afforded special treatment to procedural injuries under Article III, noting that "[t]here is much truth to the assertion that 'procedural rights' are special: The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 572 n. 7, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The doctrine

loosen[s] the strictures" of the standing inquiry, *Summers v. Earth Island Ins*t., 555 U.S. 488, 129 S.Ct. 1142, 1151, 173 L.Ed.2d 1 (2009), by relaxing the immediacy and redressability requirements, *Lujan*, 504 U.S. at 572 n. 7, 112 S.Ct. 2130.  An individual can enforce his procedural rights "so long as the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing." *Id.* at 573 n. 8, 112 S.Ct. 2130. As explained by this court, the doctrine "relieves the plaintiff of the need to demonstrate that (1) the agency action would have been different but for the procedural violation, and (2) ... court-ordered compliance with the procedure would alter the final result." *Nat'l Parks Conserv. Ass'n v. Manson*, 414 F.3d 1, 5 (D.C.Cir.2005) (citation omitted).  It has treated "[t]he hypothetical in footnote 7 of Lujan [as] represent[ing] the archetypal procedural injury:  an agency's failure to prepare a statutorily required environmental statement before taking action with potential adverse consequences to the environment." *Nat'l Parks Conserv. Ass'n*, 414 F.3d at 5. In that hypothetical, "one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years." *Lujan*, 504 U.S. at 572 n. 7, 112 S.Ct. 2130."

*Id.*


## Permissive Intervention

22. Levitan is not required to prove injury in fact for permissive intervention to apply; only that Wells Fargo has willfully violated the precepts of the Consent Judgment.  Rule 24(b) authorizes permissive intervention for a movant who timely files a motion where a federal statute, and in this case a federal Consent Judgment conferring rights on Levitan as a beneficiary of that Judgment, confers a conditional right to intervene. *District of Columbia v. Potomac Elec. Power Co.*, 826 F.Supp.2d 227, 233 (D.D.C.2011) (citing *Envt'l Def. v. Leavitt*, 329 F.Supp.2d 55, 65 (D.D.C.2004) and Fed. R. Civ. P. 24(b)).  Under Rule 24(b)(2), a would-be intervenor must show "(1) an independent ground for subject matter jurisdiction;  (2) a timely motion;  and (3) a claim or defense that has a question of law or fact in common with the main action.' " *Potomac Elec. Power Co.*, 826 F.Supp.2d at 233 (citing *EEOC v. Nat'l Children's Ctr.*, 146 F.3d 1042, 1046 (D.C.Cir.1998)) (internal quotations omitted).  As previously noted, the decision to

allow permissive intervention under  Rule 24(b) is committed to the district court's discretion.
*Id.* (citing *Nat'l Children's Ctr.*, 146 F.3d at 1046, 1048).   In exercising its discretion to allow
permissive intervention, the Court must consider whether the proposed intervention "will unduly
delay or prejudice the adjudication of the original parties' rights."    Fed.R.Civ.P. 24(b).  Movant
asserts he has a right to intervene in this action as the Judgment confers that right in the preamble
and in the substantive parts of the Consent Judgment.  Notwithstanding that right, alternatively
Levitan would request intervention by permissive leave of Court to enforce the Consent
Judgment and its' terms against Wells Fargo.

## Contempt of Court Notice to Show Cause

Contempt has been defined as any act which is calculated to embarrass, hinder, or
obstruct the court in its administration of justice, or which is calculated to lessen its authority or
its dignity.  The major purpose of the law of contempt is to maintain and preserve the dignity of
the judiciary and the orderly administration of justice. A contempt proceeding is characterized as
civil contempt where one party initiates it by motion and seeks to compel the other party's
compliance with a court order rather than to punish him or her for noncompliance.

The standard to be applied in determining whether conduct is contemptuous is an
objective one based upon a determination of the conduct's tendency to hinder the administration
of justice, rather than a subjective one concerned with the sensitivities of a particular judge.
Importantly, the conduct alleged to be contemptuous must be calculated to cause harm.

In order to establish that Defendant is in contempt, Plaintiff must demonstrate "by clear
and convincing evidence, (1) the existence of a reasonably clear and unambiguous court order
and (2) a violation of that order by the defendant."  *Walker v. Ctr. for Food Safety*, 667
F.Supp.2d 133, 136 (D.D.C.2009) (citing *Broderick v. Donaldson*, 437 F.3d 1226, 1234

(D.C.Cir.2006)).  In finding a party to be in civil contempt of a court's order, "the intent of the recalcitrant party is irrelevant," and the court must only determine whether its order has been violated.

An order granting injunctive relief or a [consent judgment] is enforceable by the district court's power of contempt, and the Consent Judgment specifically provides for these powers. *See  Gunn v. Univ. Comm. to End War in Viet Nam*, 399 U.S. 383, 389, 90 S.Ct. 2013, 26 L.Ed.2d 684 (1970).  A contempt finding is proper where "the putative contemnor has violated an order that is clear and unambiguous" and the violation of an order is "proved by clear and convincing evidence."  *Armstrong v. Executive Office of the President, Office of Admin.*, 1 F.3d 1274, 1289 (D.C.Cir.1993) (citation and internal quotation marks omitted).  "In the context of civil contempt, the clear and convincing standard requires a quantum of proof adequate to demonstrate a reasonable certainty that a violation occurred."  *Breen v. Tucker*, 821 F.Supp.2d 375, 383 (D.D.C.2011) (citations and internal quotation marks omitted). *See, Phillips v. Mabus*, 894 F.Supp.2d 71, 91(D.D.C. 2012); *Blevins Popcorn*, 659 F.2d at 1184, 1186 n. 77. *See also Salazar ex rel. Salazar v. District of Columbia*, 602 F.3d 431, 442 (C.A.D.C. 2010)

It is well-established that civil contempt is a vehicle by which courts can ensure that contemnors abide by court orders.  "Civil contempt differs from criminal contempt in that it seeks only to 'coerc [e] the [contemnor] to do' what a court had previously ordered him to do." *Turner v. Rogers*, --- U.S. ----, 131 S.Ct. 2507, 2516, 180 L.Ed.2d 452 (2011); *see also Cunningham v. Hamilton Cnty., Ohio*, 527 U.S. 198, 207, 119 S.Ct. 1915, 144 L.Ed.2d 184 (1999) ("Civil contempt is designed to force the contemnor to comply with an order of the court.") (internal citation omitted). *See, Sieverding v. U.S. Dept. of Justice*, 847 F.Supp.2d 75, 87(D.D.C. 2012)

A show cause order would suffice the requirements of notice and the right to be heard. *See Ashford v. E. Coast Express Eviction*, 774 F.Supp.2d 329, 331 (D.D.C.2011). To resolve the competing concerns of notice, the Court can direct that the Defendants and the other parties respond within a set period of time. Levitan has served copies of his request upon the parties, and the Electronic Case Management System ("ECM") will send copies to the parties in this action. An appropriate amount of time it is suggested is 20 days.

Wells Fargo's disobedience of the Consent Judgment demonstrates contumacious conduct." "Contumacious conduct" may be defined as a "willful disobedience of a court order." Black's Law Dictionary 292 (7th ed. 1999). A contumacious intent is not important in the context of civil contempt. *In re Brown*, 454 F.2d 999, 1007 (D.C.Cir.1971). So-called "three-stage civil contempt" consists of

> "(1) issuance of an order; (2) following disobedience of that order, issuance of a conditional order finding respondent in contempt and threatening to impose a specified penalty unless respondent purges himself of contempt by complying with prescribed purgation conditions; and (3) exaction of the threatened penalty if the purgation conditions are not fulfilled."

*See, Oil, Chemical & Atomic Workers Int'l Union v. NLRB*, 547 F.2d 575, 581 (D.C.Cir.1976).

As shown herein Wells Fargo has failed to comply with the Consent Judgment, essentially an enforcement order. Whether that failure was accompanied by willfulness is irrelevant as willfulness although alleged herein is not required for the first-stage of a contempt request. N.L.R.B. v. Jackson Hosp. Corp., 786 F.Supp.2d 123, 137 (D.D.C. 2011), and the willfulness demonstrated herein, only seeks to advise the Court of Wells Fargo's contumacious conduct was willful in the sense of requiring issuance of a show cause order to inquire into the conduct before taking the further steps of sanctions if required to compel their future compliance

or provide a way for Wells Fargo to purge themselves of the contumacious conduct. A show cause order is appropriate under the circumstances of the case and as more fully set forth herein.

## C. CONCLUSION AND REQUEST FOR RELIEF

Wells Fargo entered into the Consent Judgment duly authorized by its' Board of Directors. A Consent Judgment that not only purged Wells Fargo criminal liability arising from the foreclosure crisis, it also insured stability of the Bank, and permitted settlement of claims of fraud that could have been brought by the Government and the States throughout the country for their civil and criminal liability for their illegal foreclosure practices; it limiting their liability to pennies on the dollar. In return they had obligations to thousands of borrowers who they improperly foreclosed against by use of the illegal acts they received immunity on; and the Court entered its Consent Judgment on this agreement to Wells Fargo, the Consent Judgment also accepted by the State of Florida.  Nonetheless, in the Levitan Foreclosure Wells Fargo did not fulfill their obligations under the Judgment and its appendices, and if Wells Fargo continues to willfully violate the Court's Order then they should be held in contempt of the court and be compelled to fulfill their obligations.

**WHEREFORE** Movant respectfully moves the Court to:

i)      Issue its Show Cause Order and direct Wells Fargo to file their answer to this Motion, and to Show Cause within twenty (20) days why they should not be held in contempt of court;

ii)     Hold a hearing on the matter to take evidence of Wells Fargo's willful violations of the Consent Judgment, or as otherwise appropriate holding a hearing on the matters;

iii)   Wells Fargo be compelled to notify the State of Florida courts in the Levitan

Foreclosure actions and appeals of the unsafe, unsound practices committed by

them in the course of the Levitan Foreclosure, including filing a request to set

aside the foreclosure, enter into good faith negotiation to settle the claims, or as

the Court otherwise requires;

iv)   Require Wells Fargo to complete an immediate review of the Levitan Foreclosure

proceedings, hold a teleconference with the Levitans on the matter;

v)    Provide remuneration to the Movant as provided for under the Consent Judgment;

vi)   Permit limited discovery on the matter relative to the unlawful acts committed in

the Levitan Foreclosure; and

vii)  Any further and just relief deemed appropriate.

> Respectfully submitted,
>
> **DANIEL J. LEVITAN**, pro se
> 650607-Legal Mail
> Jackson C.I.
> 5563 10th Street
> Malone, FL. 32445
>
> _____
> **DANIEL J. LEVITAN**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was provided by U.S.

Mail first class postage prepaid to:

Thomas J. Perrelli
Tony West
Associate Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington D.C. 20530
George W. Madison
General Counsel
U.S. Department of the Treasury
1500 Pennsylvania Avenue, N.W.
Washington D.C. 20220

Lucy Morris
Deputy Enforcement Director
Consumer Financial Protection Bureau
1500 Pennsylvania Ave., N.W.
(Attn: 1801 L Street)
Washington D.C. 20220

Michael J. Heid
Executive Vice President
Wells Fargo & Company
Wells Fargo Bank, N.A.
One Home Campus
Des Moines, IA 50328

Dean Morande, Esq.
Michael Winston, Esq.
Donna Eng, Esq.
Carlton Fields Jorden Burt, P.A.
525 Okeechobee Boulevard, Suite 1200
West Palm Beach, FL. 33401

Pamela H. Levitan
1200 Georgetown Drive
Bel Air, MD. 21014-2041

Hon. Pamela Jo Bondi
Attorney General
The Capitol, PL-01
Tallahassee, FL. 32399-1050

Patricia A. Connors
Associate Deputy Attorney General
Victoria A. Butler
Assistant Attorney General
Bureau Chief
Economic Crimes Division
3507 E. Frontage Road, Suite 325
Tampa, FL. 33607

Tom Grady
Commissioner
Florida Office of Financial Regulations
200 E. Gaines Street
The Fletcher Building, Suite 118
Tallahassee, FL. 32399-0370

on this _____ day of May 2014; and that all other parties hereto will receive service of this request upon filing with the Court by the Clerk of the Court under the Court's ECM/ECF case management system.

_____

**DANIEL J. LEVITAN**

IN THE CIRCUIT COURT OF THE FIRST JUDICIAL CIRCUIT
IN AND FOR ESCAMBIA COUNTY, FLORIDA
CIVIL ACTION

DANIEL J. LEVITAN,
PAMELA H. LEVITAN,
**Plaintiffs,**

**vs.**

CASE NO:  2012-CA-001721
DIVISION: D

WELLS  FARGO BANK, N.A.,
WELLS FARGO HOME MORTGAGE, INC.;
UBS REAL ESTATE SECURITIES, INC.,
**Defendants.**
_____/

## AMENDED COMPLAINT

COMES NOW Plaintiff Daniel J. Levitan and Pamela H. Levitan ("LEVITAN"),

and sues Defendants Wells Fargo Bank, N.A.,Wells Fargo Home Mortgage Inc. ("WELLS

FARGO"), and UBS Real Estate Securities, Inc. ("UBS"), and allege as follows:

1.       This is an action for fraud, conversion, conspiracy, breach of contract, specific

performance and violations of the Florida Civil Remedies for Criminal Practices Act, Fla. State.

Ann. §772.104 (commonly referred to as "Florida Civil RICO" or "Florida RICO").  The

Levitan's were injured by Defendants' unlawful lending practices, mortgage servicing practices,

debt collection, unsafe and unsound foreclosure practices used to deprive the Levitans property

rights, absent fair notice, due process, equal protection.  Included in the unlawful practices were

unsafe and unsound practices related to residential mortgage loan servicing and foreclosure

processing, including continued foreclosure proceedings while loan modifications or special

forbearance agreements were in effect promising the suspension or dismissal of foreclosure

proceedings coming to be known as "dual-tracking".  As part of the Defendants' pattern and

practice of unlawful acts, Defendants failed to establish sufficient oversight and controls over

third-party vendors, including outside legal counsel, making material misrepresentations
commonly known as "robo-signing".

2.    The Levitans seek treble monetary damages under Florida RICO Statutes, as well
as temporary, preliminary and permanent injunctive relief under the Florida RICO Statute to
which they are entitled.

3.    The Levitans reserve the right to amend this Complaint with any appropriate
additional claims.

## I.    INTRODUCTION

4.    The State of Florida is in the midst of a residential mortgage foreclosure crisis that
has deprived borrowers' of due process to defend against illegitimate foreclosure proceedings by
Defendants by use of false, fraudulent or misleading documentation.  Plaintiffs' assertion of
certain legal rights to defend against these unsafe or unsound foreclosure practices has been
significantly diminished whether with purpose or by design; giving UBS, Wells Fargo, and their
attorneys Florida Default Law Group significant unfair advantage over the Levitans by fraud,
misrepresentation, use of mail, wires, or telephonic communications in commerce to gain an
unfair advantage in the foreclosure process.

5.    Defendants' practices by illegitimate means and use of deceptive practices have
caused foreclosure by lender(s) who have no standing to sue or are not due judgment of
foreclosure under Florida law.  Defendants sued Plaintiffs to enforce foreclosure based on false
affidavits and unverified complaints.  Florida Default Law Group has been sanctioned and
warned for their illegal practices and willingness to create false documentation representing
documents to be originals when they are not, having become commonly known as "wet ink
notes".

2

**Office of Comptroller of the Currency Cease and Desist Enforcement Action**

6.    On or about March 31, 2011, Wells Fargo entered into a "Consent Order" with the U.S. Department of the Treasury, Comptroller of the Currency, Case No. AA-EC-11-19. Wells Fargo and UBS in connection to the foreclosure of loans of residential mortgage servicing portfolio filed or caused to be filed in this court several contradictory affidavits in connection with the foreclosure of a residential mortgage *UBS Real Estate Securities, Inc. v. Pamela T. May k/n/a Pamela H. Levitan, Daniel Levitan, et.al.*, Case No. 2008CA003766, making various assertions, such as ownership of the mortgage note and mortgage, the amount of the principal and interest due, and the fees and expenses chargeable to the Levitans, in which Wells Fargo as servicer, owner, and holder of the mortgage note and mortgage represented that the facts in the affidavits were made based on personal knowledge or based on a review by the Affiant of Wells Fargo or their representative of the relevant books and records, when in this case, they were not based on such personal knowledge or review of the relevant books and records (the "Foreclosure Proceeding"), coming to be known as "robo-signing".

7.    Wells Fargo filed or caused to be filed in the public records of Escambia County, Florida affidavits or other mortgage-related documents that were not properly notarized including those not signed or affirmed in the presence of a notary.

8.    Wells Fargo litigated this foreclosure proceeding through UBS without ensuring that either the promissory note or the mortgage document were properly endorsed or assigned prior to initiating foreclosure or in the possession of the appropriate party at the appropriate time and failed to file a verified complaint pursuant to Fla. R. Civ. P. 1.110(b).

9.    Wells Fargo, UBS, and/or Florida Default Law Group, P.L ("FDLG") failed to devote sufficient financial, staffing or managerial resources to ensure proper administration of

3

the foreclosure process, without adequate oversight, internal controls, policies, and procedures, over third-party management.

10.     Wells Fargo and UBS, by and through FDLG, participated in the foreclosure proceeding by Wells Fargo failing to oversee FDLG and third-party participants handling foreclosure-related services, and by reason of this conduct Wells Fargo and UBS engaged in unsafe and unsound foreclosure and banking practices,              that included failure to abide by special forbearance agreements, or loan modifications

11.     Because of the conduct above and pursuant to the authority vested in the Comptroller of the Currency by the "Federal Deposit Insurance Act", as amended 12 U.S.C. §1818(d), the Comptroller entered a "Consent Cease and Desist Order" against Wells Fargo, in order to avoid this cease and desist, the "Consent Order" was approved by Wells Fargo's board of directors.

12.     The "Action Plan" initiated by Wells Fargo pursuant to the Consent Order requires that Wells Fargo maintain effective loss mitigation activities which includes but are not limited to special forbearances and/or modifications; Wells Fargo has failed to fulfill in this foreclosure action, and has received compensation for these agreements.

13.     Wells Fargo is responsible for the proper transfer and delivery of endorsed notes and that there shall be no "open endorsements", that all endorsements shall be verifiable and properly held which FDLG has failed to do at the proper time and place.

14.     Wells Fargo has failed to institute its "single point of contact" in the foreclosure proceeding and FDLG has failed to follow through at the direction of Wells Fargo or UBS.

15.    Wells Fargo or UBS has failed to properly and effectively certify FDLG or recertify FDLG as a third-party provider and that certification process has failed to identify FDLG non-compliance with the dictates of the Consent Order.

16.    Wells Fargo, UBS, and/or FDLG failed to comply with the loss mitigation activities in accordance with the requirements of HAMP, the loan modification, or special forbearance agreements process.

17.    Wells Fargo has failed to coordinate communications with the Plaintiff, that communication is ineffective to avoid confusion, that there has been no further good faith effort by Defendants to ensure that FDLG foreclosure is not overlapping the promised forbearance or loan modification process; "dual-tracking".

**II.    PARTIES**

**A. Plaintiffs**

18.    Plaintiffs Daniel J. Levitan and Pamela H. Levitan are husband and wife, U.S. Citizens, and residents of the State of Florida. Pamela H. Levitan transfers all right, title and interest she may have or as may accrue against Wells Fargo and UBS to Plaintiff Daniel J. Levitan, to take all action for recovery on those claims as he in his sole and exclusive discretion may seek in this litigation.

**B. Defendants**

19.    Wells Fargo Bank, N.A., Sioux Fall, South Dakota, is a national banking association chartered pursuant to the National Bank act of 1864, as amended, 12 U.S.C. §§1, *et.seq.*, and is an insured depository institution within the meaning of 12 U.S.C. §1818(b)(1), and is the maker, holder, servicer of that certain mortgage note and mortgage for the subject property

commonly referred to as 1257 Greystone Lane, Pensacola, Florida 32514, and/or at relevant times herein was an agent for UBS Real Estate Securities, Inc. ("Wells Fargo").

20.    UBS Real Estate Securities, Inc., is a corporation that purchases investment rights in aid to Mortgage Backed Securities Pools ("MBS") and subject to the servicing right of Wells Fargo, has sued for a residential mortgage foreclosure against Plaintiff without proper and legal entitlement to do so, and has failed to perfect an assignment prior to the foreclosure action nor has a verifiable assigned endorsement. ("UBS").

21.    Florida Default Law Group, P.L. is a law firm who has represented Wells Fargo and UBS in foreclosure proceedings against Plaintiff, and through which UBS and Wells Fargo sought foreclosure based on their unsafe and unsound foreclosure practices, and have obtained a judgment of foreclosure against 1257 Greystone Lane, Pensacola, Florida 32514 through material misrepresentations, violation of valid special forbearance agreements, loan modifications, and by extrinsic fraud thereby fraudulently obtaining a judgment for foreclosure and this is an independent action to set aside that judgment.

## III.    JURISDICTION AND VENUE

22.    Jurisdiction of this action is based upon the claims and/or amount of the case or controversy exceeds $15,000.00 exclusive of costs, interest and attorney's fees.

23.    Venue is proper as the acts, occurrences, and financial instruments were negotiated and executed in Escambia County, Florida.

## IV.    FACTUAL ALLEGATIONS

### A. Background of Illegal Practices
### Fraudulent Marketing Practices

24.    Wells Fargo Home Mortgage k/n/a Wells Fargo Bank, N.A. marketed their mortgage financing as a community based lender seeking to assist the Levitans ("borrowers") in

6

refinancing their residence representing to them that a refinancing would save the Levitans thousands of dollars. As part and parcel to the inducement, Wells Fargo advised the Levitans that interest rates would decrease over time and in addition to long-term savings, the Levitans would recognize immediate savings by reducing their monthly payments to $780.47.

25.     Wells Fargo has filed affidavits of Amounts Due and Owing that are not based on personal knowledge of the documents reviewed or made, and were used to perpetrate a fraud on the Court in the foreclosure proceeding, .            as the affidavits were inaccurate and otherwise unreliable.

26.     Instead of the savings that the Levitans anticipated based on the expertise of Wells Fargo in determining whether or not to refinance their home and their representations, the Levitans incurred significantly increased costs, inability to communicate with Wells Fargo, loss of ownership protections, contrary to Wells Fargo's representations.

### B. Failure to Give Timely Legal Notice or Demand

27.     Wells Fargo and/or UBS has failed to give reasonable or adequate legal notice of default prior to the filing of the foreclosure action, notice and demand accelerating the note, nor afforded the Levitans the opportunity to reinstate the loan or of their right to cure default as provided under the note. Without these notices, the Levitans were unable to cure the default, participate in a workout, avoid late charges, legal fees, costs related foreclosure, or the reinstatement of the loan before foreclosure was filed.

28.     Wells Fargo and/or UBS has never given notice of sale or assignment to the Levitans prior to litigation or transfer of the financial instruments conferring any right or entitlement to any other party sufficient to convey legal standing.

7

### C. UBS Has No Standing or Right to Sue

29.     UBS has filed a false and/or fraudulent "Mortgage Foreclosure Complaint" without any legal right or authority to do so.  UBS has no right of assumption or assignment of the notes sufficient to convey a right or privilege to sue on the notes against the Levitans, and have made demand for payment of an amount of principal that is incorrect and false, and have sought relief from the Court for false claims by use of false documentation and filings.

30.     UBS's lien is subordinate to Daniel Levitan's lien and judgment he has filed in the official records of Escambia County.  UBS does not have a perfected lien or mortgage assignment prior to filing of foreclosure.

### D. Wells Fargo Illegal, Unsound, Unsafe Practices

31.     Wells Fargo and/or UBS has been found to have committed by negligence or fraud, illegal practices in foreclosing on loans without their right or entitlement to foreclose.

32.     United States Treasury Office of the Comptroller of the Currency, Administrator of the National Banks ("OCC") has made findings of fact, of fraud, misrepresentations, financial harm to borrowers, false promises, and purposeful failure to abide by legal and proper foreclosure procedures against Wells Fargo.

33.     On April 13, 2011, the OCC announced formal enforcement actions against Wells Fargo for unsafe and unsound practices related to residential mortgage loan servicing and foreclosure processing.

34.     The OCC addressed significant wide-spread practices of unlawful conduct of Wells Fargo in foreclosure processing, loan governance, loan modification processes, and financial harm to borrowers, the same as the Levitans have sustained.

35.     Wells Fargo and/or UBS has failed to promptly correct deficiencies. The OCC actions required Wells Fargo to make significant improvements in practices for residential mortgage loan servicing and foreclosure processing, including communications with borrowers such as the Levitans, "dual-tracking" causing continued foreclosure when the proceedings should have been suspended during the forbearance, and loan modification process which Wells Fargo advised and confirmed to the Levitans that they had been pre-approved for on four separate and distinct periods.

36.     The OCC enforcement action against Wells Fargo requires Wells Fargo to suspend or withdraw foreclosure actions when the loan modification process is under review or approved along with a single point of contact through the foreclosure or modifications process. Included in the OCC requirements are that Wells Fargo must establish robust oversight and controls pertaining to third-party vendors, including outside legal counsel, that provide default management or foreclosure services. In the implementation of the OCC enforcement action, Wells Fargo is required to complete a comprehensive "look back" to assess the violations against the Levitans, by their errors, misrepresentations, false affidavits, fraud or other deficiencies to compensate the Levitans for financial injury sustained from the foreclosure process.

37.     Wells Fargo and/or UBS pursuant to the OCC Consent Order, is required to establish a process to compensate or remediate the Levitans for the injury sustained as a result of Wells Fargo's deficiencies. In an Interagency Review produced by the OCC, the Board of Governors of the Federal Reserve System, and the Office of Thrift Supervision found that Wells Fargo's practices failed to comply with requirements and proof of entitlement to maintain standing to foreclose on financial instruments.

38.     Several State Supreme Courts around the United States have found that Wells Fargo did not have right to foreclose. As part of the findings, the "Massachusetts Supreme Judicial Court" found that Wells Fargo failed to prove a right to foreclose as the borrowers had not been notified of the assumption of the mortgage. Wells Fargo failed to properly file assignments from whence they acquired mortgages, failed to file assignments in official records of sales of financial instruments to purchasers causing the holder of the mortgages not to be entitled to foreclose or convey title as the lender or investors were not the holders of record at the time of the foreclosure.

39.     In October 2010, the "Mortgage Foreclosure Multistate Group" ("MFMG") consisting of the attorney generals from all 50 states and the District of Columbia, formed a bipartisan group investigating the sales and foreclosure practices of Wells Fargo. The MFMG has preliminary findings of systematic corrupt practices by Wells Fargo.

### E.  UBS and Wells Fargo Complicit in Conspiracy

40.     UBS and Wells Fargo began filing hundreds of "Amended Affidavits of Amounts Due and Owing" employing the very same false processes in creating the phony affidavits in this litigation. UBS filed with the Court their "Mortgage Foreclosure Complaint" on December 1, 2008. In the Complaint, UBS affirmed to the Court that they were the owner and holder of the mortgage and mortgage note of the Levitans'. In addition, UBS at the direction of Wells Fargo, conspired to file false documents and misrepresentations to the Court to perpetrate a fraud on the Court in order to obtain foreclosure when UBS and/or Wells Fargo were not entitled to foreclose. UBS alleged that: i) the mortgage and note were in default; ii) that no payments subsequent to May 1, 2008 had been made; iii) that $120,701.38 together with interest, fees were due; iv) that all conditions precedent under law or the note and mortgage have been performed or have

occurred; and, v) that UBS is entitled to foreclose. Each and every one of the assertions are untrue and were made in pursuance of the fraud in order to foreclose on a mortgage or financial instrument UBS did not have standing to claim a right on.

41. UBS further attested to personal service of Daniel Levitan when service of process had not been perfected. Certification of service upon Daniel Levitan was not properly completed; notwithstanding this fact, UBS moved for default to foreclose against Daniel Levitan without fair notice to him to defend the action.

42. UBS attached to the Complaint an alleged "Demand Letter" dated November 25, 2008, sent to "Pamela May, 1257 Greystone Lane, Pensacola, Florida 32514". Demand was made by the Florida Default Law Group, P.L. on behalf of their client "UBS Real Estate Securities, Inc.". Pursuant to the terms of the subject notes financial instruments and mortgage there are several rights conferred upon the Levitans to receive notice of default, then of demand, a right to cure, a right to reinstate, and a right to receive a demand notice at least all with 30-day minimum requirements prior to the filing of foreclosure. Foreclosure of the notes were filed seven (7) days after the mailing of the alleged Demand Letter sent on behalf of UBS. No Demand has ever been made by Wells Fargo.

43. UBS, through counsel "Kuyk, Fla. Bar No. 52730", filed with the Court a "notice of Filing of Affidavit as to Amounts Due and Owing"; "Notice of Filing of Affidavit of Reasonable Attorney's Fees"; "Affidavit as to Reasonable Attorney's Fees"; and an "Affidavit as to Amounts Due and Owing".

44. Affidavit as to Reasonable Attorney's Fees sworn to under the penalties for perjury is material to the request by UBS to tax fees against the Levitans. LISA CULLARO certified and swore personal review of the necessities certifying amounts owed. It appears that

LISA CULLARO may be one and the same person as ERIN CULLARO or in consanguity to

ERIN CULLARO invalidating the oath; representing falsification of the document; fraud on the

Court to obtain a judgment; or a conspiracy to defraud the Levitans.

45.    Affidavit as to Amounts Due and Owing sworn to under the penalties provided

for perjury provides the HELEN BOLTON stated the Affidavit is material and is being used to

obtain a summary judgment for $126,196.45 against the Levitans. Ms. Bolton states that she is

Vice President of Loan Documentation for Wells Fargo Bank N.A., and that Ms. Bolton is

alleged to have examined documents and records of Wells Fargo. UBS then goes on to allege

that UBS is owed $126,196.45, and that UBS has employed the Services of Florida Default Law

Group, P.L. Ms. Bolton purports to certify a debt alleged against the Levitans for or on behalf of

Wells Fargo, then not being a custodian of records nor an officer of UBS, affirms UBS is also

entitled to $126,196.45. Ms. Bolton has no corporate capacity alleged to assert or affirm

anything for UBS.

46.    An "Affidavit of Plaintiff's Counsel as to Attorney's Fees and Costs",

"Composite Exhibit A" sworn to by KRISTIA M. BARED and attested to by ALICIA

WILLIAMS, Notary Public, states under the penalties for perjury; and that the affidavit is

material and necessary to obtain judgment against the Levitans. The Affidavit attaches "Invoice

Number: 1330235" in the amount of $271.00, but then states in the Affidavit the costs for

investigation or Service of Process is $360.00, which is $89.00 more than the amount of the

invoice. In addition, the Affidavit seeks to tax fees of "New House Title, LLC.", a company

owned by Florida Default Law Group, P.L., and fails to attach an invoice for services rendered.

Said Affidavit also seeks to tax a filing for $371.00. A review of the Clerk of the Court website

for Escambia County Florida indicates the f8iling fee to be $310.00, which is $61.00 more than the filing fee charged. In total, UBS counsel seeks $150.00 more than was charged for costs.

47.     The "Affidavit of Plaintiff's Counsel as to Attorney's Fees and Costs", sworn to by KRISTIA M. BARED under penalty of perjury and attested to by ALICIA WILLIAMS is material and necessary to obtain judgment against the Levitans. The attorney's fees affirmed those fees to be $1,200.00; the previous affidavit affirmed the fee to be $1,450.00, a difference of $250.00 where there should have been no variance.

48.     UBS as part of their Motion for Summary Judgment affirmed that the "Defendants were duly and regularly served with process", and that no issue of material fact existed which when made was untrue.

49.     Pamela Levitan made a Motion to Dismiss and for Specific Performance contesting the material facts of the case, by alleging the existence of a valid enforceable forbearance agreement, including a payment of $1,845.00 evidence by a Cashier's Check dated 12/08/08, drawn from Whitney Bank. Part and parcel to that agreement was that Wells Fargo agreed to suspend these foreclosure proceedings, which they failed to do breaching their agreement and the Levitans suspended any further payments due to Wells Fargo's refusal to abide by the Forbearance Agreement. Wells Fargo again agreed to pre-approve loan modification asserted in the Levitan's "Amended Motion", which the Levitans fulfilled and Wells Fargo failed to complete the loan modification. Daniel Levitan moved to "Set Aside Default, Objections to Motion for Summary Judgment and for Specific Performance" indicating Daniel Levitan's clear desire to defend the action and statement of material facts precluding summary judgment.

50.     An "Amended Affidavit of Attorney's Fees and Costs" was filed by UBS attesting under penalties for perjury sworn to by SAMIR A MAASARANI, Fla. Bar. No. 69837, and attested to by Notary Public WILLIAM C. JONES affirming the attorney's fees to be $1,300.00. This affidavit is contrary to the other prior and affirmed affidavits filed in the action.

51.     Daniel Levitan filed a "Motion to Dismiss", and noticed the parties of the correct address for service.  Daniel Levitan filed additional motions to the Court:  Docs. #38, 39, 40, 41, 42, 49, 53, 54, 57, 58.  Motion to Dismiss; Motion for Substitution or in the Alternative Motion to Intervene; Motion for Court to Compel Compli8ance with Administrative Order; Motion to Strike; Motion to Transport to Hearing; Affidavit of Daniel Levitan in Opposition to Motion for Summary Judgment; Motion for Judicial Notice; Motion to Dismiss; Affidavit of Pamela H. Levitan in Opposition to Motion for Summary Judgment; Notices of Unavailability were all filed between 11/20/10 and 05/10/11.

52.     Wells Fargo and UBS have been made fully aware on at least ten (10) occasions telephonically that the Levitans wished to reinstate the mortgage, and/or defend the substantive allegations.  Contrary to the notice, UBS and Wells Fargo made false representations to the Circuit Court, first, that the Levitans did not dispute the facts of the Complaint; second, that no payments had been received since May 2008; third, that counsel swore to the accuracy of amounts owing which were alleged on three different pleadings each affidavit different from the other.

53.     In order to push litigation against the Levitans through the foreclosure process, UBS and Wells Fargo made false and material misrepresentations to the Circuit Court to gain an unfair advantage and to obtain a judgment based on false facts to foreclose against the Levitans residence by taking unfair advantage while a "Notice of Unavailability" had been filed thereby

using the death of Pamela Levitan's mother to obtain a hearing while Pamela Levitan was out of town.

54.     Wells Fargo and UBS, in order to save costs in litigation and foreclosure proceedings, regularly made false assignments, filed false affidavits, filed fraudulent complaints, filed foreclosure actions misrepresenting facts where UBS would swear to the facts and Wells Fargo would swear to the facts knowing them to be false when made.

55.     It is now clear by the OCC, Federal Reserve, and the Attorneys Generals of all 50 States, and the U.S. Attorney General that have now filed enforcement actions and litigation including agency actions making findings against Wells Fargo for their unlawful foreclosure practices for the very unlawful conduct to which Wells Fargo and UBS illegally took against the Levitans.

**F.  Florida Default Law Group, P.L. Complicit**

56.     It is equally clear that UBS Counsel, Florida Default Law Group, P.L., was fully aware of and aided and abetted the misrepresentations, material omissions and concealment of false statements associated with UBS and Wells Fargo illegal and unsafe foreclosing practices. Even knowing the dangers of making false statements with fraudulent representations meant to play the odds that the Levitans would not notice the improper conduct and allow foreclosure improperly brought UBS and Wells Fargo continued to foreclose with assistance of FDLG providing capability to do so.

57.     FDLG and its principal Michael Echevarria employ a practice to increase costs of litigation by naming several additional tenants in foreclosure actions.  This practice was previously employed by Mr. Echevarria in Echevarria Associates and based on this past conduct,

the Supreme Court of Florida sanctioned Mr. Echevarria for identical practices employed by
FDLG in the foreclosure proceedings against the Plaintiff.

58.     FDLG has filed hundreds of false affidavits to obtain foreclosure against
homeowners. When it was discovered that FDLG and its employees or attorneys filed these false
affidavits, FDLG withdrew the affidavits. These affidavits were alleged to be based on "personal
knowledge" when in fact the affiant had not received any file to review to assert personal
knowledge. This practice was not a single incident because at a deposition of Jeffrey Stephan, an
attorney with FDLG, he admitted that it was a common practice at FDLG to execute affidavits
for foreclosure without the affiant having any personal knowledge of anything sworn to in the
affidavits.

59.     FDLG also employed the regular practice of filing unverified complaints for a
residential mortgage foreclosure even though the Florida Supreme Court amended Rule 1.110(b)
to require that residential mortgage foreclosure complaints be verified.   Notwithstanding the rule
or the reasons for its amendment, FDLG failed to apply the rules requirements to several
proceedings including the foreclosure proceeding against Plaintiff to avoid the falsities
throughout the proceeding.

60.     FDLG had a clear notice that Plaintiff's wife Pamela Levitan was in Baltimore,
Maryland from on or about May 15, 2011 through July 15, 2011, due to the unexpected illness of
her mother Louise Haupt. Mrs. Haupt had been diagnosed with Stage IV small cell lung cancer
and subsequently passed away. In this same time period, FDLG moved for a final summary
judgment and held a hearing without notice to the Levitans obtaining a judgment when FDLG
was aware of a "family medical emergency", that prevented Plaintiff's wife or himself from
being present. It was a patently illegal step to gain the summary judgment against the Levitans

while Pamela was out of town in Baltimore, Maryland attending to her 81-year old father and the death of her mother.

### G. Related RICO Fraudulent Predicate Acts: Business As Usual

61. Wells Fargo's and UBS's practice of fraud and deceit is "business as usual" through Florida Default Law Group, P.L., it's attorneys and employees knowingly sought to throw families out of their homes, or to prey on borrowers in false marketing of Wells Fargo Products or legally deficient documentation to obtain foreclosure against borrowers.

62. For the fiscal year ending 2010, Wells Fargo announced higher and record profits in their mortgage servicing divisions due to their illegal practices, employed against the Levitans and others respecting a pattern and practice.

63. The Levitans, owners of a single-family home, have suffered enormous direct financial injury as a direct consequence of UBS and Wells Fargo's unlawful conduct nationwide, resulting from their practices. These direct RICO injuries include but are not limited to the fact that the Levitans have actually realized diminished property values directly caused by Wells Fargo unlawful RICO violations, and the diminished value has tangibly manifested itself. The Levitans' injuries are concrete, tangible injuries directly cause by UBS and Wells Fargo unlawful conduct; the Levitans injuries are not speculative or contingent.

64. As alleged above, Wells Fargo has itself even acknowledged that the unlawful practices and associated unlawful conduct subjects Wells Fargo and/or UBS to liability for the direct injury it has caused the Levitans. The OCC "[e]nforcement actions, coordinated among the federal banking regulators, require major reforms in mortgage servicing operations", "These reforms will not only fix the problems [OCC] found in foreclosure processing, but will also correct failures in governance and the loan modification process and address financial harm to

17

borrowers. [OCC] enforcement actions are intended to fix what is broken, identify and

compensate borrowers who suffered financial harm, and ensure a fair and orderly mortgage

servicing process going forward", but have failed to do so in the Levitan's case.

## COUNT I
### LEVITANS AGAINST UBS AND WELLS FORGO
### FOR VIOLATION OF FLORIDA RICO

65.     Levitans reallege and incorporate by reference Paragraphs 1 through 64 above.

66.     Fla. Stat. Ann. §772.103(3) provides:

> "It is unlawful for any person. . . employed by, or associated with, any
> enterprise to conduct or participate, directly or indirectly in such enterprise
> through a pattern of criminal activity or the collection of an unlawful debt."

67.     Wells Fargo and UBS, is and was at all times relevant to this action, a RICO

"person" within the meaning of Fla. Stat. Ann. §772.103.

68.     Florida Default Law Group, P.L., its attorneys, paralegals, employees ("FDLG")

is an "enterprise" within the meaning of Fla. Stat. Ann. §772.102(3). The FDLG is a law firm

representing UBS and Wells Fargo that at all times relative hereto along with New House Title,

LLC, possessed and continues to possess an ongoing organizational structure separate from all

racketeering activity, that provides the structure and capability for UBS and/or Wells Fargo to

continue their illegal practices to defraud the courts and borrowers based upon phony affidavits

and false or otherwise fraudulent documentation.

69.     At all relevant times FDLG and new House Title have affected and continue to

affect interstate and foreign commerce and existed separate and apart from the racketeering

activity. For example, FDLG for the foreclosure of Wells Fargo and UBS actions without Wells

Fargo or UBS's entitlement to sue. FDLG acts and omissions provide an independent ways and

means for UBS and Wells Fargo to foreclose on borrowers when the underlying documentation

18

and mortgages were sold on fraudulent practices and underlying papers, or documents are false, or misrepresent amounts due and owing.

70.     Throughout the period relevant to this action, Wells Fargo and/or UBS was a financial services company fraudulently marketing and acquiring mortgages, notes, or financial instruments for the purpose of servicing and investment in Mortgage Backed Securities ("MBS") for profit and/or to increase profits for servicing or investment, and conducted and participated in a pattern of racketeering activity in violation of Fla. Stat. Ann. §772.103(3).

**Predicate Acts of Racketeering**

71.     As set forth in greater detail above in Paragraphs 1-64, Wells Fargo and UBS engaged in a fraudulent scheme to maximize profits at the expense of U.S. Citizens and the Levitan's by marketing, loaning, selling, mortgages, notes, financial instruments by fraudulently representing or by false representations that the underlying loan documents are legally or properly executed, by corrupting and manipulating the judicial system, or federal regulatory systems for the purpose of foreclosing on borrowers based upon false or fraudulent assertions of fact. Wells Fargo and/or UBS did this by courting and corrupting FDLG employees, attorneys, or agents and sending them woefully incomplete or inaccurate documents that FDLG would then rubber stamp without the slightest review.

72.     For the purpose of devising and carrying out their scheme to defraud the Levitans and FDLG by means of false and fraudulent pretenses, representations and promises, Wells Fargo and UBS did place in an authorized depository for mail, or did deposit or cause to be deposited with private and commercial carriers knowingly caused to be delivered by the United States Postal Service letters, memoranda, and other matters, in violation of 18 U.S.C. §1341, as follows, or aided and abetted the following criminal acts:

19

a. A mailing dated April 22, 2005 from Knoxville, Tennessee by Wells Fargo for an Adjustable Rate Note for a mortgage. In order to obtain the mortgage, Wells Fargo required that Jane E. Levitan divest herself by quit claim deed to Pamela May. By mailing and arranging for the mortgage, Wells Fargo's representations of the promised savings never accrued, but in fact the Levitans incurred thousands of dollars in additional expenses and costs.

b. A mailing dated December 4, 2008, from Wells Fargo to Pamela T. May entering into a forbearance agreement and agreeing to suspend foreclosure upon the initial payment being made, and continue to suspend the action as long as the terms of the Agreement are met. On or about December 8, 2008, the Levitans paid to Wells Fargo $1,845.00. Wells Fargo and UBS continued to pursue litigation and failed to notify the Court of suspension of litigation; and according to an Invoice 1330235 by Provest, Wells Fargo and UBS attempted service of process on November 26, 2008, six days before litigation was filed. This mailing was meant to begin foreclosure based upon the fraudulent documents.

c. A mailing dated November 25, 2008, to Pamela T. May from FDLG representing UBS and notifying the Levitans of the acceleration of the note, and demanding payment five days prior to filing litigation on December 1, 2008. The letter was "being sent to comply with the Fair Debt Collection Practices Act" further stating "Our client may make advances and incur fees and expenses after the date of this letter which are recoverable under the terms of the Promissory Note and Mortgage". "Therefore, if you wish to receive

figures to reinstate (bring you loan current) or pay-off your loan through a specific date, please contact this law firm". In this letter, UBS advised the Levitans that Defendants were aware of the provisions of the note that required 30 days notice of acceleration prior to litigation, of the right to reinstate prior to litigations and of the legal requirements of the Fair Debt Collection practices Act. Notwithstanding the requirements of the contract, Defendants filed foreclosure five days after the notice was mailed.

d. A mailing dated November 21, 2008, in which Wells Fargo or UBS sent to FDLG initiating foreclosure action with the note identified as Document ID 1784, four (4) days prior to acceleration, to reinstatement or to cure default. This mailing further evidences Defendants predisposition to deny the Levitans their right to cure or of fair notice to foreclose contrary to clear rights of the contracts, and contrary to promises and of forbearance agreements fraudulently representing to the Levitans Defendants intent to suspend proceedings contrary to the actions.

e. A mailing and court filing dated November 26, 2008, filing of a *Lis Pendens* by UBS without right or entitlement to do so; as the false *Lis Pendens* without proper right of assignment was designed to prevent the Levitans entitlement to peaceful enjoyment of their home preventing the free sale or transfer of the property; to file a fraudulent or false notice for foreclosure on (1) day after acceleration of the note for the creditor UBS and without demand from Wells Fargo was blatantly disregarding responsibility of their contractual obligations.

f.  UBS and Wells Fargo's mailing of the Affidavit as to Amounts Due and
Owing executed by HELEN BOLTON in South Carolina and mailed on or
about February 5, 2009 to FDLG to tax fees, cost, and attesting to principal
owed, perpetuated the foreclosure proceeding but was submitted to cover-up
the deficient documentations prior to the present

g.  UBS and Wells Fargo mailings through FDLG on or about December 1, 2008
for the *Lis Pendens*; July 23, 2009 to tax fees, costs, principal; August 28,
2009 Motion for Default; August 31, 2009 Motion for Default; September 8,
2009 Motion for Summary Judgment with Affidavits—these five mailings by
UBS and Wells Fargo were critical to foreclose against the Levitans due to the
deficient documents and to cover-up the failure to give notice or right to cure.

73.     For the purpose of devising and carrying out their schemes and artifice to defraud
the Levitans by means of false and fraudulent pretenses, representations and promises, the
Defendant's caused to be transmitted by means of wire communication in commerce, writings
signals and sounds, to wit, interstate electronic mail messages and/or facsimile in violation of 18
U.S.C. §1343 as follows:

a.  On or about December 4, 2008, a telephone call between the Levitans and
Wells Fargo Home Mortgage in Fort Mill, South Carolina, customer service
counseling services promised to suspend foreclosure proceedings and to
guarantee a forbearance agreement that required the Levitans pay to Wells
Fargo an initial payment of $1,845.00 before December 18, 2008.  On
December 8, 2008, payment for execution of the forbearance was made to
Wells Fargo, and after payment was received, Wells Fargo failed to credit

payment to the Levitans and failed to execute the agreement and did not

suspend proceedings nor filed evidence of suspension to the Court. After

Wells Fargo's breach, the Levitans demanded compliance which Wells Fargo

refused.

b. On or about December 2009 – February 2010, the Levitans participated in

several telephone calls with Wells Fargo who informed the Levitans that

Wells Fargo had pre-approved them for a mortgage loan modification and that

three payments would need to be made totaling $2,250.00. Upon completion

and full payment the foreclosure would be dismissed and the loan modified to

payments of $750.00 per month. Payments were made by the Levitans to

Wells Fargo. On or about September 3, 2010, Wells Fargo failed to abide by

the terms of the agreement after receiving payment in full.

74.     There are numerous additional mail and wire fraud predicate acts, including the

following fraudulent communications that were sent by either mails or the wires or both, to wit:

a. A Wells Fargo news release and response to Government inquiries as to their

mortgage foreclosure practices as being safe and sound and had been lawfully

complied with State and Federal law and regulation. As part of these

positions taken by Wells Fargo but the representations to the OCC and

enforcement consent agreement were contrary to the consent agreement's

admission of unsafe and unsound practices.

b. Wells Fargo and UBS transmitted on at least six occasions Investor

Information for foreclosure; information that was patently incorrect. On

October 22, 2010, a communication was exchanged between Wells Fargo and

FDLG attesting to a lost mortgage affidavit and on the same date foreclosure

was to have been suspended. Instead of suspending the foreclosure

processing, FDLG continued foreclosure.

75.    FDLG has aided and abetted UBS and Wells Fargo in committing RICO

violations. FDLG was the debt collector, attorneys, and title search or insurance firm since

inception of this foreclosure and pre-foreclosure. As such, FDLG has been and is fully aware of

the submission of the documents to them and the misrepresentations of UBS and Wells Fargo

inability to maintain and keep accurate records or of compliance with State and Federal law.

UBS and Wells Fargo began a media campaign to conceal the enormity of incorrect foreclosure

proceedings, false affidavits, judgments or fraud on the courts and use of the courts to cover-up

the legal inaccuracies of Wells Fargo and UBS.

76.    The Defendant's predicate acts constituted a pattern of racketeering activity

because the predicate acts are related and continuous. Each predicate act had the same or similar

purpose and result, to wit: to use FDLG to fraudulently foreclose against borrowers when

Defendants had no lawful entitlement to do so, or had made promises or written and oral

agreements not to foreclose due to a forbearance agreement or valid loan modification

precluding foreclosure.

77.    Throughout the period relevant to this action, Defendants were a mortgage

servicer, owner of mortgages, maker of mortgages, seller of MBS, fraudulently covering-up,

foreclosing on, falsely producing, or foreclosing on borrowers homes that were not due to be

foreclosed on by conducting and participating in a pattern of racketeering activity in violation of

Fla. Stat. Ann. §772.103(3).

**Predicate Acts of Racketeering**

78.     The Levitans incorporate and re-allege the predicates and related predicates set

forth in Paragraphs 68-74 of this Complaint.

79.     The Defendants predicate acts constitute a pattern of racketeering activity within

the meaning of Fla. Stat. Ann. §772.102(4) because the predicate acts are related and continuous.

Each predicate act had the same or similar purpose and result (to foreclose against homeowners

by affidavit claiming right to foreclose by fraud or on false pretenses).

80.     Continuity is demonstrated by the predicates and related predicates alleged above.

These predicates illustrate a threat of continued racketeering activity and show that the predicates

constitute the regular manner in which Wells Fargo and UBS conducts business through its

attorneys FDLG.

81.     Plaintiffs are and continue to be injured in their person and property by reason of

the Defendants' commission of predicate acts of racketeering and subsequent RICO violations.

82.     As such, the Levitans have been injured in their person or property by reason of

the Defendants' violation of Fla. Stat. Ann. §772.103(3) and are entitled to recover threefold the

damages they have sustained and the costs of this suit, including a reasonable attorney's fees and

damages exceeding $15,000.00.

## COUNT II
## LEVITANS AGAINST UBS AND WELLS FARGO
## FOR VIOLATION OF FLORIDA RICO FLA. STAT. ANN. §772.103(4)

83.     Plaintiffs reallege and incorporate by reference the allegations of Count I.

84.     Fla. Stat. Ann. §772.103(4) provides that it shall be unlawful to conspire to

violate Fla. Stat. Ann. §772.103(3).

85.     Defendants UBS and Wells Fargo, is and was at all times relevant to this action, a RICO "person" within the meaning of Fla. Stat. Ann. §772.103.

86.     Florida Default Law Group, P.L. (hereinafter "FDLG") is an "enterprise" within the meaning of Fla. Stat. Ann. §772.102(3). The FDLG is a law firm representing UBS and Wells Fargo that at all times relative hereto along with New House Title, LLC, possessed and continues to possess an ongoing organizational structure separate from all racketeering activity, that provides the structure and capability together with U.S. Bank National Association, as Trustee for the holders of MASTR Asset Backed Securities Trust 2005-WF1 ("UBS"), Mortgage Electronic Registration Systems, Inc. ("MERS"), who are used to subrogate State and Federal law and regulation that also possessed and continues to possess an ongoing organizational structure separate from all racketeering activity, that provides that the structure and capability of the "enterprise" was the manner and means or capabilities to conspire in unlawful conduct.

87.     At all relevant times FDLG, together with and in cooperation with UBS and MERS activities have affected and continue to affect interstate and foreign commerce and existed separate and apart from the racketeering activity. For example, UBS acts as the trustee of the MASTR Asset Backed Securities Trust 2005-WF1 and MERS registers the securities under a private registration system that when the mortgages are sold, does not record the sale in the state it is subject to, and does not record any assignment of any sale as required under state law. As a result of failure to abide by Florida Law, FDLG has provided a manner, means, or structure to foreclose against borrowers' homes without legal entitlement to do so by use of false, fraudulent, affidavits meant to cover-up their illegitimate actions.

88.     Throughout the period relevant to this action, Defendants were a mortgage servicing, mortgage originator, mortgage seller, who used fraudulent practices and false

26

documentation to foreclose against properties or borrower's home without right or entitlement to do so, thereby conducted and participated in a pattern of racketeering activity in violations of Fla. Stat. Ann. §772.103(3).

## Predicate Acts of Racketeering

89.     The Levitans incorporate and re-allege the predicates and related predicates set forth in Paragraphs 68-74 of this Complaint.

90.     The Defendants' predicate acts constitute a pattern of racketeering activity within the meaning of Fla. Stat. Ann. §772.102(4) because the predicate acts are related and continuous. Each predicate act had the same or similar purpose and result (to use FDLG, UBS, and MERS to fraudulently foreclose against the Levitans and thus deprive the Levitans of protections offered by State and Federal Law, and Regulatory Agency rules).

91.     Continuity is demonstrated by the predicates and related predicates above.  These predicates illustrate a threat of continued racketeering activity and show that the predicates constitute the regular manner in which UBS and Wells Fargo conducts business.

92.     The Levitans are and continue to be injured in their person or property by reason of the Defendants' commission of predicate acts or practices of racketeering and subsequent RICO violations.

93.     Defendants UBS conspired with Wells Fargo to violate Fla. State. Ann. §772.103(3) in violation of Fla. Stat. Ann. §772.103(4).

94.     As such, the Levitans have been injured in their person or property by reason of Defendants' violation of Fla. Stat. Ann. §772.103(4) and are entitled to recover threefold the

27

damages they have sustained and the cost of this suit, including a reasonable attorney's fees and damages exceeding $15,000.00.

## COUNT III
## BREACH OF CONTRACT DECEMBER 2008

95.     The Levitans reallege and incorporate by reference Paragraphs 1 through 64 above.

96.     Wells Fargo and/or UBS on or about December 4, 2008, offered the Levitans a Special Forbearance Agreement to retain their home, to suspend foreclosure proceedings once the initial payment was received, and to continue suspension of the proceedings.

97.     Wells Fargo advised the Levitans that the initial payment was received. Wells Fargo and/or UBS immediately breached and failed to fulfill the terms of the forbearance agreement by failing to suspend the foreclosure proceeding. Daniel Levitan called Wells Fargo in South Carolina and advised the counseling services representative that the FDLG had refused to suspend the foreclosure proceedings because they had no record being directed by UBS or Wells Fargo to do so.

98.     The Levitans advised Wells Fargo and UBS that further payments were being suspended for Defendants' failure to abide by the terms of the forbearance agreement.

99.     As a result of Defendant's breach of contract, the Levitans incurred injury including but not necessarily limited to: loss of money, reduced valuation of their property, fear, vexation, illness, worry due to Defendants' unlawful acts against the Levitans for Defendants' failure or refusal to abide by the terms of their agreement and as a result the Levitans incurred injury, demand costs of suit, reasonable attorney's fees, enforcement of the agreement, and damages exceeding $15,000.00.

## COUNT IV

28

## BREACH OF CONTRACT DECEMBER 2009

100.    The Levitans reallege and incorporate by reference Paragraphs 1 through 64 above.

101.    Wells Fargo and/or as agent for UBS advised the Levitans that they had been pre-approved for a permanent home mortgage modification. Terms of the modification required the Levitans to make payments to Wells Fargo over a 90-day period and at the end of that period, the mortgage loan would be permanently modified. Payments were completed and Wells Fargo and UBS failed to fulfill the promise and in order to obtain the money from the Levitans made false and/or fraudulent representations or promises knowing them to be false meant to defraud borrowers without intent to fulfill the obligation having done so to countless other borrowers and to the Levitans.

102.    Wells Fargo and/or UBS, on or about December 2009, offered permanent loan modification which the Levitans agreed to commit to, and paid to Wells Fargo a total of $2,250.00 in consideration for the agreement, which included the dismissal of the foreclosure action.

103.    Wells Fargo failed to fulfill their promises to permanently modify the Levitan's home mortgage, failed to fulfill their promises to dismiss the foreclosure action, after knowingly misrepresenting, defrauding, and making false representations to the Levitans knowing them to be false to lull the Levitans into a false sense of security of having resolved the foreclosure proceeding, to permit FDLG to foreclose without notice to the Levitans.

104.    As a result of Defendants' breach of contract, the Levitans incurred injury including but not necessarily limited to: loss of money, reduced valuation of their property, fear, vexation, illness, worry due to Defendants' unlawful acts against the Levitans for Defendants'

failure or refusal to abide by the terms of their agreement and as a result the Levitans incurred

injury, demand costs of suit, reasonable attorney's fees, enforcement of the agreement, and

damages exceeding $15,000.00.

**COUNT V**
**CIVIL FRAUD**

105.     The Levitans reallege and incorporate by reference Paragraphs 1 through 64

above.

106.     To obtain an unfair advantage so that Defendants could foreclose without the

legally required documentation to confer standing, UBS and Wells Fargo made false

representations knowing them to be false, to induce the Levitans to pay to Defendants $4,000.00

with false promises of loan modification, suspension of foreclosure, dismissal of foreclosure so

that Defendants could gain an unfair advantage through the use of FDLG to foreclose, to hold

hearings, to file false affidavits, fraudulent documents and hold hearings in Court without proper

notice to obtain judgment against the Levitans.

107.     When the mother of Pamela Levitan was diagnosed with Stage IV Small Cell

Lung Cancer and subsequently died on May 29, 2011, Pamela Levitan had filed a Notice of

Unavailability because of the unexpected family emergency.  Defendants sought a hearing before

the Court and used the death of Pamela Levitan's mother to gain an advantage and obtain

judgment.  From on or about May 14, 2011 through July 15, 2011, Pamela Levitan filed and

noticed the Court and the parties that she was unavailable because of a "family emergency".

Defendants argued to the Court that the Levitans had previously filed a Notice of Unavailability.

In order to obtain the judgment, Defendants used the unexpected death of the Levitan's mother

and mother-in-law who was a patient at Johns Hopkins Cancer Center in Baltimore, Maryland, to

their advantage to obtain a judgment procured by fraud on the Court.  Pamela or Daniel Levitan

30

were not at home to receive mail. Defendants and FDLG had the Levitans email and telephone and refused to call in order to complete their fraud.

108.    As a result of Defendants' fraudulent conduct, the Levitans incurred injury to their rights and privileges, suffered tremendous anxiety, vexation, physical sickness, and incurred injury to their person and property, demand costs of suit, reasonable attorney's fees, and damages exceeding $15,000.00

### COUNT VI
### CONVERSION

109.    The Levitans reallege and incorporate by reference Paragraphs 8, 10, 12, 14, 16-64 above.

110.    Wells Fargo and/or UBS accepted and received in excess of $4,000.00 the property of Plaintiff meant to be consideration in return for suspending and dismissing foreclosure proceedings and to provide permanent loan modifications in the foreclosure proceeding.

111.    On or about December 2008, and February – April 2010, Defendants converted to their own use U.S. Currency that was then property of the Plaintiff in excess of $4,000.00.

112.    Plaintiff demands judgment against Defendants for damages exceeding $15,000.00, costs of suit, and reasonable attorney's fees.

### COUNT VII
### SPECIFIC PERFORMANCE—DECEMBER 2008

113.    The Levitans reallege and incorporate by reference Paragraphs 1-64 above.

114.    On or about December 2008, Plaintiff and Defendant Wells Fargo and or as agent for UBS entered into a written contract.

115.    Plaintiff tendered consideration of U.S. Currency by cashier's check dated December 8, 2008 to Wells Fargo as the initial payment that was to suspend and dismiss foreclosure proceedings.

116.    Defendant Wells Fargo was subsequently contacted telephonically about the suspension of foreclosure proceedings and advised Plaintiff not to be concerned as the proceedings would be suspended.

117.    Plaintiff made telephonic contact with a representative of FDLG.  The representative informed Plaintiff that the foreclosure proceedings had not been suspended nor had Defendant's requested such a suspension.

118.    Plaintiff contacted Defendant Wells Fargo and advised the representative over the telephone that their attorneys FDLG had confirmed that Wells Fargo had not directed them to suspend foreclosure proceedings.

119.    Defendants refused to comply with their agreements and promises after receiving compensation in consideration of the contract.

120.    Plaintiff offers to continue the payments on the loan modification

121.    Plaintiff demands judgment that Defendants be required to perform their agreement and promises, and for costs of suit, damages in excess of $15,000.00, and reasonable attorney's fees.

## COUNT VIII
### SPECIFIC PERFORMANCE—FEBRUARY-APRIL 2010

122.    The Levitans reallege and incorporate by reference Paragraphs 1-64 above.

123.    On or about January 2010, Plaintiff and Defendant Wells Fargo and/or as agent for UBS entered into a written contract.

124.    Plaintiff tendered consideration of U.S. Currency for approximately $2,500.00 to Wells Fargo for the agreement.

125.    The agreement required Plaintiff to make three consecutive monthly payments for a trial loan modification. Defendants had been informed by the Plaintiff that a permanent loan modification had been pre-approved, that foreclosure would be suspended during the trial period, and once the trial period was complete foreclosure proceedings would be dismissed and the permanent loan modification would begin.

126.    Once the three month trial period was complete, Plaintiff was advised that Defendant was not able to modify the loan.

127.    On September 25, 2010, Pamela Levitan made face-to-face contact with "Antwon" from the Foreclosure Prevention Help Line of Wells Fargo Home Mortgage who made further promises to Plaintiff that there would be a forthcoming modification.

128.    Defendants refused to fulfill their agreements or promises to Plaintiff after receiving compensation in consideration of the contract.

129.    Plaintiff offers to continue the payments of the loan modification.

130.    Plaintiff demands judgment that Defendants be required to perform their agreement and promises, and for costs of suit, damages in excess of $15,000.00, and reasonable attorney's fees.

## COUNT IX
## FRAUDULENT INDUCEMENT

131.    The Levitans reallege and incorporate by reference paragraphs 1-130 above.

132.    Wells Fargo and/or as agent for UBS offered Plaintiff special forbearance agreements that required Plaintiff to pay to Wells Fargo compensation under the forbearance agreement to suspend foreclosure proceedings.

133.   Wells Fargo promised that the trial modification period subject to the consideration would be made permanent and the foreclosure proceeding would be dismissed.

134.   Wells Fargo made and entered into a special forbearance agreement in December 2008, received consideration and failed to fulfill the terms of the agreement. Wells Fargo entered into another forbearance agreement with Plaintiff on or about February, March and April 2010, received consideration for the agreement which included a trial modification which was fulfilled in April 2010, was to result in dismissal of the foreclosure action and a permanent loan modification which had been pre-approved. Wells Fargo failed to fulfill their agreement. Pamela Levitan met face-to-face with a Wells Fargo representative in the Governor's Foreclosure conference who assured Mrs. Levitan that once he returned to Maryland that the errors would be corrected. Wells Fargo failed to fulfill those promises made by an oral agreement.

135.   Wells Fargo and/or as agent for UBS made material representations to Plaintiff and entered into agreements promising modification of the subject loan and dismissal of the foreclosure action. Plaintiff paid over to Wells Fargo consideration for the agreements and knew at the time made or should have known that Wells Fargo was not going to fulfill their promise. Wells Fargo used the promises to Plaintiff as the inducement to Plaintiff to rely on their representation that foreclosure would be suspended and as a result, Wells Fargo continued to foreclose against Plaintiff while using their representations to give Plaintiff a false sense of compromise, and used these various deceptions to obtain a foreclosure judgment, having come to be known as "dual-tracking".

136.   Wells Fargo and/or UBS did thereby fraudulently induce Plaintiff by a false statement of a material fact that Defendant knew or should have known their promises or

representations were false when made, and as a result of these promises induced Plaintiff to pay consideration for the agreements, contracts, promises, and failed to perform their representations and Plaintiff to his detriment relied upon Wells Fargo representations.

137.    Plaintiff, due to Wells Fargo's and/or as agent for UBS fraudulent inducement, has been injured to his person and property and has suffered damages in excess of $15,000.00 and demands judgment including costs of suit, reasonable attorney's fees, and injunctive relief pending review of the proceedings.

## COUNT X
## DEMAND FOR TEMPORARY AND PERMANENT INJUNCTIVE RELIEF

138.    The Levitans reallege and incorporate by reference Paragraphs 1-130 and 138-144.

139.    There exists a substantial threat based on Defendants extrinsic fraud and material misrepresentations meant to obtain the final judgment and sale of Plaintiff's property and foreclosure without entitlement to do so; will occur prior to the Court being able to adjudicate this action on the merits.

140.    There exists a substantial likelihood that Plaintiff will prevail on the merits of this action. Defendant Wells Fargo and/or as agent for UBS has already entered into a consent order approved by their board of directors that outlines the unlawful practices employed by Defendants in the collateral foreclosure proceedings. Wells Fargo has also established a significant fund with the federal government for their unsafe and unsound foreclosure practice to compensate homeowners for Defendants unlawful practice used against the Plaintiff as alleged here.

141.    Attorneys Florida Default Law Group, P.L. and its principals have been previously sanctioned for similar unlawful conduct in prior foreclosure proceedings. The

k.    All relief, legal or equitable, in any form to which the Levitans may be entitled.

The Levitans demand a trial by jury on all issues so triable.

I HEREBY CERTIFY under the penalties prescribed for perjury that the foregoing is true

and correct to the best of my knowledge

Dated this ___28th___ day of ___January___, 2013.

                              Respectfully submitted,

                              DANIEL J. LEVITAN
                              DC No. 650607
                              Santa Rosa C.I. Annex
                              5850 East Milton Road
                              Milton, FL  32583-7914


                              _____
                              DANIEL J. LEVITAN


                              PAMELA H. LEVITAN
                              1257 Greystone Lane
                              Pensacola, FL  32514


                              _____
                              PAMELA H. LEVITAN