UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 12-0361 (RMC) |
| | ) | |
| BANK OF AMERICA CORP., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### UNITED STATES' MEMORANDUM OF POINTS AND AUTHORITIES REGARDING THE ENFORCEMENT TERMS OF THE CONSENT JUDGMENT

Plaintiff United States of America respectfully submits this Memorandum in response to the Court's July 22, 2014, Minute Order permitting Plaintiffs to file briefs regarding the construction of the Consent Judgment's Enforcement Terms (Exhibit E).[1]

### PRELIMINARY STATEMENT

The issue before the Court concerns the procedure for enforcing the Servicing Standards under the Consent Judgment. New York argues that the only limitation on a Plaintiff's right to enforce a Servicing Standard is the 21 day notice period required under Section J.2. New York's Mot. to Enforce, Dkt. No. 86, at 7. Wells Fargo argues that an action to enforce a Servicing Standard may be initiated only after (a) the Monitor has enacted a metric for testing the Servicing Standard, (b) the Monitor has declared a Potential Violation of the metric, and (c) the Servicer has failed to cure the Potential Violation consistent with the cure procedures under Section E. Wells Fargo's Opp., Dkt. No. 114, at 3, 9.

---

[1] The defined terms used in this Memorandum refer to the definitions under the Consent Judgment.

New York's position misinterprets Section E's cure provisions, which obligates a Plaintiff to refrain from commencing or maintaining an enforcement action while the Servicer is undertaking its obligation to cure a Potential Violation of Servicing Standards tested by metrics. Wells Fargo's position is wrong because its purported process has no basis in the text of the Enforcement Terms — it is an amalgam of Sections C.5 and 23-25, which establish the Monitor's powers and responsibilities, and Section J.3, which limits the amount of monetary civil penalties that can be awarded in a single type of enforcement action.

For the reasons explained in this Memorandum, this Court should hold that the Enforcement Terms authorize any Party (the Federal Government, the States, and the Servicer) to initiate an enforcement action for any violation of an obligation under the Consent Judgment, including compliance with all of the Servicing Standards regardless of whether they are tested by a metric, subject to a single exception: a Plaintiff may not bring an action to enforce a Potential Violation of a Servicing Standard that is tested by a metric unless the Servicer has failed to timely and successfully cure the Potential Violation in accordance with the Enforcement Terms of the Consent Judgment.[2]

## BACKGROUND

The Consent Judgment provides relief in various categories, one of which is relevant here: Servicing Standards.  Judgment, ¶ 6.  The Servicer "shall comply with the Servicing Standards," Consent Judgment at ¶ 2, which consist of more than 300 requirements governing the Servicer's business practices, of which a significant number are subject to enhanced oversight by the Monitor.  Judgment, Ex. A.  The Servicing Standards "are incorporated . . . as

---

[2] The Monitoring Committee, which consists of representatives from the Federal Government and the States, may also bring an enforcement action.  The Committee's right to bring an enforcement action is coextensive with the defined Parties, except for the 21-day notice period.

the judgment of this Court and shall be enforced in accordance with the authorities provided in

the Enforcement Terms," which are attached as Exhibit E to the Consent Judgment.[3]  Judgment,

¶ 6.  The Enforcement Terms in Exhibit E establish:

- a timeline for implementing the Servicing Standards (§ A);

- the creation of the Monitoring Committee (§ B);

- the appointment of Joseph A. Smith as the Monitor, whose responsibility is to assess the Servicer's compliance with the Consent Judgment and to report findings to the Monitoring Committee and the Court (§§ C.1, C.5, D);

- the creation of a Work Plan that incorporates specific evaluation metrics that cover a substantial portion of the Servicing Standards and governs the manner in which the Monitor carries out his responsibilities, including providing for the testing methods and procedures by which the Monitor will review the Servicer's compliance with the metrics (§§ C.6, 11-15);

- the creation of an Internal Review Group within the Servicer with responsibility for performing compliance reviews in accordance with the terms of the Work Plan (§ C.7);

- the Servicer's obligation to cure "Potential Violations" of the metrics and remediate material harm to borrowers, and a limitation on the Servicer's liability under the Consent Judgment for successfully cured Potential Violations of the metrics (§ E);

- a dispute resolution procedure governing disagreements between the Servicer, Monitor, and Monitoring Committee (§ G); and

- the authorization for "any" Party to bring an enforcement action before the Court and, if an action is based on the Servicer's failure to cure a Potential Violation in accordance with Section E, limiting the Servicer's liability to non-monetary equitable relief and monetary civil penalties up to $5,000,000 per uncured Potential Violation (§ J).

The Consent Judgment also contains an integration clause and establishes that "the terms

of the Exhibits shall govern" in the event of a conflict between the terms of the Exhibits and the

Consent Judgment.  Judgment, ¶ 18.

---

[3] The Parties' arguments over the Servicing Standards do not impact the enforceability of the Consumer Relief Requirements or other obligations under the Consent Judgment, nor limit any other remedies available to harmed borrowers under the Consent Judgment.

## ARGUMENT

### I.     The Rules for Interpreting Settlement Agreements

The terms of a settlement agreement are interpreted under the principles of contract law. *Gonzalez v. Dep't of Labor*, 609 F.3d 451, 457 (D.C. Cir. 2010).  Federal common law governs when the United States is a party to an agreement.  *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 641 (1981); *Bowden v. United States*, 106 F.3d 433, 439 (D.C. Cir. 1997). Although the D.C. Circuit has not adopted a rule governing the interpretation of settlement agreements, it has stated in dicta that it "would be inclined to fashion a federal common law rule" based on "the principles of the *Restatement (2d) of Contracts* . . . since those principles represent the 'prevailing view' among the states."  *Bowden*, 106. F.3d at 439.

Under the prevailing view of contract law, "the plain and unambiguous meaning of an instrument is controlling and the Court determines the intention of the parties from the language used by the parties to express their agreement."  *Wash. Metro. Area Transit Auth. v. Mergentime Corp.*, 626 F.2d 959, 961 (D.C. Cir. 1980) (internal citation omitted); *A-J Marine, Inc. v. Corfu Contractors, Inc.*, 810 F. Supp. 2d 168, 185 (D.D.C. 2011) (same).  "In performing this task, the Court should construe the contract as a whole so as to give meaning to all of the express terms." *Id.*

This Court has explained that the meaning of a consent judgment should be determined within the "four corners" of the document.  *United States v. Bank of Am.*, 922 F. Supp. 2d 1, 6 (D.D.C. 2013).  "A court must honor the intentions of the parties as reflected in the settled usage of the terms they accepted in the contract [] and will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity."  *The Cuneo Law Group, P.C. v. Joseph*, 669 F. Supp. 2d 99, 107 (D.D.C. 2009) (internal citation and quotation omitted).

Moreover, when a contract contains an integration clause, such as here, the Court may not consider extrinsic evidence because "the subject of that agreement clearly falls within the scope of the written agreement." *Bowden*, 106 F.3d at 440 (internal quotation omitted); Restatement (Second) of Contracts § 209 (1981).[4]

## II.   There Are Only Two Limitations on Initiating Enforcement Actions under Section J: Venue and Pre-Filing Notice

Section J of the Enforcement Terms, entitled "Enforcement," is divided into three parts: (1) the Parties' consent to the enforceability of the Consent Judgment; (2) the requirements for bringing an enforcement action; and (3) a limitation on the amount of monetary civil penalties that can be awarded in a single type of enforcement action.  The latter two are at issue here.

Section J.2 establishes that an "enforcement action under this Consent Judgment may be brought by any Party to this Consent Judgment or the Monitoring Committee."  Ex. E at 15. Within the text of Section J.2, there are only two explicit restrictions on a Party's right to bring an enforcement action: (a) the Servicer's obligations under the Consent Judgment are enforceable solely in this Court; and (b) the requirement that the Party provide the Monitoring Committee with notice and 21 days to determine whether to bring an enforcement action.  If the Monitoring Committee declines to bring an enforcement action, the Party must then wait an additional 21 days before commencing an enforcement action.  But notice is not required if "immediate action is necessary in order to prevent irreparable and immediate harm."  *Id.*

Section J.3 goes on to define the relief that the Court may order in a single type of enforcement action:  "In the event of an action to enforce the obligations of Servicer and to seek

---

[4] There is no dispute that the Consent Judgment is a fully integrated agreement.  The presence of the integration clause renders the settlement agreement presumptively integrated, *Bowden*, 106 F.3d at 440, and Wells Fargo has stated that this Court "need look no further than the plain and unambiguous language of the Consent Judgment to rule on the present motion."  Wells Fargo's Opp. at 2 n.1.

remedies for an uncured Potential Violation for which Servicer's time to cure has expired, the sole relief available in such an action will be" (a) equitable relief and (b) a limited amount of monetary civil penalties if the Servicer has failed to timely cure the Potential Violation under Section E. Ex. E at 15. This means that when the action is based on the Servicer's failure to cure a Potential Violation of a Servicing Standard that is tested by a metric in accordance with Section E, a Plaintiff may seek non-monetary equitable relief and monetary civil penalties up to the agreed upon amount per uncured Potential Violation. Moreover, it means that in any other type of enforcement action, such as an action to enforce Servicing Standards that are not tested by metrics, the full panoply of contract remedies are available. *Id.*

Read together, these provisions mean that the only limitations on a Party's authority to initiate an enforcement action under Section J are the venue and notice requirements of Section J.2. In contrast, Section J.3 does not limit a Party's authority to initiate an enforcement action. Instead, the operative language in Section J.3 establishes what remedies are available in an enforcement action seeking remedies for a Potential Violation of a Servicing Standard tested by metrics that the Servicer has failed to cure in accordance with Section E. And in that type of action, the Servicer's liability is limited to non-monetary equitable relief and up to $5,000,000 in monetary civil penalties per uncured Potential Violation. *Id.*

Nothing else in the express terms of Section J limits a Party's ability to initiate or obtain relief in an enforcement action. But, consistent with the requirement that a contract should be construed "as a whole so as to give meaning to all of the express terms," *Mergintime*, 626 F.2d at 961, the United States recognizes a single, independent limitation on when a Party may initiate an enforcement action: Section E's cure provisions, which apply when the Servicer is

undertaking its obligation to cure a Potential Violation of a Servicing Standard that is tested by a metric.

### III.    Section E is a Limited Safe Harbor That Obligates the Servicer to Cure a Potential Violation and Obligates the Plaintiffs to Hold the Servicer Harmless for Successfully and Timely Curing a Potential Violation

Section E defines a "Potential Violation" of a Servicing Standard that is tested by a metric and governs what the Servicer, the Monitor and the Plaintiffs must and can do when a Potential Violation is identified.  Section E provides a limited safe harbor requiring that the Servicer cure a Potential Violation, and if it successfully and timely cures that Potential Violation, a Plaintiff is precluded from filing an enforcement action.  Other than this narrow safe harbor, Section E does not govern or affect a Party's right to bring an enforcement action.

Section E.1 establishes that a "Potential Violation" occurs if the Servicer exceeds the error rate for a metric used by the Monitor in evaluating the Servicer's compliance with the relevant Servicing Standards that are tested by the metric.  Under Section E.2, the Servicer is obligated to cure "any Potential Violation."  Sections E.3-4 define the procedure by which the Servicer can cure the Potential Violation and how a Potential Violation may become an uncured Potential Violation.  Section E.5 obligates the Servicer to remediate material harm to borrowers. Section E.6 establishes that if a Potential Violation is cured according to the Section E.3 process, "no Party shall have any remedy under this Consent Judgment (other than the remedies in Section E.5) with respect to such Potential Violation."  Ex. E at 11-12.

Nothing in the text of Section E governs the procedures and relief available with respect to the Servicer's compliance with Servicing Standards that are not tested by metrics.  By its own terms, Section E applies only when a Servicing Standard is tested by a metric and the Servicer has exceeded the error rate for that metric.

Rather, Section E is best understood as a limited safe harbor provision that benefits all Parties and borrowers.  The metrics do not test all of the Servicing Standards, but they do test those Servicing Standards that, if violated, would cause the greatest harm to consumers.  *See, e.g.*, Ex. E1 at 1-3 (establishing testing metrics for erroneous foreclosures (1% threshold error rate), incorrect denials of loan modification requests (5% threshold error rate), and the accuracy of proofs of claim filed in bankruptcy cases (5% threshold error rate)).  Thus, in exchange for submitting to more stringent oversight on a limited subset of its obligations under the Consent Judgment and being required to undertake corrective measures when the metric testing process identifies a Potential Violation, the Servicer obtains a cap on the amount of monetary civil penalties that may be imposed (Section J.3(b)) and limited liability for successfully and timely curing a Potential Violation (Section E.6).  Requiring a Plaintiff to respect the cure process by refraining from filing an enforcement action with respect to a Potential Violation gives proper meaning to all of the express terms of the Consent Judgment.  *See Mergintime*, 626 F.2d at 961.

## IV. Wells Fargo's Proposed Construction Disregards the Plain Text of the Enforcement Terms

Wells Fargo argues that a Plaintiff may "file an enforcement action *only* if there is an "uncured Potential Violation."  Wells Fargo's Opp. at 3 (emphasis in original) (internal quotation omitted).  In reaching this conclusion, Wells Fargo relies upon the cap on monetary civil penalties under Section J.3 and the provisions establishing the scope of the Monitor's duties under Section C.  *Id.* at 15-16.  And although Wells Fargo repeatedly refers to those provisions as "clear" in supporting its conclusion, the process Wells Fargo urges this Court to adopt is so convoluted that they provided a flowchart to assist the Court's understanding.  *Id.* at 9.  In reality, that process neither exists in explicit text of the Enforcement Terms nor can it be

reasonably implied from an "ordinary" reading of the Enforcement Terms.  *See Cuneo*, 669 F. Supp. 2d at 107.

      A.    *Section J.3 Limits the Availability of Monetary Civil Penalties in an Action to Enforce an Uncured Potential Violation — No More, No Less*

Wells Fargo argues that Section J.3 limits the Plaintiffs to seeking relief only for uncured Potential Violations.  Wells Fargo's Opp. at 17.  The unstated premise of its argument is that the phrase "In the event of an action to enforce the obligations of Servicer and to seek remedies for an uncured Potential Violation" means that a Plaintiff may "file an enforcement action *only* if there is an uncured Potential Violation."  *See* Wells Fargo's Opp. at 3 (internal quotation omitted).  That argument fails for two reasons.

First, the express terms of Section J.3 do not concern when an enforcement action may be initiated.  Rather, Section J.3 presupposes that a specific type of action has been filed ("In the event of an action") and limits what type of relief the Court may order in that circumstance ("the sole relief available in such an action will be:").  That language strongly indicates that Section J.3 merely caps the amount of monetary civil penalties that a Plaintiff may seek and in no way concerns the procedures for initiating an enforcement action under the Consent Judgment.  *See Cuneo*, 669 F. Supp. 2d at 112-13.  And it is further supported by the text of Section J.2, which governs how any Party may initiate any enforcement action.

Second, nothing in the text of Section J.3 states that (a) it is the exclusive remedy for enforcing all of the Servicing Standards and (b) no relief may be granted for violating a Servicing Standard unless it has been subject to and failed metric testing.  Rather, it delineates a very specific limitation on the remedies available in enforcing the Consent Judgment: "In the event of an action to enforce the obligations of the Servicer and to seek remedies for an uncured Potential Violation, the sole relief available in such an action will be: . . ."  The term "Potential

Violations" has a defined meaning under the Consent Judgment and only exists if a Servicing

Standard is subject to metric testing and the Servicer has exceeded the metric's threshold error

rate.  Thus, interpreting Section J.3 as limiting the Servicer's liability for monetary civil penalties

only after the Servicer has tried and failed to cure a Potential Violation in accordance with

Section E gives the plain and ordinary meaning to all of Section J.3's express terms.  *See*

*Mergintime*, 626 F.2d at 961.

       B.      *The Monitor's Power to Enact New Metrics Under Section C Does Not Restrict a*
              *Plaintiff's Right to Enforce Servicing Standards Not Tested by Metrics*

        Wells Fargo also argues that when Servicing Standards are not tested by metrics, the only

method by which a Plaintiff may enforce compliance is to petition the Monitor to initiate the

process for creating new metrics and to submit the allegations of misconduct to the existing

metric testing procedures, including Section E's cure procedures.  Wells Fargo's Opp. at 18-19.

But Wells Fargo does not explain how the Monitor's limited authority to propose new metrics in

the course of his duties under Section C subsumes the specific provisions of the agreement that

authorize any Party to bring an enforcement action under Section J.  *Id.* at 5-6 (describing the so-

called "Metric-Centered Enforcement Process"), 18-19.  Nor can it because no such overriding

provision exists.

        Section C is entitled "Monitor" and comprehensively governs the duties of the Monitor

and the monitoring process.  Section C.5 establishes the scope of the Monitor's responsibilities:

"It shall be the responsibility of the Monitor to determine whether Servicer is in compliance with

the Servicing Standards and the Mandatory Relief Requirements . . . in accordance with the

authorities provided herein and to report his or her findings as provided in Section D.3."  Ex. E at

3.  That provision mandates what the Monitor is required to do (determine compliance and report

findings) and how he must do it (in accordance with the authorities set forth in Exhibits D and E).

For example, Sections C.23-25 provide a process by which the Monitor may propose and create additional metrics if he concludes that the Servicer is not in material compliance with the Servicing Standards.  Nothing in the text of Section C states that this process is the exclusive remedy for enforcing Servicing Standards not tested under the metrics.  Similarly, nothing in the text of Section C affects the Enforcement Terms under Section J or establishes an independent limitation on a Plaintiff's right to request relief from this Court to enforce the Servicing Standards.  Ex. E at 8-9.

Section C defines the Monitor's obligations and the monitoring process.  There is no reason to interpret the provisions under Section C as affecting or limiting the rights of the Parties, including superseding the specific enforcement procedures established in Section J.  *See Cuneo*, 669 F. Supp. 2d at 107 (cautioning against "tortur[ing] words to import ambiguity").

The Monitor is an independent, third-party who is tasked with, among other things, evaluating and reporting on the Servicer's compliance with the Servicing Standards, including via metrics that test a limited subset of the Servicing Standards.  And because the Monitor's authority is derived solely from the Consent Judgment, what the Monitor is required to do, what the Monitor may choose to do, and how the Monitor can fulfill those responsibilities must be explicitly stated in the Consent Judgment.

How the Monitor exercises his duties under the Consent Judgment does not impair the Parties' enforcement rights under Section J, including the Plaintiffs' right to enforce Servicing Standards that are not tested by metrics.  The Consent Judgment does not give the Monitor the exclusive power to enforce the Consent Judgment.  And although the Consent Judgment gives

the Monitor discretion to expand how he exercises his duties by initiating a process for the creation of new metrics in a single, narrow circumstance, nowhere does it state that it exclusively governs the enforcement process or that Sections C.23-25 are the exclusive avenue for enforcing Servicing Standards that are not tested by existing metrics.

Moreover, the structure of the Consent Judgment and of the monitoring process further indicate that the Parties did not intend for the monitoring process to be the exclusive avenue for enforcement of the Servicing Standards that are not tested by metrics.  The Parties carefully negotiated the Servicing Standards that would be subject to the monitoring, testing, and cure procedures.  And under Sections C.23-25, the Parties agreed that the Monitor could expand the scope of his oversight only if "the Monitor" found a pattern of material noncompliance "reasonably likely to cause material harm to borrowers."  Ex. E at 8-9.

Agreeing to those procedures required compromises by all Parties.  The Plaintiffs agreed to limit the scope of the monetary relief for noncompliance and to tolerate a lengthy cure procedure in lieu of immediately seeking to enforce the Consent Judgment.  The Servicers agreed to incur significant expenses in accepting the enhanced oversight and the possibility that the Monitor could broaden the scope of his responsibilities in a single, narrow circumstance.

It makes no sense to upset this careful balance by construing the Monitor's limited authority to propose new metrics in a single, narrow circumstance as impliedly limiting when the Plaintiffs can bring an enforcement action.  Wells Fargo's reasoning turns the purpose of Sections C.23-25 on its head.  Rather than serving as a "safety valve" to ensure that the Monitor can conduct an effective compliance review of the tested Servicing Standards, it would strip the Plaintiffs of the right to enforce Servicing Standards that are outside of the monitoring process and would render many of the prophylactic obligations under the Servicing Standards that are not

tested by metrics practically unenforceable.  *See* Ex. A at 11-12 (requiring the Servicer to enact quality assurance reviews by employees who are independent from the employees working on foreclosure and bankruptcy processes).

## **CONCLUSION**

Based on the above, this Court should hold that the Enforcement Terms authorize any Party (the Federal Government, the States, and the Servicer) to initiate an enforcement action for any violation of an obligation under the Consent Judgment, including compliance with all of the Servicing Standards regardless of whether they are tested by a metric, subject to a single exception: a Plaintiff may not bring an action to enforce a Potential Violation of a Servicing Standard that is tested by a metric, unless the Servicer has successfully and timely cured the Potential Violation in accordance with the Enforcement Terms of the Consent Judgment.

Adopting the United States' construction best preserves both (a) the intentions of the Parties in compromising over the monitoring, testing, and cure procedures with respect to certain Servicing Standards, and (b) the Plaintiffs' and the Court's ability to enforce all of the Servicer's obligations under the Consent Judgment, including Servicing Standards that are untested by a metric.

*   *   *

Respectfully Submitted,

STUART F. DELERY
Assistant Attorney General, Civil Division

RONALD C. MACHEN JR.
United States Attorney for the District of Columbia

*/s/ Brian P. Hudak*

KEITH V. MORGAN
BRIAN P. HUDAK
Assistant United States Attorneys
555 Fourth Street, NW
Washington, DC  20530
Tel.:  (202) 252-2500
Fax:  (202) 252-2599

RAMONA D. ELLIOTT
Deputy Director/General Counsel
NOAH M. SCHOTTENSTEIN
DIARMUID GORHAM
Trial Attorneys
United States Department of Justice
Executive Office for United States Trustees
441 G Street, NW, Suite 6150
Washington, DC 20530
Tel.: (202) 307-1399
Fax: (202) 305-2397

MICHAEL D. GRANSTON
RENÉE BROOKER
WILLIAM C. EDGAR
DANIEL H. FRUCHTER
United States Department of Justice
Civil Division
Commercial Litigation Branch
601 D Street, NW, Room 9936
Washington, D.C. 20004
Tel.:  (202) 353-7950
E-Mail: William.Edgar@usdoj.gov
Tel.:  (202) 305-2035
E-Mail:  Daniel.Fruchter@usdoj.gov

*Attorneys for the United States of America*