UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | Civil Action No. 12-361 (RMC) |
| BANK OF AMERICA, *et al.*, | ) ) ) | |
| Defendants. | ) ) | |

## OPINION

The United States and numerous states sued Wells Fargo & Company and Wells Fargo Bank N.A. (collectively, Wells Fargo), as well as other major mortgagee banks, alleging misconduct in their home mortgage practices. All parties agreed to a national settlement, resulting in multiple consent judgments. In its consent judgment, Wells Fargo agreed to pay approximately $5.9 billion (including over $100 million to the State of New York), without admitting fault, in exchange for the release of certain liabilities. Now, the Attorney General for the State of New York (NYAG) moves to enforce the Consent Judgment against Wells Fargo. Before the Court can decide the motion, however, it must determine whether NYAG can seek enforcement of the Consent Judgment when only the court-appointed Monitor has authority to enforce certain terms. The Court finds that NYAG may seek enforcement of the Consent Judgment with limitations described in this Opinion. Even so, because NYAG's allegations of noncompliance are so insubstantial, NYAG has failed to allege breach of the Consent Judgment.

## I. FACTS

On March 12, 2012, the United States, the District of Columbia, and forty-nine States[1] filed this case alleging that Wells Fargo and other major mortgagee banks (collectively, Banks) engaged in misconduct in making Federal Housing Administration (FHA) insured mortgage loans.[2] *See* Compl. [Dkt. 1]. Plaintiffs complained that the Banks' activities related to loan "servicing conduct" and loan "origination conduct" violated a host of federal laws. *See id.* ¶¶ 47-64 (servicing misconduct); *id.* ¶¶ 65-89 (origination misconduct). The Complaint set forth the following eight counts:

> Count I – unfair and deceptive consumer practices with respect to loan servicing;
>
> Count II – unfair and deceptive consumer practices with respect to foreclosure processing;
>
> Count III – unfair and deceptive consumer practices with respect to origination;
>
> Count IV – violation of the False Claims Act (or FCA), 31 U.S.C. §§ 3729(a)(1)(A)-(C) & (G), 3729(a)(1), (2), (3) & (7);
>
> Count V – violation of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA), 12 U.S.C. § 1833a;
>
> Count VI – violation of the Servicemembers Civil Relief Act, 50 U.S.C. § App. 501, *et seq.*;
>
> Count VII – declaratory judgment under 28 U.S.C. §§ 2201, 2202; and

---

[1] The State of Oklahoma did not participate in this suit.

[2] The Banks who are named as defendants in the Complaint are: Bank of America Corporation; Bank of America, N.A.; BAC Home Loans Servicing, LP; Countrywide Home Loans, Inc.; Countrywide Financial Corporation; Countrywide Mortgage Ventures, LLC; Countrywide Bank, FSB; Citigroup, Inc.; Citibank, N.A.; Citimortgage, Inc.; J.P. Morgan Chase & Company; JPMorgan Chase Bank, N.A.; Residential Capital, LLC; Ally Financial, Inc.; GMAC Mortgage, LLC; GMAC Residential Funding Co., LLC; Wells Fargo & Company; Wells Fargo Bank N.A. Subsequently, Green Tree Servicing LLC and Ocwen Loan Servicing LLC became successors by assignment from Residential Capital, Ally Financial, and GMAC Mortgage. *See* Notice [Dkt. 193]; Notice [Dkt. 194].

Count VIII – abuse of the bankruptcy process under common law. *Id.* ¶¶ 102–137.

On April 4, 2012, all parties agreed to a national settlement and entered into five separate consent judgments, together valued at $25 billion. *See* Consent Js. [Dkts. 10-14] (commonly, the National Mortgage Settlement). One of the consent judgments relates to Wells Fargo, *see* Consent J. [Dkt. 14], and this Court retained jurisdiction to enforce its terms for the duration of the Consent Judgment. *See id.* ¶ 13. The Consent Judgment and all Exhibits remain in full force for a term of three and one-half years from the date it was entered (March 12, 2012), unless otherwise specified. *See* Consent J., Ex. E (Enforcement Terms) § K.

Under its Consent Judgment, Wells Fargo agreed to pay $5 billion and to take various actions beneficial to homeowners, including setting up programs to assist mortgagors at risk of foreclosure. *Id.* In exchange, the United States and the States released Wells Fargo from certain types of liability. *See id.*, Ex. F (Federal Release) & Ex. G (State Release).

The Consent Judgment also requires Wells Fargo to comply with 304 defined business practice requirements called "Servicing Standards," including several regarding the loan modification process. Consent J. ¶ 2; *id.*, Ex. A (Settlement Term Sheet). A "loan modification" is a permanent change in the terms of a homeowner's mortgage loan in order to lower the homeowner's monthly mortgage payment to an affordable amount and to bring the loan current so that foreclosure can be avoided. *See* Mem. in Support of Mot. to Enforce Consent J. [Dkt. 86-1] (NYAG Mem.) at 4. Some of the Servicing Standards impose deadlines intended to ensure that Wells Fargo makes prompt decisions on applications for loan modification, such as:

1. Servicer[3] shall provide written acknowledgment of the receipt of documentation submitted by the borrower in connection with a first lien loan modification application within 3 business days. In its initial acknowledgement, Service shall briefly describe the loan modification process and identify deadlines and expiration dates for submitted documents.
Ex. A § IV(F)(1) (3-day Acknowledgment).

2. Servicer shall notify borrower of any known deficiency in borrower's initial submission of information, no later than 5 business days after receipt, including any missing information or documentation required for the loan modification to be considered complete.
Ex. A § IV(F)(2) (5-day Deficiency Notice).

3. Subject to section IV.B, Servicer shall afford borrower 30 days from the date of Servicer's notification of any missing information or documentation to supplement borrower's submission of information prior to making a determination on whether or not to grant an initial loan modification.
Ex. A § IV(F)(3) (30-day Notice of Missing Information).

4. Servicer shall review the complete first lien loan modification application submitted by borrower and shall determine the disposition of borrower's trial or preliminary loan modification request no later than 30 days after receipt of the complete loan modification application, absent compelling circumstances beyond Servicer's control.
Ex. A § IV(F)(4) (30-day Notice of Disposition).

5. Servicer shall promptly send a final modification agreement to borrowers who have enrolled in a trial period plan under current HAMP guidelines (or fully underwritten proprietary modification programs with a trial payment period) and who have made the required number of timely trial period payments, where the modification is underwritten prior to the trial period and has received any necessary investor, guarantor or insurer approvals. The borrower shall then be converted by Servicer to a permanent modification upon execution of the final modification documents, consistent with applicable program guidelines, absent evidence of fraud.
Ex. A § IV(A)(4) (Prompt Delivery of Final Modification Agreement).

---

[3] "Servicer" in this Consent Judgment refers to Wells Fargo; the terms are the same in each bank's judgment, except for the dollar amount.

The Attorney General for the State of New York filed a Motion to Enforce Consent Judgment, alleging that Wells Fargo failed to comply with the five servicing standards detailed above: (1) the 3-day Acknowledgment; (2) the 5-day Deficiency Notice; (3) the 30-day Notice of Missing Information; (4) the 30-day Notice of Disposition; and (5) the Prompt Delivery of Final Modification Agreement (collectively, Loan Modification Timeline Requirements).  NYAG alleges that Wells Fargo failed to comply with these Servicing Standards in 97 out of the roughly 450,000 loans that Wells Fargo services in the State of New York.  This amounts to less than .022% of the New York loans serviced by Wells Fargo.  Despite this small number, NYAG alleges that Wells Fargo repeatedly failed to comply with these Loan Modification Timeline Requirements, subjecting numerous New York homeowners to "Kafkaesque delays and obstructions in the loan modification process."  NYAG Mem. at 2.  For example, NYAG alleges that Wells Fargo required many homeowners to resubmit documents that they had already provided months earlier, that often Wells Fargo's demands were cryptic and confusing, and that after many rounds of requests for documents already provided, Wells Fargo would declare the application for loan modification to be stale and the process would begin all over again. *Id*. at 2-4.  Delays in the loan modification process cause fees and interest to grow, making it more difficult to modify a loan and thus to avoid foreclosure.  NYAG seeks an order requiring that:

> (1) Wells Fargo comply with the Loan Modification Timeline Requirements;
>
> (2) Wells Fargo take such additional steps as are necessary to ensure compliance with the Loan Modification Timeline Requirements;[4]

---

[4] NYAG states that it seeks an order requiring Wells Fargo to take certain "commonsense steps that will help ensure the Bank's compliance, such as requiring that the Bank assign key staff and

      (3) Wells Fargo provide relief from foreclosure for New York borrowers harmed by Wells Fargo's breaches of the Consent Judgment;

      (4) Wells Fargo provide relief from assessments due to Wells Fargo's violations of the rights of New York borrowers; and

      (5) Wells Fargo provide such other relief as the Court may deem just and proper.

Mot. to Enforce J. [Dkt. 86] at 3; NYAG Mem. at 29-31.

      The Court stayed discovery and briefing on the factual issues presented in NYAG's Motion to Enforce Consent Judgment to consider the threshold legal issue presented: whether NYAG's motion is barred by terms of the Consent Judgment that give certain enforcement rights to the Monitor. *See* Minute Order Oct. 16, 2013. The issue is fully briefed.[5]

## II. STANDARD FOR REVIEWING A CONSENT DECREE

      A consent decree must be construed according to principles of contract interpretation. *Segar v. Mukasy*, 508 F.3d 16, 21 (D.C. Cir. 2007). The meaning of a consent decree, like a contract, should be determined within its "four corners." *United States v. W. Elec. Co.*, 894 F.2d 1387, 1390 (D.C. Cir. 1990). When a contract is clear and unambiguous, courts presume that the words in the contract have their ordinary meaning. *Mesa Air Grp., Inc. v. Dep't of Transp.*, 87 F.3d 498, 503 (D.C. Cir. 1996). "Under general contract law, the plain and unambiguous meaning of an instrument is controlling." *WMATA v. Mergentime Corp.*, 626 F.2d 959, 960-61 (D.C. Cir. 1980). "Where the contract is unambiguous, as evidenced by the plain language of the contract, the court's inquiry is at an end, and the plain language of the contract

---

decision-makers early in the loan modification review process for New York homeowners." NYAG Reply [Dkt. 116] at 8. This claim for injunctive relief is vague.

[5] *See* NYAG Mot. to Enforce J. [Dkt. 86]; Wells Fargo Opp'n [Dkt. 114]; NYAG Reply [Dkt 116]; Monitoring Committee Brief [Dkt. 176]; U.S. Brief [Dkt. 177]; Banks' Brief [Dkt. 183].

controls." *Red Lake Band of Chippewa Indians v. Dep't of Interior*, 624 F. Supp. 2d 1, 15 (D.D.C. 2009).  A contract is unambiguous when there is only one reasonable interpretation.  *Id*. The question of whether an agreement is clear or ambiguous is one of law for the court.  *NRM Corp. v. Hercules, Inc.*, 758 F.2d 676, 682 (D.C. Cir. 1985).

A contract is not rendered ambiguous merely because the parties disagree over its proper interpretation.  A contract is deemed ambiguous only when it can be reasonably construed to have two or more different meanings.  *Tillery v. Dist. of Columbia Contract Appeals Bd.*, 912 A.2d 1169, 1176 (D.C. 2006).  If a contract is ambiguous, then the court should be guided by extrinsic evidence such as "the circumstances surrounding the formation of the consent order, any technical meaning words used may have had to the parties, and any other documents expressly incorporated in the decree."  *W. Elec. Co.*, 894 F.2d at 1390; *see also Tillery*, 912 A.2d at 1177 (extrinsic evidence may include the circumstances of contract formation, custom, and course of conduct).

In the case of ambiguity of an ordinary contract, courts look to extrinsic evidence in order to determine what a reasonable person in the position of the parties would have thought the disputed language meant.  *Tillery*, 912 A.2d at 1176; *see WMATA v. Georgetown Univ.*, 347 F.3d 941, 945-46 (D.C. Cir. 2003) (under District of Columbia law, contracts are construed in accord with the intention of the parties insofar as it can be discerned from the text of the instrument).  In the case of a consent decree, a court must be careful not to interpret the decree by reference to the purpose of one of its parties because:

> [T]he decree itself cannot be said to have a purpose; rather the parties have purposes generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve. . . .  [T]he instrument must be construed as it is written,

7

and not as it might have been written had the plaintiff established
his factual claims and legal theories in litigation.

*ITT Cont'l Baking Co.*, 420 U.S. at 236-37 (citing *United States v. Armour & Co.*, 402 U.S. 673, 681-82 (1971)).  Further, a court should construe a contract as a whole, to give meaning to all of its express terms.  *Mergentime*, 626 F.2d at 961.  It is a cardinal principle of contract construction that "a document should be read to give effect to all its provisions and to render them consistent with each another."  *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 (1995).

### III. ANALYSIS

The Consent Judgment provides that the Servicer (here, Wells Fargo) "shall comply with the Servicing Standards," Consent J. ¶ 2, and the Consent Judgment "shall be enforced" in accord with the procedures set forth in Exhibit E, titled "Enforcement Terms."  *Id.* ¶ 6.  Generally, the Enforcement Terms establish:

- a timeline for implementing Servicing Standards, Consent J., Ex. E § A;

- the creation of a Monitoring Committee,[6] *id.* § B;

- the appointment of Joseph A. Smith, Jr., as Monitor to assess the Servicer's compliance with the Consent Judgment and to report findings to the Monitoring Committee and the Court, *id.* § C(1), (5), D;

- the creation of a Work Plan incorporating specific Metrics for compliance evaluation, covering a substantial portion of the Servicing Standards and providing for Metric testing methods and procedures, *id.* § C(6), (11)-(15);

---

[6] The Monitoring Committee is composed of representatives of the State attorneys general and financial regulators as well as the Department of Justice and the Department of Housing and Urban Development.  Consent J., Ex. E § B.  The State members of the Monitoring Committee are: Attorneys General of Iowa, Texas, Florida, Connecticut, California, Colorado, Nevada, North Caroline, Washington, Ohio, Michigan, Arizona, Oregon, and Illinois, as well as the Maryland Commissioner of Financial Regulation.

- the creation of an Internal Review Group[7] within the Servicer responsible for reviewing compliance, *id*. § C(7);

- the Servicer's obligation to cure "Potential Violations" of the Metrics and remediate material harm to borrowers, *id*. § E;

- a dispute resolution procedure, *id*. § G; and

- the authorization to bring an enforcement action, *id*. § J.

### A. Compliance Testing by the Monitor

More specifically, the Consent Judgment designates a Monitor, Ex. E § C(1), who is required to determine whether the Servicer is in compliance with defined Servicing Standards, *see id*. § C(5). The Consent Judgment sets forth 304 Servicing Standards, *see* Ex. A, and the Monitor is responsible for implementing and performing "Metric" testing to determine compliance with such Standards, *see id*. § C(6), (11). That is, the Monitor reviews the Servicer's performance on each Metric to ensure no greater rate of error than that permitted by the Metric. To assess compliance, the Monitor reviews internal national data and testing with respect to Metrics defined in Exhibit E-1 to the Consent Judgment, as reported to him each quarter by the Servicer's Internal Review Group that is charged with this task. *See id*. § C(6), (11), (15), D(1). The Monitor uses sampling methods to determine for each Metric whether the Servicer's errors in performance are higher than the negotiated threshold error rate assigned to each Metric. *See id*. § C(11), (15). If the error rate is exceeded, the Monitor notifies the Servicer of a "Potential Violation" and a corrective procedure is triggered. *See id*. § E(1)-6). A corrective action plan is put into place. *See id*. § E(3). The Servicer has a right to cure a Potential Violation within a set cure period. *Id*. § E(2). The Monitor thereafter confirms that the threshold error rate for the

---

[7] The Internal Review Group is "an internal quality control group independent from the line of business whose performance is measured . . . to perform compliance reviews each calendar quarter . . . ." Ex. E § C(7).

relevant Metric was not exceeded during the cure period, which is usually the first quarter after the completion of the corrective action plan. *See id*. § E(3). If this notice/cure procedure brings the Servicer into compliance with Metric, no Party to the Consent Judgment can sue on the Potential Violation.[8] *See id*. § E(6) ("[i]n the event a Potential Violation is cured . . . , then no Party shall have any remedy under this Consent Judgment . . . with respect to such Potential Violation.")

When the Monitor identifies a Potential Violation, the Servicer also is required to remediate any material harm to borrowers that have been identified. *Id*. § E(5). If the Potential Violation is widespread, the Servicer is required to identify other borrowers who suffered harm and remediate as to them as well. *Id*.

There are 33 Metrics, many of which relate to more than one Servicing Standard.[9] *See* Ex. E; Ex. E-1 (Servicing Standards Quarterly Compliance Metrics). While the Metrics do not test all 304 Servicing Standards, they do test those that would cause the greatest harm to borrowers if violated. *See, e.g.*, Ex. E1 at 1-3 (establishing testing Metrics for erroneous foreclosure, incorrect denials of loan modification requests, and the accuracy of proofs of claim filed in bankruptcy). Although there are Metrics for the majority of the Servicing Standards, there is not a Metric for every Servicing Standard. As a result, there are over 100 Servicing Standards that are not covered by Metric testing and are not covered by the Potential Violation/cure procedure. States' Brief [Dkt. 176] at 4-5.

---

[8] "Party" means any party to the Consent Judgment—the Federal Government, the States, the District of Columbia, and the Servicer.

[9] Under Exhibit E § C(12), the Monitor can add up to three additional Metrics that relate to material terms of the Servicing Standards. The total of 33 Metrics includes three added by the Monitor on October 2, 2013. *See* Notice of Additional Metrics [Dkt. 84].

The enforcement process appears to have been working. On November 14, 2012, the Wells Fargo Internal Review Group (IRG) filed its First Quarterly Report indicating that Wells Fargo had not exceeded the threshold error rate for any of the tested Metrics. Monitor Report (6/18/13) [Dkt. 74] at 16. On February 14, 2013, the IRG filed the Second Quarterly Report stating that Wells Fargo had not exceeded the threshold error rate for any of the tested Metrics except for Metric 19. *Id*. at 17. Metric 19 tests whether Wells Fargo complied with Servicing Standards §§ IV(F)(2) & (3) regarding timely and accurate 5-day notices to borrowers whose loan modification applications are missing information, *see* Ex. A §IV(F)(2) (5-day Deficiency Notice), and whether Wells Fargo afforded borrowers 30 days to submit supplemental information, *see* Ex. A § IV(F)(3) (30-day Notice of Missing Information). *See also* Monitor Report (6/18/13) [Dkt. 74] at 31-32.

Metric 19 is assigned a threshold error rate of 5%, and Wells Fargo's national error rate was 7.84%, an error rate 2.84% over the threshold. For this analysis, the Monitor determined that the noncompliance was not widespread. *Id*. at 33. Wells Fargo proposed a corrective action plan, and the Monitor approved it in June 2013. *Id*. at 33-34. Subsequently, the Monitor determined that Wells Fargo satisfactorily implemented the corrective action plan. *See* Monitor Report (12/4/13) [Dkt. 123] at 24. Wells Fargo has since been in compliance with Metric 19. *See* Monitor Report (5/14/114) [Dkt. 163] at 20. In fact, Wells Fargo has not failed any other Metric. *See* Monitor Report (6/18/13) [Dkt. 74] at 16-17; Monitor Report (12/4/13) [Dkt. 123] at 9-12; Monitor Report (5/14/114) [Dkt. 163] at 7-10; Monitor Report (12/16/14) [Dkt. 195] at 7-10.

### B. Enforcement Actions

Critical to the Court's decision here, Exhibit E § J(2) of the Consent Judgment, provides that *any* Party or the Monitoring Committee can bring an enforcement action:

> 2. Enforcing Authorities. Servicer's obligations under this Consent Judgment shall be enforceable solely in the U.S. District Court for the District of Columbia. An enforcement action under this Consent Judgment may be brought by any Party to this Consent Judgment or the Monitoring Committee.

Ex. E § J(2).[10] This language is clear and unambiguous—even more so when construed in context.

Exhibit E foresees two types of enforcement actions: (1) actions alleging that the Servicer violated an "obligation" under the Consent Judgment; and (2) actions alleging that the Servicer failed to cure a "Potential Violation" of the Metrics as revealed by testing. Ex. E § J(3) (describing relief that is available "[i]n the event of an action to enforce the obligations of Servicer and to seek remedies for an uncured Potential Violation"). Section J(3) provides:

---

[10] Section J(2) further provides that notice must be given to the Monitoring Committee before commencing an enforcement action:

> [U]nless immediate action is necessary in order to prevent irreparable and immediate harm, prior to commencing any enforcement action, a Party must provide notice to the Monitoring Committee of its intent to bring an action to enforce this Consent Judgment. The members of the Monitoring Committee shall have no more than 21 days to determine whether to bring an enforcement action. If the members of the Monitoring Committee decline to bring an enforcement action, the Party must wait 21 additional days after such a determination by the members of the Monitoring Committee before commencing an enforcement action.

Ex. E § J(2). NYAG provided the requisite notice to the Monitoring Committee, and the Monitoring Committee declined to bring an enforcement action. Ex. 12 [Dkt. 86-14] (6/27/13 Committee Letter). NYAG filed its Motion To Enforce Consent Judgment on October 2, 2013, more than 21 days after the Monitoring Committee declined to bring an enforcement action.

> 3. Enforcement Action. In the event of an action to enforce the obligations of Servicer and to seek remedies for an uncured Potential Violation for which Servicer's time to cure has expired, the sole relief available in such an action will be:
>
> (a) Equitable Relief. An order directing non-monetary equitable relief, including injunctive relief, directing specific performance under the terms of this Consent Judgment, or other non-monetary corrective action.
>
> (b) Civil Penalties. The Court may award as civil penalties an amount not more than $1 million per uncured Potential Violation . . . Nothing in this Section shall limit the availability of remedial compensation to harmed borrowers as provided in Section E.5.
>
> (c) Any penalty or payment owed by Servicer pursuant to the Consent Judgment shall be paid to the clerk of the Court or as otherwise agreed by the Monitor and the Servicer and distributed by the Monitor . . . .

The Consent Judgment does not define the word "obligation." Exhibit E uses "obligation" broadly to refer to any promise, duty, or responsibility—*i.e.*, to refer to servicing standards, *see* Ex. E §§ C(25), K; consumer relief requirements, *see id*. §§ C(7), (11); payment obligations, *see id*. §§ D(1), (6); and the responsibility to cure Potential Violations, *see id*. § E(5). *See also* Ex. F (Federal Release) & Ex. G (State Release) (both using the term "obligation" without any limitation). In contrast, the Consent Judgment expressly defines "Potential Violation." As explained above, a Potential Violation occurs when the Servicer exceeds the threshold error rate on a Servicing Standard that is tested by a Metric. Ex. E § E(1).

The remedies that a Party or the Monitoring Committee may seek in enforcing an "obligation" versus a "Potential Violation" are different, as provided in § J(3) (quoted in pertinent part above). When the parties to the Consent Judgment or the Monitoring Committee sue to enforce an "obligation," they may seek only non-monetary equitable relief, *see* Ex. E § J(3)(a). When they sue the Servicer for failure to cure a Potential Violation in a timely manner,

they can seek a civil penalty.[11] *See id*. § J(3)(b). There is no provision for a civil penalty for a suit to enforce an obligation.

The broad right of a Party or the Monitoring Committee to file an enforcement action as provided by § J(2) is limited by § E(6), which provides that "[i]n the event a Potential Violation is cured . . . , then no Party shall have any remedy under this Consent Judgment . . . with respect to such Potential Violation." Thus, a suit on a cured Potential Violation is prohibited. Section E(6) supplies a safe harbor that *precludes* an enforcement action when the Monitor cites the Servicer for a Potential Violation and the Servicer successfully and timely cures the Potential Violation. Section E(6) *allows* an enforcement action when the Monitor notifies the Servicer of a Potential Violation and the Servicer fails to cure it. Obviously, the cure process for a Potential Violation must run its course before suit on an uncured Potential Violation can be filed. The Servicer has a *right* to cure under § E(2). To be clear, because § E(6) only allows suit on *uncured* Potential Violations, in the first instance only the Monitor can enforce Servicing Standards that are covered by a Metric.

Section E(6) is narrow. It does not restrict enforcement actions to uncured Potential Violations. It does not restrict enforcement actions to Servicing Standards tested by Metrics. Therefore, suits to enforce Servicing Standards not measured by a Metric and suits to enforce other "obligations" under the Consent Judgment are allowed.

The Servicing Standards for which there are Metrics are enforceable through monitoring and notice of Potential Violation by the Monitor; only if not timely cured can a Party sue. *See* Ex. E § E(6) ("[i]n the event a Potential Violation is cured . . . , then no Party shall have

---

[11] NYAG does not base its Motion to Enforce Consent Judgment on an uncured Potential Violation. Instead, it moves to enforce Servicing Standards and seeks only non-monetary equitable relief. NYAG Reply [Dkt. 116] at 3-4.

any remedy under this Consent Judgment . . . with respect to such Potential Violation."). This framework bars NYAG's Motion to Enforce Consent Judgment to the extent it is premised on Wells Fargo's failure to comply with Servicing Standards §§ IV(F)(2) and (3), *i.e*. Wells Fargo's alleged failure to timely and accurately send 5-day notices to borrowers regarding missing information required by Ex. A § IV(F)(2) (5-day Deficiency Notice) and Wells Fargo's alleged failure to afford borrowers 30 days to submit supplemental information as required by Ex. A § IV(F)(3) (30-day Notice of Missing Information). The Monitor cited Wells Fargo for a Potential Violation of Metric 19, due to violations of Servicing Standards §§ IV(F)(2) and (3). Wells Fargo timely cured the Potential Violation, and under § E(6), no Party can sue Wells Fargo on past performance of Servicing Standards §§ IV(F)(2) and (3).

Section E(6) also bars NYAG's Motion To Enforce Consent Judgment to the extent that NYAG seeks to enforce Servicing Standard § IV F(4) (30-day Notice of Disposition) because this Servicing Standard is tested via Metric 20. Despite repeated testing since the quarter ending September 2012, the Monitor has never cited Wells Fargo for a Potential Violation of Metric 20. *See* Monitor Report (6/18/13) [Dkt. 74] at 16-17; Monitor Report (12/4/13) [Dkt. 123] at 9-12; Monitor Report (5/14/114) [Dkt. 163] at 7-10; Monitor Report (12/16/14) [Dkt. 195] at 7-10. Only the Monitor has the authority to enforce Servicing Standards measured by a Metric (such as the § IV F(4) 30-day Notice of Disposition) in the first instance.

That leaves NYAG with a Motion To Enforce Consent Judgment premised only upon Wells Fargo's alleged failure to comply with Servicing Standards § IV(F)(1) (3-day Acknowledgment) and § IV(A)(4) (Prompt Delivery of Final Modification Agreement), which do not have an associated Metric. Wells Fargo contends that NYAG cannot premise an enforcement action on failure to comply with these Servicing Standards. Wells Fargo argues that

NYAG can *only* file an enforcement action for uncured Potential Violations, pursuant to the language of § J(3). This argument goes too far.

Section J(3) does not state that it is the exclusive remedy for enforcing all Servicing Standards. Equally important, it does not state that there is no remedy for the violation of a Service Standard that is not covered by a tested Metric. Section J(3) does not delineate when or what type of an enforcement action may be filed. It presupposes that an action has been filed by stating "[i]n the event of an action to enforce the obligations of Servicer and to seek remedies for an uncured Potential Violation for which Servicer's time to cure has expired . . .", and then § J(3) proceeds to limit the type of relief available. Wells Fargo reads limitations into § J that simply do not exist. If enforcement of the Consent Judgment were limited to uncured Potential Violations, the more than 100 Servicing Standards that are not tested by a Metric could not be enforced. As noted above, the key operative language is found in § J(2), which provides:

> Servicer's obligations under this Consent Judgment shall be enforceable solely in the U.S. District Court for the District of Columbia. An enforcement action under this Consent Judgment may be brought by any Party to this Consent Judgment or the Monitoring Committee.

And while § E(6) prohibits suits on cured Potential Violations, § E(6) does not restrict enforcement actions outside the scope of Metric testing. Because the Court is required to give effect to all of the terms of the Consent Judgment, *see Mastrobuono*, 514 U.S. at 63, the Court finds that (1) only the Monitor can enforce Servicing Standards covered by a Metric unless there has been a failure to cure and (2) the parties and the Monitoring Committee can sue to enforce (a) uncured Potential Violations of Servicing Standards covered by a Metric and (b) Servicing Standards that are outside the Metric testing/Potential Violation process.

Wells Fargo also argues that when a Servicing Standard is not tested by a Metric, the only way that a Plaintiff can enforce compliance is to petition the Monitor to add a Metric

under § C(12) or under § C(23)-(25). Section C(12) permits the Monitor to add up to three Metrics that are similar to the Metrics already established and that relate to a material term of the Servicing Standards. As noted above, the Monitor added the maximum number of Metrics it could add under § C(12). *See* Notice of Additional Metrics [Dkt. 84]. Sections C(23)-(25) provide a process whereby the Monitor can expand his oversight and add Metrics if it finds that the Servicer has "engaged in a pattern of noncompliance with a material term of the Servicing Standards that is reasonably likely to cause harm to borrowers." *See* Ex. E § C(23). These terms do not limit a Party's right to enforce the Consent Judgment.

Wells Fargo also reads § C as limiting enforcement of the Consent Judgment because § C(5) provides that it is the responsibility of the Monitor to determine, via the Metric testing process, whether the Servicer is complying with the Servicing Standards. Wells Fargo misapprehends § C. Section C is titled "Monitor" and it includes the following subsections: Retention and Qualifications and Standard of Conduct, § C(1)-(4); Monitor's Responsibilities § C(5)-(6); Internal Review Group § C(7)-(10); Work Plan, § C(11)-(15); Monitor's Access to Information, § C(16)-(21); and Monitor's Powers, § C(22)-(25). Section C sets forth the responsibilities of the Monitor, describes how compliance with Servicing Standards and consumer relief standards will be tested, and specifies how Metrics can be added. It does not address or limit enforcement actions. It does not limit the ability of the parties or the Monitoring Committee to bring an enforcement action. Moreover, enforcement is covered by § J, tellingly titled "Enforcement." To reiterate, § J(2) broadly provides that an enforcement action may be brought by any Party or the Monitoring Committee.

Nonetheless, NYAG's Motion to Enforce Consent Judgment will be denied for failure to allege a breach of the Consent Judgment.[12] NYAG alleges that Wells Fargo failed to comply with the Servicing Standards regarding 97 out of the approximately 450,000 loans that Wells Fargo services in the State of New York. This amounts to less than .022% of the New York loans serviced by Wells Fargo; it represents an even smaller percentage if compared to the total number of mortgage loans serviced by Wells Fargo nationwide.

In reaching the national settlement, the parties agreed to limits on enforcement suits in return for the large monetary payments by the banks, totaling $25 billion. As explained above, such limits on enforcement bar NYAG from bringing an action based on Servicing Standards §§ IV(F)(2)-(4). Many of NYAG's complaints of noncompliance regarding the 97 loans relate to such barred claims. As for the remaining two types of claim, *i.e.* that Wells Fargo failed to comply with Servicing Standards § IV(F)(1) (3-day Acknowledgment) and § IV(A)(4) (Prompt Delivery of Final Modification Agreement), NYAG asserts 41 violations of Servicing Standard § IV(F)(1) and only 11 violations of Servicing Standard § IV(A)(4). These 52 alleged violations represent a mere .012% of New York loans serviced by Wells Fargo.

The Consent Judgment does not require absolute perfection in loan servicing. The Parties understood this, and thus they negotiated threshold error rates for each Metric, ranging from 1% to 10%. *See, e.g.*, Monitor Report (12/16/14) [Dkt. 195] at 7-8. Errors amounting to .012% of New York loans are just too few to constitute a breach of the Consent Judgment. As Wells Fargo points out, "[t]he Court is ill-suited to regulate the mortgage industry

---

[12] Because NYAG's motion in essence brings a complaint for breach of contract, it must state a claim under Federal Rule of Civil Procedure 12(b)(6). Like a complaint, the Motion to Enforce Consent Judgment must contain sufficient factual matter, accepted as true, to state a claim for relief that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

in such detail on an ongoing basis," *see* Opp'n [Dkt. 114] at 20, and it was the Parties' intent in drafting the Consent Judgment to avoid such a result.

To permit NYAG to enforce failures to comply with the Servicing Standards that are so insubstantial would open the floodgates to lawsuits, running afoul of the core purpose of the Consent Judgment—to resolve problems in the mortgage industry with monitoring and compliance and without litigation. No Party, and certainly not this Court, envisioned penny-ante enforcement actions regarding compliance with the Consent Judgment.[13] For this reason, and to protect the Court's ability to manage its docket efficiently, NYAG's Motion to Enforce Consent Judgment will be denied for failure to allege a breach of contact.

## IV.  CONCLUSION

For the reasons set forth above, NYAG's Motion to Enforce Consent Judgment [Dkt. 86] will be denied. A memorializing Order accompanies this Opinion.

Date:  February 2, 2015                                  /s/
                                                         ROSEMARY M. COLLYER
                                                         United States District Judge

---

[13] While the Court stayed discovery and briefing on the factual issues presented in NYAG's Motion to Enforce Consent Judgment in order to consider the threshold legal issue regarding whether NYAG has the right to bring an enforcement action, the Court now finds that further briefing on the factual allegations is not necessary.